**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LISA PAGE,<br><br>        Plaintiff,<br><br>    v.<br><br>U.S. DEPARTMENT OF JUSTICE,<br>950 Pennsylvania Avenue NW,<br>Washington, D.C. 20530,<br><br>and<br><br>FEDERAL BUREAU OF<br>INVESTIGATION,<br>935 Pennsylvania Avenue NW,<br>Washington, D.C. 20535<br><br>        Defendants. | Case No. 1:19-CV-3675-TSC |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

For the reasons stated in the accompanying memorandum, Defendants respectfully request that the Court enter summary judgment in Defendants' favor pursuant to Federal Rule of Civil Procedure 56.

Dated: March 13, 2020

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Grace X. Zhou*
GRACE X. ZHOU
(NY Bar No. 83836)
BRADLEY P. HUMPHREYS
Trial Attorneys
U.S. Department of Justice

Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Phone: (202) 616-8267
Fax: (202) 616-8460
Grace.X.Zhou@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LISA PAGE, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 1:19-cv-3675-TSC |
| v. | ) |
| | ) |
| U.S. DEPARTMENT OF JUSTICE, | ) |
| 950 Pennsylvania Avenue NW, | ) |
| Washington, D.C. 20530, | ) |
| | ) |
| and | ) |
| | ) |
| FEDERAL BUREAU OF | ) |
| INVESTIGATION, | ) |
| 935 Pennsylvania Avenue NW, | ) |
| Washington, D.C. 20535 | ) |
| | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 3

I.  Plaintiff's FBI Tenure ................................................................................................ 3

II.  The Department's Discovery of Plaintiff's Text Messages ................................. 3

III.  The Department's Disclosure to the News Media ............................................... 6

IV.  This Lawsuit ............................................................................................................ 10

STANDARD OF REVIEW .............................................................................................. 10

ARGUMENT ..................................................................................................................... 11

I.  The FBI is Entitled to Summary Judgment Because the Agency Did Not Disclose Plaintiff's Text Messages to the Media on December 12, 2017. ..................................... 11

II.  The Department is Entitled to Summary Judgment Because the Department's Disclosure Was Permissible Under the Privacy Act. ......................................................... 13

    A.  The Department's Disclosure of Plaintiff's Text Messages to the Media Was Compatible with the Purposes for Which Those Records were Collected. .................................................................................................... 14

    B.  The Department's Disclosure of Plaintiff's Text Messages to the Media Falls Within a Routine Use Published in the Federal Register. ............................ 17

III.  Plaintiff Is Not Entitled to Damages Even if the Department's Disclosure Contravened the Privacy Act. ......................................................................................... 23

CONCLUSION ................................................................................................................. 27

# TABLE OF AUTHORITIES

**Cases**

*Albright v. United States*,
732 F.2d 181 (D.C. Cir. 1984) ............................................................................................ 23

*American Civil Liberties Union v. U.S. Department of Justice*,
655 F.3d 1 (D.C. Cir. 2011) ...................................................................................... 19, 20

*\*Ames v. U.S. Dep't of Homeland Security*,
861 F.3d 238 (D.C. Cir. 2017) ................................................................ 13, 15, 17

*Augustus v. McHugh*,
825 F. Supp. 2d 245 (D.D.C. 2011) ........................................................................ 14

*Bigelow v. Dep't of Defense*,
217 F.3d 875 (D.C. Cir. 2000) ................................................................................ 13

*\*Britt v. Naval Investigative Serv.*,
886 F.2d 544 (3d Cir. 1989) .......................................................................... 14, 15

*Budik v. United States*,
949 F. Supp. 2d 14 (D.D.C. 2013) .................................................................. 13, 17

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ...................................................................................... 11, 23

*Chichakli v. Tillerson*,
882 F.3d 229 (D.C. Cir. 2018) ................................................................................ 14

*\*Citizens for Responsbility and Ethics in Wash. (CREW) v. U.S. Dep't of Justice*,
746 F.3d 1082 (D.C. Cir. 2014) ...................................................................... 20, 21

*Dep't of Air Force v. Rose*,
425 U.S. 352 (1976) ................................................................................................ 20

*Dutton v. U.S. Dep't of Justice*,
302 F. Supp. 3d 109 (D.D.C. 2018) ........................................................................ 19

*Kimberlin v. Dep't of Justice*,
139 F.3d 944 (D.C. Cir. 1998) ................................................................................ 21

*Logan v. Dep't of Veterans Affairs*,
357 F. Supp. 2d 149 (D.D.C. 2004) ........................................................................ 11

*Maydak v. United States,*
   630 F.3d 166 (D.C. Cir. 2010) ................................................................................ 11, 23, 24

*McCready v. Nicholson,*
   465 F.3d 1 (D.C. Cir. 2006) ................................................................................ 14

*Military Audit Project v. Casey,*
   656 F.2d 724 (D.C. Cir. 1981) ................................................................................ 19

*Mori v. Dep't of the Navy,*
   731 F. Supp. 2d 43 (D.D.C. 2010) ................................................................................ 10

*Nat'l Archives and Records Admin. v. Favish,*
   541 U.S. 157 (2004) ................................................................................ 20

*Pro-Football, Inc. v. Harjo,*
   284 F. Supp. 2d 96 (D.D.C. 2003) ................................................................................ 10

*Radack v. U.S. Dep't of Justice,*
   402 F. Supp. 2d 99 (D.D.C. 2005) ................................................................................ 13

*Reed v. Dep't of the Navy,*
   910 F. Supp. 2d 32 (D.D.C. 2012) ................................................................................ 11, 13, 24

*Sussman v. U.S. Marshals Serv.,*
   494 F.3d 1106 (D.C. Cir. 2007) ................................................................................ 23, 25, 26

*Tijerina v. Walters,*
   821 F.2d 789 (D.C. Cir. 1987) ................................................................................ 24

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press,*
   489 U.S. 749 (1989) ................................................................................ 19, 20

*U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO,*
   9 F.3d 138 (D.C. Cir. 1993) ................................................................................ 15

*United States v. Flynn,*
   411 F. Supp. 3d 15 (D.D.C. 2019) ................................................................................ 5, 6

**Statutes**

5 U.S.C. § 552 ................................................................................ 18

5 U.S.C. § 552(b)(6) ................................................................................ 18

5 U.S.C. § 552(b)(7)(C) ................................................................................ 18

5 U.S.C. § 552a(a)(5) ................................................................................................ 14

5 U.S.C. § 552a(a)(7) ................................................................................................ 13

5 U.S.C. § 552a(b) .................................................................................................... 13

5 U.S.C. § 552a(b)(3) ................................................................................................ 13

5 U.S.C. § 552a(b)(9) ................................................................................................ 21

5 U.S.C. § 552a(e)(4)(D) ........................................................................................... 13

5 U.S.C. § 552a(g)(4) .......................................................................................... 23, 26

42 U.S.C. § 2000ee-1 ................................................................................................ 17

Pub. L. No. 99-508, 100 Stat. 1848 (Oct. 21, 1986) ................................................. 13

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................. 10

Fed R. Civ. P. 56(c) .................................................................................................. 11

**Legislative Materials**

*Oversight Hearing with Deputy Attorney General Rod Rosenstein Before the
   H. Comm. on the Judiciary*, 115 Cong. 37 (2017) ............................................. 9, 25

*Analysis of House and Senate Compromise Amendments to the Federal Privacy Act*,
   120 Cong. Rec. 40,405 (1974) ........................................................................... 14, 24

**Regulations**

28 C.F.R. § 50.2 ........................................................................................................ 18

*72 Fed. Reg. 36,725 (July 5, 2007) ............................................................... 9, 14, 18

**Other Authorities**

*A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice
   in Advance of the 2016 Election*, June 2018, https://www.justice.gov/file/1071991/
   downloadOIG ..................................................................................................... *passim*

*Mueller Removed Top Agent in Russia Inquiry Over Possible Anti-Trump Texts*, NY Times (Dec.
   2, 2017), https://nyti.ms/2Vtis8m ............................................................................ 6

*Review of Four FISA Applications and other Aspects of the FBI's Crossfire Hurricane Investigation*, December 2019, https://www.justice.gov/storage/120919-examination.pdf/ ........................................................ 5

*Top FBI Official Assigned to Mueller's Probe Said To Have Been Removed After Sending Anti-Trump Texts*, Washington Post (Dec. 2, 2017), https://wapo.st./2T22Rv0 ................................ 6

## INTRODUCTION

During her tenure at the Federal Bureau of Investigation ("FBI" or "the Bureau"), Plaintiff Lisa Page served as an attorney on two of the most high-profile investigations in recent memory. From February 2016 to mid-2017, Plaintiff acted as the Deputy Director's Special Counsel and liaison to both the investigation into former Secretary of State Hillary Clinton's use of a private email server and the investigation into Russian interference in the 2016 presidential election.

In the summer of 2017, a review by the Department of Justice ("Department") Office of the Inspector General ("OIG") of the Clinton investigation uncovered over 40,000 text messages that Plaintiff had exchanged with the FBI Deputy Assistant Director in charge of the investigative teams, Peter Strzok, on their FBI-issued mobile devices. These text exchanges contained political opinions about the 2016 presidential election, including statements of hostility toward then-candidate Trump and statements of support for candidate Clinton. As OIG noted, many of the messages also appeared to mix political opinions with discussions about the ongoing investigations, raising questions as to whether Plaintiff's and Mr. Strzok's political opinions may have affected their investigative decisions.

Several months later, in December 2017, news about Plaintiff's text messages with the Deputy Assistant Director broke. Shortly thereafter, committee chairmen of the House and Senate requested that the Department turn over the relevant text messages to Congress for oversight purposes. To comply with these requests, the Department obtained a subset of Plaintiff's messages that OIG identified as particularly inappropriate and processed the messages to redact purely personal or law enforcement sensitive information. As expressly permitted by the Privacy Act, the Department released the redacted messages to Congress on December 12, 2017. Given the significant public interest in the Clinton and Russia investigations and the strong likelihood that

Congress would disclose the messages in a selective fashion, the Department ultimately concluded that it was in the public interest for the Department to release the subset of the text messages to the media that same day.  Before authorizing the disclosure, however, the Department obtained legal advice from its Privacy Act expert as to whether the proposed disclosure would be lawful.  After reviewing the messages with proposed redactions, the expert concluded that the Department's proposed disclosure would be permissible pursuant to a published routine use that was compatible with the purpose for which the records were collected.

Plaintiff now claims in the instant suit against the Department and the FBI that the December 12, 2017 disclosure of her text messages to the media violated the Privacy Act.  Plaintiff's Privacy Act claim has no basis in law or fact.  Plaintiff cannot maintain a Privacy Act claim against the FBI because the record clearly establishes that the Department—not the Bureau—authorized the disclosure at issue.  And Plaintiff's Privacy Act claim against the Department fails as well.  Even assuming that the text messages at issue were records covered by the Privacy Act, as Plaintiff alleges, the Department's disclosure falls within the "routine use" exemption to the Act.  A published routine use allows disclosures to the media unless the disclosure would constitute an unwarranted invasion of personal privacy, and here, the public interest in the disclosure of these records outweighed any privacy interest in them.  But even if Plaintiff could somehow establish that the Department's disclosure was inconsistent with its published routine use, she still cannot prevail on her claim for damages because any violation cannot be considered willful or intentional where the decisionmaker did his due diligence and reasonably believed the disclosure was lawful.

Accordingly, the Court should enter summary judgment in favor of Defendants.

## FACTUAL BACKGROUND

### I.      Plaintiff's FBI Tenure

Plaintiff Lisa Page was employed by the FBI as a GS-15 level attorney from 2012 until her resignation in May 2018.  Compl. ¶¶ 13, 70, ECF 1.  During her time at the Bureau, Plaintiff served in a variety of positions, including as Special Counsel to then-Deputy Director, Andrew McCabe, starting in February 2016.  *Id.* ¶¶ 13–14; *see also A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election*, June 2018 ("OIG Report") at 397, https://www.justice.gov/file/1071991/downloadOIG.

In her role as Special Counsel, Plaintiff participated in some of the most high-profile FBI investigations in recent memory.  For instance, Plaintiff acted as Deputy Director McCabe's liaison to the team investigating former Secretary of State and presidential candidate Hillary Clinton's use of a private email server to send government communications (the "Midyear investigation").  Compl. ¶ 14; OIG Report at 397.  Plaintiff was also assigned "the same liaison function" on the team that investigated the Russian government's efforts to interfere in the 2016 presidential election (the "Crossfire Hurricane investigation").  OIG Report at 397.  After former FBI Director Robert S. Mueller, III, was appointed Special Counsel over the Russia investigation in May 2017, Plaintiff completed a 45-day detail on the Special Counsel's staff.  Compl. ¶ 17; OIG Report at 397.

### II.     The Department's Discovery of Plaintiff's Text Messages

In January 2017, the Department's Office of the Inspector General ("OIG") began a review of various actions by the FBI and the Department in connection with the Midyear investigation.  OIG Report at i.  The review was initiated "in response to requests from Congress, various organizations, and members of the public."  *Id.*  As part of its review, OIG requested and received

text messages from FBI-issued mobile devices for personnel involved in the Midyear investigation, including those sent and received by Plaintiff, for the period spanning from when the Midyear investigation began through July 1, 2017. *Id.* at 395–96 & 397 n.198.

In reviewing the collected messages, OIG identified over 40,000 texts that Plaintiff had exchanged with Peter Strzok, the Deputy Assistant Director of the FBI who led the Midyear and Crossfire Hurricane investigations, on their FBI-issued work cell phones. *Id.* at 396–97. Some of those messages expressed political opinions about the candidates and issues involved in the 2016 Presidential election, "including statements of hostility toward then candidate Trump and statements of support for candidate Clinton." *Id.* at 396. In addition, OIG found that "[s]everal of their text messages also appeared to mix political opinions with discussions about the Midyear and Russia investigations," which raised questions as to whether Plaintiff's and Mr. Strzok's political opinions may have affected their investigative decisions. *Id.*

Although OIG ultimately found no evidence that "improper considerations, including political bias, directly affected the specific investigative decisions" of the Midyear team, *id.* at iii, it concluded that Plaintiff's text messages with Mr. Strzok "cast a cloud over the FBI Midyear investigation and sowed doubt [on] the FBI's work on, and its handling of, the Midyear investigation," *id.* at xi. OIG pointed to, in particular, Plaintiff's August 8, 2016 text exchange with Mr. Strzok, in which she asked for reassurance that candidate Trump would not become President, and he responded: "No. No he won't. We'll stop it." *Id.* at ix. According to the OIG Report, this exchange gave rise to the implication that Plaintiff and Mr. Strzok were "willing[] to take official action to impact a presidential candidate's electoral prospects." *Id.* at 497. The OIG Report is also replete with other examples of how Plaintiff's text messages with Mr. Strzok potentially indicated or created the appearance that investigative decisions were impacted by bias

or improper considerations.[1]  *See, e.g., id.* at 401 ("In connection with a discussion about how

many people from the FBI and Department should be present during a potential interview of former

Secretary Clinton, [Plaintiff] stated in a February 24, 2016 text message to Strzok, 'One more

thing: she might be our next president.  The last thing you need us going in there loaded for bear.");

*id.* at 403 ("In an exchange on August 6, 2016, [Plaintiff] forwarded Strzok a news article relating

to Trump's criticism of the Khans (the Gold Star family who appeared at the Democratic National

Convention) and stated, 'Jesus. You should read this.  And Trump should go f himself.' . . . She

then sent another text message, 'And maybe you're meant to stay where you are because you're

meant to protect the country from that menace.'").

OIG informed the Special Counsel and then-Deputy Attorney General Rod Rosenstein of

the text messages on July 27, 2017.  OIG Report at 397; Declaration of Rod Rosenstein ¶ 5

("Rosenstein Decl.") (Exhibit 1).[2]  Afterward, Mr. Strzok was removed from the Special Counsel's

investigation on July 28, 2017.  OIG Report at 397; Rosenstein Decl. ¶ 7.  Plaintiff had already

ended her detail at the Special Counsel's office and returned to her previous role at the FBI at that

point.  *Id.*  On November 30, 2017, the Department also disclosed the existence of the text

---

[1] OIG also examined Plaintiff's text messages with Mr. Strzok during its later review of actions by the Department and the FBI during the Crossfire Hurricane investigation.  *See Review of Four FISA Applications and the other Aspects of the FBI's Crossfire Hurricane Investigation*, December 2019 ("Second OIG Report") at i, iii, 66–69, https://www.justice.gov/storage/120919-examination.pdf.  Although OIG did not find documentary or testimonial evidence that political bias or other improper considerations influenced the decision to open the Crossfire Hurricane investigation, *id.* at iii, its report again highlighted that the text messages between Plaintiff and Mr. Strzok that "appeared to mix political opinions and discussion of the investigation," *id.* at 66, creating the appearance of potential bias.

[2] The declarations attached to Defendants' Motion were previously filed in *Strzok v. Barr*, No. 19-cv-2367-ABJ (D.D.C.).  They are equally applicable here given that both cases allege Privacy Act claims arising out of the Department's December 12, 2017 disclosure of the text messages between Plaintiff and Mr. Strzok to the news media.

messages and their general content to defense counsel as potentially exculpatory information in a criminal prosecution arising out of the Special Counsel's investigation. *See United States v. Flynn*, 411 F. Supp. 3d 15, 24 (D.D.C. 2019) ("On November 30, 2017, . . . [t]he government informed defense counsel that the DOJ's Inspector General ('IG') reviewed allegations involving certain electronic communications of Peter Strzok . . . that showed a preference for a presidential candidate. This included information about certain text messages between Mr. Strzok and former FBI attorney Lisa Page[.]").

## III.    The Department's Disclosure to the News Media

On December 2, 2017, the *New York Times* and the *Washington Post* both reported on the existence of politically charged text messages between Plaintiff and Mr. Strzok, and Mr. Strzok's subsequent removal from the Special Counsel's investigation. *See Top FBI Official Assigned to Mueller's Probe Said To Have Been Removed After Sending Anti-Trump Texts*, Washington Post (Dec. 2, 2017), https://wapo.st/2T22Rv0; *Mueller Removed Top Agent in Russia Inquiry Over Possible Anti-Trump Texts*, NY Times (Dec. 2, 2017), https://nyti.ms/2Vtis8M. Shortly thereafter, several House and Senate committee chairmen contacted the Department, requesting that the text messages referenced in the articles be produced to Congress for oversight purposes. *See* Rosenstein ¶ 8; Declaration of Stephen Boyd ¶ 7 ("Boyd Decl.") (Exhibit 2).

In order to respond to those congressional requests, the Associate Deputy Attorney General ("ADAG")—a career Department employee responsible for managing congressional oversight— requested copies of the relevant text messages from OIG. Rosenstein Decl. ¶ 9. OIG then provided the Department with a subset of the text messages that it had collected between Plaintiff and Mr. Strzok that "OIG identified as inappropriate and particularly troubling." *Id.*; *see also* Boyd Decl.

¶ 8.  The text messages were processed to redact purely personal and law enforcement sensitive information.  *See* Boyd Decl. ¶¶ 9–10; Declaration of Peter Winn ¶ 16 ("Winn Decl") (Exhibit 3).

Then-Deputy Attorney General Rod Rosenstein was scheduled to testify before the House Judiciary Committee on December 13, 2017, at an oversight hearing.  Rosenstein Decl. ¶ 10.  On December 12, he learned that the text messages from OIG were ready to release to the Senate and House Committees that had requested them.  *Id.* ¶ 10.  Although Mr. Rosenstein's staff "presented [him] with the option of delaying disclosure for one day" so that he would not have to "receive the inevitable harsh criticism of the FBI" during his testimony before the House Judiciary Committee the next day, Mr. Rosenstein concluded that "it would be inappropriate to withhold the messages for that reason."  *Id.* ¶ 14.  Instead, he determined that the redacted text messages should immediately be released to Congress because there was no law enforcement or privacy interest that would warrant their withholding, and the messages were arguably relevant to the congressional hearing the next day.  *See id.* ¶¶ 10, 14.

In making his decision, Mr. Rosenstein "expressly asked [his] staff whether OIG objected to providing the messages to Congress," and was "advised that OIG did not raise any objection and that the disclosure would not interfere with any ongoing investigation."  *Id.* ¶ 11.[3]  He also asked whether Plaintiff or Mr. Strzok had any overriding privacy interest in the text messages that would prevent disclosure and "understood that they did not" because the messages "(1) were sent on government phones with the knowledge that they were subject to review by [the] FBI; (2) were

---

[3]  As the Inspector General explained in his December 15, 2017 letter to the leadership of Congressional oversight committees, OIG did not object to the Department's release of the text messages to Congress, but noted the Department would need to determine whether any legal restrictions limited its ability to do so.  The Inspector General also stated in his letter that the Department did not consult OIG regarding the disclosure to the media.  *See* https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/nadler%20raskin %20response%20letter.pdf.

so inappropriate and intertwined with their FBI work that they raise[d] concerns about political bias influencing official duties; and (3) the redacted portions proposed for disclosure were not sufficiently personal in nature." *Id.* ¶ 13. Accordingly, Mr. Rosenstein authorized the Department's Office of Legislative Affairs ("OLA") to immediately disclose the relevant text messages to the congressional oversight committees. *Id.* ¶ 14. OLA made a hard-copy production of the redacted text messages to the congressional committees on the evening of December 12, 2017. Boyd Decl. ¶ 11.

The Department's Office of Public Affairs ("OPA") recommended providing the text messages to the media "because otherwise, some congressional members and staff were expected [to] release them intermittently before, during, and after the hearing, exacerbating the adverse publicity for Mr. Strzok, Ms. Page, and the Department. The disclosure obviously would adversely affect public confidence in the FBI, but providing the most egregious messages in one package would avoid the additional harm of prolonged selective disclosures and minimize the appearance of the Department concealing information that was embarrassing to the FBI." Rosenstein Decl. ¶ 15.

Before authorizing OPA to release the text messages to the media, however, Mr. Rosenstein wanted to confirm that it would not violate the Privacy Act. Accordingly, the ADAG consulted with Peter Winn, Director of the Office of Privacy and Civil Liberties and Acting Chief Privacy and Civil Liberties Officer, to ensure that the disclosure of the text messages to the media would be permissible under the Privacy Act. *Id.* ¶ 16; *see also* Winn Decl. ¶ 4. As described in his accompanying declaration, Mr. Winn reviewed the relevant messages with the proposed redactions on December 12, 2017. Winn Decl. ¶ 4. Assuming that the text messages came from an OIG system of records, Mr. Winn considered that OIG's relevant Systems of Records Notice,

or SORN, permits compatible disclosures "[t]o the news media and the public, including disclosures pursuant to 28 C.F.R. § 50.2, unless it is determined that release of the specific information in the context of a particular case would constitute an unwarranted invasion of personal privacy." *Id.* ¶¶ 9–10 (quoting 72 Fed. Reg. 36,725, 36,726 (July 5, 2007)).  Based on his review of the text messages provided to him, Mr. Winn concluded that the public interest outweighed the privacy interests of Plaintiff and Mr. Strzok and thus, the relevant routine use would permit disclosure. *Id.* ¶¶ 9–18.  Accordingly, Mr. Winn determined that the Department's disclosure of the text messages would not violate the Privacy Act and relayed this conclusion to the ADAG. *Id.* ¶ 18; *see also* Rosenstein Decl. ¶ 16.

The ADAG reported Mr. Winn's conclusion to Mr. Rosenstein, who "with the express understanding that it would not violate the Privacy Act and that the text messages would become public by the next day in any event," authorized OPA to disclose the same subset of text messages that were being provided to Congress to the news media on December 12, 2017.  Rosenstein Decl. ¶¶ 16–17.  "The decision to disclose the text messages to the media was based on the understanding that the text messages would become public when the Department provided them to Congress, and that releasing them all at once would further the goal that the Department be forthcoming with the public—consistent with [its] duties to safeguard law enforcement information, protect public safety and national security, preserve privileges and respect valid privacy interests of employees and citizens—even when information is damaging to the Department." *Id*. ¶ 18.

In fact, Mr. Rosenstein openly acknowledged that he authorized the disclosure of Plaintiff's text messages to the media on behalf of the Department during his testimony before the House Judiciary Committee on December 13, 2017.  *See Oversight Hearing with Deputy Attorney General Rod Rosenstein Before the H. Comm. on the Judiciary*, 115 Cong. 37, 63 (2017).  He also

acknowledged that the Department had invited reporters to view the text messages at its offices.
*See id.*  The Department made subsequent productions to Congress of text messages between
Plaintiff and Mr. Strzok.  Boyd Decl. ¶ 11.

## IV.    This Lawsuit

Plaintiff filed this action against the Department and the FBI on December 10, 2019.  *See*
Compl., ECF No. 1.  The complaint alleges a single claim—that the December 12 disclosure of
Plaintiff's text messages to the news media violated the Privacy Act, §§ 552a(b), (g)(1)(D).  *Id.*
¶¶ 81–89.  According to Plaintiff, the December 12 disclosure violated her rights under the Privacy
Act because it "was not compatible with the purpose" for which her text messages were collected
and "was not otherwise a permissible 'routine use' of those records under [the Act]."  *Id.* ¶ 86.
Specifically, Plaintiff alleges that "DOJ and/or FBI officials disclosed [her text] messages to
reporters for multiple improper reasons[,] including to elevate DOJ's standing with the President."
*Id.* ¶ 4.

## STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides that a court "shall grant
summary judgment if the movant shows that there is no genuine dispute as to any material fact and
the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Although a court
should draw all inferences from the supporting records submitted by the nonmoving party, the
mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment."  *Pro-*
*Football, Inc. v. Harjo*, 284 F. Supp. 2d 96, 112 (D.D.C. 2003).  Rather, the dispute must regard a
question of fact that is material, meaning that it is "capable of affecting the substantive outcome
of the litigation."  *Id.*  That is determined by "look[ing] to the substantive law on which each claim
rests."  *Mori v. Dep't of the Navy*, 731 F. Supp. 2d 43, 45 (D.D.C. 2010).  The dispute must also

be genuine, meaning that it is "supported by sufficiently admissible evidence such that a reasonable

trier-of-fact could find for the nonmoving party." *Pro-Football*, 284 F. Supp. 2d at 112.  The non-

moving party's opposition must, accordingly, consist of more than unsupported allegations or

denials, and must be supported by affidavits, declarations, or other competent evidence setting

forth specific facts in order to demonstrate a genuine issue for trial.  *See* Fed R. Civ. P. 56(c);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## ARGUMENT

**I.     The FBI is Entitled to Summary Judgment Because the Agency Did Not Disclose Plaintiff's Text Messages to the Media on December 12, 2017.**

As a threshold matter, Plaintiff's Privacy Act claim against the FBI necessarily fails

because, as evidenced by the sworn declarations attached to Defendants' motion, the Bureau did

not disclose Plaintiff's text messages to the press on December 12, 2017.  To succeed on a claim

for monetary damages under § 552a(g)(1)(D) of the Privacy Act, Plaintiff must establish four

elements: "1) the disclosed information is a 'record' contained within a 'system of records'; 2) the

agency improperly disclosed the information; 3) the disclosure was willful or intentional; and 4)

the disclosure adversely affected [Plaintiff]."  *Reed v. Dep't of the Navy*, 910 F. Supp. 2d 32, 40

(D.D.C. 2012) (quoting *Logan v. Dep't of Veterans Affairs*, 357 F. Supp. 2d 149, 154 (D.D.C.

2004)); *see also Maydak v. United States*, 630 F.3d 166, 178 (D.C. Cir. 2010).  Because the

Department—not the FBI—made the disclosure at issue, Plaintiff cannot maintain her Privacy Act

claim against the Bureau.

In support of their request for summary judgment, Defendants submit a declaration from

then-Deputy Attorney General Rod Rosenstein, who undisputedly authorized the December 12

disclosure on behalf of the Department.  *See generally* Rosenstein Decl.  Mr. Rosenstein's

declaration clearly attests that he made the decision to release Plaintiff's text messages to the media

on December 12, 2017, after consulting with senior Department officials.  *See id.* ¶¶ 16–18.  As described in his declaration, the Department initially requested and received from OIG copies of Plaintiff's text messages with Mr. Strzok in order to respond to several congressional requests for the text messages.  *Id.* ¶¶ 8–9.  On December 12, 2017, Mr. Rosenstein authorized the Department's Office of Legislative Affairs to "disclose the relevant text messages to the congressional oversight committees," after determining that there was no basis to withhold them. *Id.* ¶ 14.  The Department's Office of Public Affairs then suggested providing the text messages to the media as well "because, otherwise, some congressional members and staff were expected [to] release them intermittently before, during, and after the [congressional] hearing" scheduled for the next day.  *Id.* ¶ 15.  After confirming that the Department's Privacy Act expert concluded the disclosure would not violate the Privacy Act, Mr. Rosenstein authorized OPA to release redacted versions of the text messages to the media.  *Id.* ¶ 17.

Mr. Rosenstein's account of the December 12, 2017 disclosure is corroborated by the sworn declarations of Peter Winn, the Acting Chief Privacy and Civil Liberties Officer, who performed the Privacy Act analysis, *see generally* Winn Decl., and Stephen Boyd, the head of OLA, who coordinated the production of copies of the text messages to Congress, *see generally* Boyd Decl.  Critically, all three declarations confirm that the Department—not the FBI—obtained the relevant text messages from OIG, assessed the Privacy Act implications of releasing Plaintiff's texts to the media, authorized the disclosure, and coordinated the release of the text messages to the media.  Indeed, Plaintiff's complaint itself is devoid of any factual allegations about the FBI's involvement.   Although Plaintiff alleges that "DOJ and/or FBI officials retrieved" her text messages and "disclosed them to reporters," Compl. ¶¶ 65, all of the supporting factual allegations in her complaint pertain only to the Department, *see, e.g.*, *id.* ¶ 65 (alleging that "DOJ officials

requested and obtained copies of the 375 text messages from OIG"); *id.* ¶¶ 50–55 (describing the Department's alleged process of releasing the text messages to reporters); *id.* ¶ 47 (describing the Department's alleged motive for releasing the text messages).

Given Defendants' conclusive evidence that the Department—not the FBI—was responsible for the December 12, 2017 disclosure, the Court should enter summary judgment in favor of the FBI.

## II.     The Department is Entitled to Summary Judgment Because the Department's Disclosure Was Permissible Under the Privacy Act.

Plaintiff also cannot prevail on her Privacy Act claim against the Department because the December 12, 2017 disclosure to the news media was permissible under the "routine use" exemption to the Privacy Act.  *See* 5 U.S.C. § 552a(b)(3).  Although the Privacy Act, Pub. L. No. 99-508, 100 Stat. 1848 (1986) (codified as amended 5 U.S.C. § 552a), "generally prohibits government agencies from disclosing personnel files" without "written request by, or without the prior written consent of, the individual to whom the record pertains," *Bigelow v. Dep't of Defense*, 217 F.3d 875, 876 (D.C. Cir. 2000); U.S.C. § 552a(b), an agency may properly disclose a protected record pursuant to any one of a dozen enumerated exemptions, *see* 5 U.S.C. § 552a(b). Accordingly, where a plaintiff "cannot establish that disclosure was improper, [s]he cannot, as a matter of law, succeed under the Privacy Act." *Reed*, 910 F. Supp. 2d at 41.

At issue in this case is whether the "routine use" exemption to the Privacy Act, 5 U.S.C. § 552a(b)(3), applies to the Department's disclosure of Plaintiff's text messages to the news media. The D.C. Circuit has held that, "[t]o fit within the confines of the routine use exception . . . , an agency's disclosure of a record must be both (i) 'for a purpose which is compatible with the purpose for which it was collected' and (ii) within the scope of a routine use notice published by the agency." *Ames v. U.S. Dep't of Homeland Security*, 861 F.3d 238, 240 (D.C. Cir. 2017) (citing

U.S.C. § 552a(a)(7), 552a(e)(4)(D)); *see also Budik v. United States*, 949 F. Supp. 2d 14, 28 (D.D.C. 2013) (describing the "compatibility" and "publication" requirements); *Radack v. U.S. Dep't of Justice*, 402 F. Supp. 2d 99, 105 (D.D.C. 2005) (same).

The routine use at issue here is the one in an OIG SORN that permits disclosures of information maintained in OIG's systems of records "[t]o the news media and the public . . . unless it is determined that release of the specific information in the context of a particular case would constitute an unwarranted invasion of personal privacy." Winn Decl. ¶¶ 9–10; *see also* 72 Fed. Reg. 36, 725, 36,726 (July 5, 2007). As discussed below, even assuming that Plaintiff's text messages were contained in an OIG system of records,[4] as Plaintiff alleges, *see* Compl. ¶ 63, no reasonable juror could conclude that the Department violated the Privacy Act because the disclosure clearly satisfies both the "compatibility" and "publication" requirements of the routine use exemption.

### A. The Department's Disclosure of Plaintiff's Text Messages to the Media Was Compatible with the Purposes for Which Those Records were Collected.

To assess compatibility, courts conduct a "dual inquiry into the purpose for the collection of the record in the specific case and the purpose of the disclosure." *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 548–49 (3d Cir. 1989); *see also Chichakli v. Tillerson*, 882 F.3d 229, 233 (D.C. Cir. 2018). This inquiry is independent of, and unaffected by, an agency's published routine

---

[4] The fact that Plaintiff's text messages came from OIG does not necessarily mean that they were contained in a "system of records," as that term is used in the Privacy Act. *See* 5 U.S.C. § 552a(a)(5) (defining "system of records" as "a group of any records under the control of any agency form which information is retrieved by the name of the individual or by some . . . identifying particular assigned to the individual"). If, for instance, OIG did not retrieve the text messages at issue by using a personal identifier for Plaintiff, then those messages do not qualify as protected records under the Privacy Act. *See McCready v. Nicholson*, 465 F.3d 1, 17 (D.C. Cir. 2006); *Augustus v. McHugh*, 825 F. Supp. 2d 245, 256 (D.D.C. 2011). The Court need not resolve this issue, however, because Defendants are willing to assume, for the purposes of this Motion, that Plaintiff's text messages were contained in an OIG system of records.

uses and is intended to act as a check on the "unnecessary exchange of information to another person or to agencies who may not be as sensitive to the collecting agency's reasons for using and interpreting the material." *Analysis of House and Senate Compromise Amendments to the Federal Privacy Act*, *reprinted in* 120 Cong. Rec. 40,405, 40,406 (1974)).  Although the D.C. Circuit has yet to "definitely determine[] the precise meaning of 'compatible,'" *Ames*, 861 F.3d at 240 n.1, the court has cited approvingly to the test articulated by the Third Circuit: Whether a "concrete relationship or similarity" exists "between the disclosing agency's purpose in gathering the information and in its disclosure." *U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 9 F.3d 138, 145 (D.C. Cir. 1993) (citing *Britt*, 886 F.2d at 549–50); *see also Ames*, 861 F.3d at 240 n.1.  Under that test, an agency need only demonstrate a "meaningful degree of convergence" between collection and disclosure.  *Britt*, 886 F.2d at 549.

Here, the Department's stated purpose for OIG's review of the Midyear investigation and rationale for the December 12, 2017 disclosure are one and the same: to shed light on potential government misconduct.  As described in the OIG Report, Plaintiff's text messages were collected as part of OIG's review of various actions by the FBI and the Department in connection with the Midyear investigation.  The purpose of that review—consistent with OIG's statutory mandate to "prevent and detect fraud and abuse," 5 U.S.C. § App. 3, § 2—was to respond to public and congressional concerns regarding the DOJ's and FBI's handling of the Midyear investigation.  *See* OIG Report at i.  Mr. Rosenstein's declaration demonstrates that the same public transparency rationale motivated the Department's disclosure of Plaintiff's text messages to the news media. He attests: "The decision to disclose . . . was based on the understanding that the text messages would become public when the Department provided them to Congress, and that releasing them all at one time would further the goal that the Department be forthcoming with the public . . . even

when information is damaging to the Department."  Rosenstein Decl. ¶ 18; *see also id.* ¶¶ 5, 13 (noting that the text messages raised concerns about political bias influencing official duties).  His account is corroborated by Mr. Winn, who confirms that the disclosure was motivated by the Department's desire to "be as open and transparent with the public as possible, consistent with the law and established Department policy."  Winn Decl. ¶ 6.

Also relevant to the compatibility analysis is the fact that OIG's collection of information relevant to its review—including the text messages at issue in this case—later culminated in a publicly available report, which itself described some of those text messages.  *See* OIG Report at 395–410.  Plaintiff can hardly argue that disclosure of the text messages collected through the OIG's review is incompatible with the purpose of the collection of those messages, when the ultimate product of OIG's review was a report that also disclosed many of the same messages publicly.

The Court should not credit Plaintiff's speculation that the Department, in fact, disclosed Plaintiff's text messages to the media in order to "elevate DOJ's standing with the President." Compl. ¶ 4.  Not only are Plaintiff's purely speculative allegations about the Department's motives conclusively refuted by the sworn declarations of Mr. Rosenstein and Mr. Winn, they do not follow as a matter of common sense.  Had Mr. Rosenstein wished "to promote the false narrative that Plaintiff and others at the FBI were biased against President Trump," *id.* ¶ 3, as Plaintiff alleges, he could have waited for Congress to disclose the messages the very next day without any concern regarding the Privacy Act.  Although Plaintiff hypothesizes that Mr. Rosenstein released the texts to the media on December 12 to avoid criticism at the hearing for failing to respond to congressional oversight requests, *id.* ¶ 43, those requests had been pending for, at most, ten days. *See* Rosenstein Decl. ¶ 8.  Plaintiff's theory that the Department disclosed the texts to the media

to curry favor with the President, in response to his "months-long barrage of criticism" against the Department and Attorney General Sessions, Compl. ¶ 44, is also inconsistent with the fact that the Office of the Deputy Attorney General learned of the texts in the summer of 2017 but didn't release them until December 12. *See* Rosenstein Decl. ¶ 5; Compl. ¶ 19.

Accordingly, speculation aside, the compatibility requirement is easily satisfied on the facts of this case. *See Ames*, 861 F.3d at 240 n.1 (noting that, at most, compatibility requires "a nexus approaching an identity of purpose").

### B. The Department's Disclosure of Plaintiff's Text Messages to the Media Falls Within a Routine Use Published in the Federal Register.

Assuming that the disclosed text messages were contained in an OIG system of records, the disclosure at issue also satisfies the publication requirement. *See Ames*, 861 F.3d at 240 (requiring the agency to show that its disclosure falls "within the scope of a routine use notice published by the agency"); *Budik,* 949 F. Supp. 2d at 30 (same). In support of their request for summary judgment, Defendants submit the declaration of Peter Winn, the Director of the Office of Privacy and Civil Liberties, and the Acting Chief Privacy and Civil Liberties Officer. Mr. Winn is the senior Department official responsible for providing authoritative legal advice and guidance to the Department's leadership regarding whether disclosures fall within a routine use contained in a component's SORN. *See* Winn Decl ¶¶ 3–4; *see also* 42 U.S.C. § 2000ee-1 (requiring the Attorney General to designate privacy and civil liberties officers); Director, Office of Privacy and Civil Liberties, Director, Office of Privacy and Civil Liberties, https://www.justice.gov/legal-careers/job/director-office-privacy-and-civil-liberties (explaining that the Office of Privacy and Civil Liberties "provides legal advice and guidance" to, among other things, "[e]nsure[] the Department's privacy compliance, including compliance with the Privacy Act of 1974").

17

Mr. Winn's declaration leaves no doubt that, in assessing whether the Department's proposed disclosure fell under the routine use exemption to the Privacy Act, he looked to OIG's published SORN, which describes the purpose, scope, uses, management, and maintenance of its investigative records.   Winn Decl ¶ 9; *see also* 72 Fed. Reg. 36,725 (July 5, 2007) ("OIG's SORN").   After reviewing the text messages, Mr. Winn concluded that disclosure of Plaintiff's text messages to the media would be consistent with Routine Use (k) of OIG's SORN, which expressly permits disclosures "to the news media and the public, including disclosures pursuant to 28 C.F.R. § 50.2, unless it is determined that release of the specific information in the context of a particular case would constitute an unwarranted invasion of personal privacy."  *See* Winn Decl. ¶¶ 11, 18 (quoting 72 Fed. Reg. at 36,726).   There can be no dispute, then, that the Department's disclosure relied on a routine use published in the Federal Register.

The Department's reliance, moreover, was clearly proper.   Routine Use (k) closely tracks the language from Exemptions 6 and 7(C) of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.   *Compare* 72 Fed. Reg. at 36, 726 (permitting disclosures "[t]o the news media . . . unless it is determined that release of the specific information would constitute an unwarranted invasion of personal privacy"), *with* 5 U.S.C. § 552(b)(6) (exempting from disclosure "personnel or medical files . . . the disclosure of which would constitute a clearly unwarranted invasion of personal privacy"), *and id.* § 552(b)(7)(C) (exempting from disclosure "records or information compiled for law enforcement purposes" the disclosure of which "could reasonably be expected to constitute an unwarranted invasion of personal privacy").   Accordingly, the Department's practice has been to treat the "unwarranted invasion of personal privacy" limitation in its routine uses as requiring the same analysis required under the FOIA's Exemptions 6 and 7(C).   Winn Decl. ¶ 11. That is, the Department does not disclose records to the public or to news media under this routine use if

18

such a disclosure "could reasonably be expected to constitute an unwarranted invasion of privacy." *See id.* (quoting 5 U.S.C. § 552(b)(7)(C)).

In evaluating a withholding under Exemption 6 and/or 7(C), courts routinely rely on the declarations of agency officials to determine whether the agency properly weighed the private interests at stake versus the public interest in disclosure. *See Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981) (explaining that a court may award summary judgment in a FOIA action based on information provided by the agency through declarations that describe "the documents and the justifications for nondisclosure with reasonably specific detail;" that "demonstrate that the information withheld logically falls within the claimed exemption[s];" and that "are not controverted by either contrary evidence in the record nor by evidence of agency bad faith"); *Dutton v. U.S. Dep't of Justice*, 302 F. Supp. 3d 109, 124 (D.D.C. 2018) (granting the government's summary judgment motion with respect to withholdings under Exemptions 6 and 7(C) on the basis of an agency declaration). Defendants respectfully submit that the Court should do the same here.

The test for whether the release of particular information constitutes an "unwarranted" invasion of privacy under Exemption 7(C), requires "balanc[ing] the public interest in disclosure against the privacy interest Congress intended the Exemption to protect."[5] *Am. Civ. Liberties Union (ACLU) v. U.S. Dep't of Justice*, 655 F.3d 1, 6 (D.C. Cir. 2011) (quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 776 (1989)). Critically, the

---

[5] Although Mr. Winn cited both Exemption 6 and Exemption 7(C) in his Privacy Act analysis, *see* Winn Decl. ¶ 11, the Court need only assess the disclosure at issue under the Exemption 7(C) standard. As the D.C. Circuit noted in *American Civil Liberties Union v. U.S. Department of Justice*, 655 F.3d 1, 6 (D.C. Cir. 2011), "Exemption 7(C) is more protective of privacy than Exemption 6;" therefore, a disclosure that satisfies Exemption 7(C) will necessarily satisfy Exemption 6.

public interest analysis centers not on "the particular purpose for which the document is being requested," but instead, "the nature of the requested document and its relationship to the basic purpose of the [FOIA] 'to open agency action to the light of public scrutiny.'" *Reporters Comm.*, 489 U.S. at 772 (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976) (citation omitted)). Information that sheds light on an agency's performance of its statutory duties, for example, falls squarely within that statutory purpose. *Id.* at 773; *see also Nat'l Archives and Records Admin. v. Favish*, 541 U.S. 157, 174 (2004) (holding that there is a public interest in disclosure where a requester produces "evidence that would warrant a belief by a reasonable person" that government impropriety has occurred). On the privacy interest side of the scale, courts consider, among other factors, the nature of the information being released and its availability in the public sphere. *See Citizens for Responsibility and Ethics in Wash. (CREW) v. U.S. Dep't of Justice*, 746 F.3d 1082, 1092 (D.C. Cir. 2014) (noting that an individual's "obvious privacy interest in keeping secret the fact that he was the subject of an FBI investigation" is "diminished" when there is a well-publicized announcement of that very fact); *see also ACLU*, 655 F.3d at 7–9.

Applying the balancing test here, it is clear that Mr. Winn properly concluded that the Department's disclosure would not constitute an "unwarranted" invasion of privacy. To begin, Mr. Winn's analysis cited multiple reasons why Plaintiff had a diminished privacy interest in the text messages at issue. *See* Winn Decl. ¶¶ 13–16. *First*, the messages were exchanged on a Department-issued mobile device, which was subject to monitoring. *Id.* ¶ 14. *Second*, the fact that Plaintiff's communications "exhibited very strong political opinions about an individual who was the subject of an ongoing FBI investigation," and was exchanged with another "high-ranking FBI official," should have put her on notice that "these texts would have been subject to review by others in the Department and possibly even the subject of a FOIA request or disclosed in

connection with discovery in a possible criminal prosecution." *Id.* ¶¶ 13–15. *Third*, "because the public had already become aware" of Plaintiff's and Mr. Strzok's identities through the December 2, 2017 news reports, "there appeared to be no way to mitigate the invasion of privacy that would accompany the release of the texts by redacting their names." *Id.* ¶ 16. The fact that purely personal information in the messages was redacted, moreover, only further reduces Plaintiff's privacy interest. *Id. Finally*, the text messages were slated for release to Congress—as is permitted by the Privacy Act, *see* 5 U.S.C. § 552a(b)(9)—and Deputy Attorney General Rosenstein was scheduled to testify publicly at a Congressional hearing the next day "where he was expected to be asked questions about [the] text messages." Winn Decl. ¶ 16.

On the other hand, the public interest in disclosure was significant. Upon reviewing the messages, Mr. Winn determined that "the texts displayed what a reasonable person could consider to constitute bias." Winn Decl. ¶ 17; *see also* Rosenstein Decl. ¶¶ 5, 13. This, in turn, "risked undermining public confidence in the objectivity and impartiality of the work of the FBI and the Department, given that the apparent bias concerned individuals who figured prominently" in the Clinton and Russia investigations. Winn Decl. ¶ 17; *see also* OIG Report at xi (concluding that Plaintiff's text messages with Mr. Strzok "cast a cloud over the FBI Midyear investigation and sowed doubt [on] the FBI's work on, and its handling of, the Midyear investigation"). Mr. Winn also noted that "the appearance of possible bias in this matter . . . involved the potential exercise of government power against a citizen." Winn Decl. ¶ 17. Such an appearance of bias in connection with criminal investigations conducted by the FBI was more than sufficient to shift the presumption away from protecting personal privacy to one favoring public transparency. *See CREW*, 746 F.3d at 1092–93 (holding that there is "a weighty public interest in shining a light on the FBI's investigation of major political corruption"); *Kimberlin v. Dep't of Justice*, 139 F.3d

944, 949 (D.C. Cir. 1998) (noting that, "when balancing the public interest in disclosure against the private interest in exemption," courts may consider "the rank of the public official involved and the seriousness of the misconduct alleged").

Moreover, the fact that the OIG's review involving the text messages was ongoing as of December 12, 2017, does not mean the Department could not have made a good faith determination that their release was in the public interest, as Plaintiff alleges. *See* Compl. ¶ 87 ("Ms. Page's privacy interest was not outweighed by any public interest in the messages' release. Indeed, prior to the disclosure on December 12, DOJ and/or FBI officials could not in good faith have determined that public disclosure was warranted on that basis, given the preliminary nature of OIG's review of the text messages."). Mr. Rosenstein specifically asked his staff whether OIG objected to providing the messages to Congress. He was advised "that OIG did not raise any objection and that the disclosure would not interfere with any ongoing investigation." Rosenstein Decl. ¶ 11. While, as noted above, the Department did not consult OIG regarding the disclosure of the texts to the media, that was a foregone conclusion of the disclosure to Congress. *See* Winn Decl. ¶ 16. Accordingly, the Department properly relied on Mr. Winn's considered judgment that the December 12, 2017 disclosure fell within OIG's published routine use because the public interest in disclosure outweighed Plaintiff's privacy interest in her text messages.

*       *       *

Because the Department's disclosure of Plaintiff's text messages to the media would fall within a compatible, published routine use exception—assuming the records were contained in an OIG system of records, as Plaintiff alleges—the Court should also enter summary judgment in the favor of the Department.

22

**III.    Plaintiff Is Not Entitled to Damages Even if the Department's Disclosure Contravened the Privacy Act.**

Even if the Court were to find that the Department's December 12, 2017 disclosure violated the Privacy Act, Plaintiff still cannot prevail on her claim for monetary damages because she cannot establish that the disclosure was "intentional or willful." 5 U.S.C. § 552a(g)(4).  Where a complaint is based on a violation of § 552a(g)(1)(D) of the Privacy Act—as Plaintiff's claim is here—the D.C. Circuit has held that monetary damages are only available where "the agency acted in a manner which was intentional or willful." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) (quoting 5 U.S.C. § 552a(g)(4)).  In other words, an agency is only liable for an "intentional or willful failure . . . to abide by the Act, and not to all voluntary actions which might otherwise inadvertently contravene . . . the [Act][.]" *Albright v. United States*, 732 F.2d 181, 189 (D.C. Cir. 1984).  Therefore, "proof of intent or willfulness is a *necessary* element of [the plaintiff's Privacy Act] claim[], and failure to provide supporting evidence [will] lead to summary judgment in favor of the [defendants]." *Sussman*, 494 F.3d at 1122 (emphasis added) (citing *Celotex Corp.*, 477 U.S. at 322–23).

To succeed on her Privacy Act claim, then, Plaintiff must show that the Department disclosed her text messages to the media "without grounds for believing it to be lawful, or by flagrantly disregarding [her] rights under the Act." *Sussman*, 494 F.3d at 1122.  This is a high bar. In distinguishing between inadvertent and intentional violations of the Privacy Act, the D.C. Circuit has assembled a variety of tests: whether a "violation [is] so patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful"; whether the violation was "committ[ed] without grounds for believing it to be lawful"; and whether the violator acted in "flagrant[] disregard of others' rights under the Act." *Id.* (citations omitted); *see also Maydak*, 630 F.3d at 182.  At bottom, these tests set forth a standard of agency conduct that is

"greater than gross negligence." *Tijerina v. Walters*, 821 F.2d 789, 799 (D.C. Cir. 1987) (quoting *Analysis of House and Senate Compromise Amendments to the Federal Privacy Act*, reprinted in 120 Cong. Rec. 40,405–06 (1974)).

Significantly, courts have found no willful or intentional violation where there is affirmative evidence that the defendant did its "due diligence before releasing the documents." *Reed*, 910 F. Supp. 2d at 44.  For example, the court in *Reed* held that one alleged wrongdoer (Cooper) did not violate the Privacy Act because he conducted legal research and consulted with colleagues experienced in Privacy Act issues before deciding to disclose the information at issue. *Id.*  The Court held the same with respect to a second alleged wrongdoer (Carter) because he "was trained in the Privacy Act, was well aware of his duties under the Act, and asked Cooper to be present during the conference call with the [Charleston Police Department] to be sure that he did not inadvertently violate the Privacy Act." *Id.* at 44 n.1.  Courts have also credited affidavits from agency officials "explaining the motives and purposes of the [officials] who engaged in the disputed" disclosure. *See, e.g.*, *Maydak*, 630 F.3d at 181 (finding no Privacy Act violation where the BOP provided affidavits explaining the purpose behind its challenged photo retention policy).

Here, Mr. Rosenstein's, Mr. Winn's, and Mr. Boyd's sworn declarations demonstrate that the Department did not intentionally or willfully seek to violate the Privacy Act.  As Mr. Rosenstein explains, after receiving requests for the text messages between Plaintiff and Mr. Strzok from Congress, he sought guidance on whether providing those same text messages to the news media would be permissible under the Privacy Act.  *See* Rosenstein Decl. ¶ 16.  The Department contacted Mr. Winn—Director of the Office of Privacy and Civil Liberties and Acting Chief Privacy and Civil Liberties Officer—who has extensive expertise with regard to the Privacy Act and is the person within the Department responsible for providing authoritative advice and

guidance to the Department's leadership on the lawfulness of proposed disclosures under the Privacy Act, including whether a proposed disclosure would fall within a routine use contained in a component's SORN.  *See* Winn Decl. ¶¶ 3–4.  As described in his declaration, Mr. Winn reviewed the text messages at issue and analyzed whether the Privacy Act would permit disclosure, including a detailed weighing of Plaintiff's privacy interest in the messages against the public's interest in the information contained therein.  *See id.* ¶¶ 13–17.

Given the Department's thoughtful treatment of the December 12, 2017 disclosure—specifically with respect to any potential Privacy Act implications—Plaintiff cannot prove the requisite willfulness or intent to avail herself of damages under the Privacy Act.  Indeed, no reasonable finder of fact could conclude that the Department disclosed the text messages "without grounds for believing [its actions were] lawful," *Sussman*, 494 F.3d at 1122, when Mr. Rosenstein expressly attested that he understood, based on Mr. Winn's analysis, that the disclosure would not violate the Privacy Act.  *See* Rosenstein Decl. ¶¶ 16–17.  In fact, Mr. Rosenstein stated that "[he] would have ordered Department employees not to make the disclosure" if he "had believed that the disclosure was prohibited by the Privacy Act."  *Id.* ¶ 19.  None of Plaintiff's claims about the circumstances in which the Department's spokesperson allegedly disclosed the texts to the media, such as it being done after business hours, or that DOJ did not provide reporters with copies of the texts to take with them, *see* Compl. ¶¶ 45, 52–54, 87, has anything to do with Mr. Rosenstein or Mr. Winn's due diligence, legal analysis, or belief that disclosure would not violate the Privacy Act.  Mr. Rosenstein himself openly acknowledged the disclosure before Congress the next day, including the fact that the Department had invited reporters to view the text messages at its offices. *See Oversight Hearing with Deputy Attorney General Rod Rosenstein Before the H. Comm. on the Judiciary*, 115 Cong. 37, 63 (2017).

Nor is there any evidence—aside from Plaintiff's pure speculation about the Department's motives—that the Department "flagrantly disregard[ed]" Plaintiff's rights under the Privacy Act. *Sussman*, 494 F.3d at 1122.  To the contrary, Defendants' sworn declarations are replete with evidence that the Department gave due consideration to Plaintiff's privacy interests.  For example, the text messages were redacted to remove purely personal information in Plaintiff's text messages before releasing them precisely to safeguard Plaintiff's privacy.  *See* Boyd Decl. ¶¶ 9–10; Winn Decl. ¶ 16.  Moreover, as noted above, Mr. Winn specifically assessed the strength of Plaintiff's privacy interests in the text messages.  *See* Winn Decl. ¶¶ 13–17.  He ultimately concluded, however, that Plaintiff's privacy interests were weakened by the fact that (1) the communications took place on a Department-issued mobile device, *id.* ¶ 14; (2) "the public had already become aware of [her] name[]" through the December 2, 2017 news articles, *id.* ¶ 16; and (3) "the text messages would be disclosed to Congress," which "could have released the text messages itself without creating any Privacy Act implications," *id.*  Finally, Mr. Rosenstein—the ultimate decisionmaker for the Department with respect to the disclosure—separately weighed the privacy implications to Plaintiff of releasing the text messages to the media in one package versus allowing Congress to release them without any Privacy Act constraints.  *See* Rosenstein Decl. ¶ 15.  He attested that, based on the information available to him at the time, it was apparent that a disclosure by the Department would be preferable for both Plaintiff and the Department because, otherwise, "prolonged [and] selective disclosures" by Congress would have "exacerbat[ed] the adverse publicity" for both.  *Id.*

Accordingly, even if Plaintiff could somehow establish that the Department's December 12 disclosure violated the Privacy Act, the Court should still enter summary judgment in favor of

the Department because Plaintiff cannot prove that the disclosure was "intentional or willful," 5

U.S.C. § 552a(g)(4).

## CONCLUSION

For the above stated reasons, the Court should enter judgment in favor of Defendants.


Dated: March 13, 2020                          Respectfully submitted,

                                               JOSEPH H. HUNT
                                               Assistant Attorney General

                                               MARCIA BERMAN
                                               Assistant Branch Director

                                               */s/ Grace X. Zhou*
                                               GRACE X. ZHOU
                                               (NY Bar No. 83836)
                                               BRADLEY P. HUMPHREYS
                                               Trial Attorneys
                                               U.S. Department of Justice
                                               Civil Division, Federal Programs Branch
                                               1100 L Street, NW
                                               Washington, D.C. 20005
                                               Phone: (202) 616-8267
                                               Fax: (202) 616-8460
                                               Grace.X.Zhou@usdoj.gov

                                               *Counsel for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | |
| LISA PAGE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:19-CV-3675-TSC |
| v. | ) | |
| | ) | |
| U.S. DEPARTMENT OF JUSTICE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Civil Rule 7(h), Defendants hereby submit this Statement of Material Facts Not in Dispute in conjunction with their motion for summary judgment.

1.      Plaintiff Lisa Page was employed by the Federal Bureau of Investigation ("FBI" or the "Bureau") as a GS-15 level attorney from 2012 until her resignation in May 2018.  Compl. ¶¶ 13, 70, ECF 1.

2.      During her FBI tenure, Plaintiff served in a variety of positions, including as Special Counsel to then-Deputy Director, Andrew McCabe, starting in February 2016.  Compl. ¶¶ 13–14; *A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election*, June 2018 ("OIG Report") at 397, https://www.justice. gov/file/1071991/downloadOIG.

3.      In her role as Special Counsel, Plaintiff acted as Deputy Director McCabe's liaison to the team investigating former Secretary of State and presidential candidate Hillary Clinton's use of a private email server to send government communications (the "Midyear investigation").  Compl. ¶ 14; OIG Report at 397.

4.     Plaintiff was also assigned "the same liaison function" on the team that investigated the Russian government's efforts to interfere in the 2016 presidential election (the "Crossfire Hurricane investigation").  OIG Report at 397.

5.     After former FBI Director Robert S. Mueller, III, was appointed Special Counsel over the Russia investigation in May 2017, Plaintiff completed at 45-day detail on the Special Counsel's staff.  Compl. ¶ 17; OIG Report at 397.

6.     In January 2017, in response to requests from Congress, various organizations, and members of the public, OIG undertook a review of various actions by the FBI and the Department in connection with the Midyear investigation that Plaintiff participated in.  OIG Report at i.

7.     As part of that review, OIG requested and received text messages from FBI-issued mobile devices for personnel involved in the Midyear investigation, including those sent and received by Plaintiff, for the period when the Midyear investigation began through July 1, 2017. OIG Report at 395–96 & 397 n.198.

8.     In reviewing the collected text messages, OIG identified over 40,000 text messages exchanged on FBI-issued cell phones between Plaintiff and Peter Strzok, the Deputy Assistant Director of the FBI's Counterintelligence Division, who led the Midyear and Crossfire Hurricane investigations.  OIG Report at 396–97; *see also* Compl. ¶¶ 14–15, ECF 1, *Strzok v. Barr*, No. 19-cv-2367 (D.D.C. Aug. 6, 2019).  Some of those text messages expressed political opinions about candidates and issues involved in the 2016 Presidential election, "including statements of hostility toward then candidate Trump and statements of support for candidate Clinton."  OIG Report at 396.

9.      In addition, according to OIG, "[s]everal of their text messages also appeared to mix political opinions with discussions about the Midyear and Russia investigations." OIG Report at 396.

10.     Upon review of Plaintiff's text messages with Mr. Strzok, OIG was "particularly concerned" that certain texts "potentially indicated or created the appearance that investigative decisions [Plaintiff and Mr. Strzok] made were impacted by bias or improper considerations." OIG Report at ix, 329, 420.

11.     OIG pointed to, in particular, Plaintiff's August 8, 2016 text exchange with Mr. Strzok, which implied a willingness to take official action to impact a presidential candidate's electoral prospects. OIG Report at ix, 497. The OIG Report is replete with other examples of how Plaintiff's text messages with Mr. Strzok potentially indicated or created the appearance that investigative decisions were impacted by bias or improper considerations. *See, e.g.*, OIG report at 399–410.

12.     Although OIG ultimately found no evidence that "improper considerations, including political bias, directly affected the specific investigative decisions" of the Midyear team, it concluded that Plaintiff's text messages with Mr. Strzok "cast a cloud over the FBI's handling of the Midyear investigation and the investigation's credibility." OIG Report at iii.

13.     OIG informed the Special Counsel and then-Deputy Attorney General Rod Rosenstein of the text messages on July 27, 2017. OIG Report at 397; Declaration of Rod Rosenstein ¶ 5 ("Rosenstein Decl.") (Exhibit 1).

14.     Afterward, Mr. Strzok was removed from the Special Counsel's investigation on July 28, 2017. OIG Report at 397; Rosenstein Decl. ¶ 7. Plaintiff had already ended her detail at the Special Counsel's office and returned to the FBI at that point. *Id.*

15.     On November 30, 2017, the Department disclosed the existence of the text messages and their general content to defense counsel as potentially exculpatory information in a criminal prosecution arising out of the Special Counsel's investigation.  *See United States v. Flynn*, 411 F. Supp. 3d 15, 24 (D.D.C. 2019).

16.     On December 2, 2017, the *New York Times* and the *Washington Post* each reported on the existence of Plaintiff's text messages with Mr. Strzok and his removal from the Special Counsel's investigation.  *See* Compl. ¶¶ 36–37; *Top FBI Official Assigned to Mueller's Probe Said To Have Been Removed After Sending Anti-Trump Texts*, Washington Post (Dec. 2, 2017), https://wapo.st/2T22Rv0; *Mueller Removed Top Agent in Russia Inquiry Over Possible Anti-Trump Texts*, NY Times (Dec. 2, 2017), https://nyti.ms/2Vtis8M.

17.     Shortly thereafter, the chairmen of congressional committees in both the U.S. House of Representatives and the U.S. Senate ("Congressional Committees") made verbal and written inquiries to the Department regarding the existence and substance of the text messages. These inquiries included written requests for the Department to produce the text messages to Congress for oversight purposes.  *See* Rosenstein Decl. ¶ 8; Declaration of Stephen Boyd ¶ 7 ("Boyd Decl.") (Exhibit 2)

18.     In order to respond to those requests, the Associate Deputy Attorney General ("ADAG")—a career Department employee responsible for managing congressional oversight— requested copies of the relevant text messages from OIG.  Rosenstein Decl. ¶ 9.

19.     OIG then provided the Department with a subset of the text messages that it had collected between Plaintiff and Mr. Strzok that "OIG identified as inappropriate and particularly troubling."  Rosenstein Decl. ¶ 9; *see also* Boyd Decl. ¶ 8.

4

20.     The subset of text messages was processed to redact non-work-related personal and sensitive law enforcement information.  *See* Boyd Decl. ¶¶ 9–10; Declaration of Peter Winn ¶ 16 ("Winn Decl") (Ex. 3).

21.     Then-Deputy Attorney General Rod Rosenstein was scheduled to testify before the House Judiciary Committee on December 13, 2017, at an oversight hearing.  Rosenstein Decl. ¶ 10.

22.     On December 12, 2017, Mr. Rosenstein learned that the text messages from OIG were ready to release to the Senate and House Committees that had requested them.  Rosenstein Decl. ¶ 10.  Mr. Rosenstein determined that the redacted text messages should immediately be released to Congress because there was no law enforcement or privacy interest that would warrant their withholding, and the messages were arguably relevant to the House Judiciary Committee's hearing the next day.  *See id.* ¶¶ 10, 14.

23.     In making his decision, Mr. Rosenstein consulted his staff about whether OIG objected to providing the messages to Congress and was advised that OIG did not raise any objection and that the disclosure would not interfere with any ongoing investigation.  Rosenstein ¶ 11.  Mr. Rosenstein also confirmed that neither whether Plaintiff or Mr. Strzok had any overriding privacy interest in the text messages that would prevent disclosure.  *See id.* ¶ 13.

24.     After Mr. Rosenstein authorized the Department's Office of Legislative Affairs ("OLA") to disclose the relevant text messages to the Congressional Committees, the Department made its initial hard copy production of redacted text messages on the evening of December 12, 2017.  Rosenstein Decl. ¶ 14; Boyd Decl. ¶ 11.

25.     The Department's Office of Public Affairs ("OPA") recommended providing the text messages to the media "because otherwise, some congressional members and staff were

expected [to] release them intermittently before, during, and after the hearing, exacerbating the adverse publicity for Mr. Strzok, Ms. Page, and the Department.  The disclosure obviously would adversely affect public confidence in the FBI, but providing the most egregious messages in one package would avoid the additional harm of prolonged selective disclosures and minimize the appearance of the Department concealing information that was embarrassing to the FBI." Rosenstein Decl. ¶ 15.

26.     Before authorizing OPA to release the text messages to the media, Mr. Rosenstein wanted to confirm that it would not violate the Privacy Act.  Rosenstein Decl. ¶ 16.  Accordingly, the ADAG consulted with Peter Winn, Director of the Office of Privacy and Civil Liberties and Acting Chief Privacy and Civil Liberties Officer, to ensure that the disclosure of the text messages to the media would be permissible under the Privacy Act.  *Id*; *see also* Winn Decl. ¶ 4.

27.     Mr. Winn is the senior Department official responsible for providing authoritative legal advice and guidance to the Department's leadership regarding whether disclosures fall within a routine use contained in a component's System of Records Notice, or SORN.  *See* Winn Decl ¶¶ 3–4; *see also* 42 U.S.C. § 2000ee-1 (requiring the Attorney General to designate privacy and civil liberties officers); Director, Office of Privacy and Civil Liberties, Director, Office of Privacy and Civil Liberties, https://www.justice.gov/legal-careers/job/director-office-privacy-and-civil-liberties (explaining that the Office of Privacy and Civil Liberties "provides legal advice and guidance to, among other things, "[e]nsure[] the Department's privacy compliance, including compliance with the Privacy Act of 1974").

28.     As described in his accompanying declaration, Mr. Winn considered that the routine use in an OIG SORN, permits compatible disclosures "[t]o the news media and the public, including disclosures pursuant to 28 C.F.R. § 50.2, unless it is determined that release of the

specific information in the context of a particular case would constitute an unwarranted invasion of personal privacy." Winn Decl. ¶ 10 (quoting 72 Fed. Reg. 36,725, 36,726 (July 5, 2007)).

29.     The Department's practice has been to treat the "unwarranted invasion of personal privacy" limitation in its routine uses as requiring the same analysis required under the FOIA's Exemptions 6 and 7(C).  Winn Decl. ¶ 11.  That is, the Department does not disclose records to the public or to news media under this routine use if such a disclosure "could reasonably be expected to constitute an unwarranted invasion of privacy." *See id.* (quoting 5 U.S.C. § 552(b)(7)(C)).  This, in turn, requires balancing the public interest in the information against the privacy interest of the individual to which the record pertains. *Id.*

30.     Based on Mr. Winn's review of the text messages provided to him, and assuming the text messages were contained in an OIG system of records, Mr. Winn concluded that the public interest outweighed the privacy interest of Plaintiff and Mr. Strzok in the messages, and that the relevant routine use would permit disclosure. *See* Winn Decl. ¶¶ 9–18.

31.     In weighing Plaintiff's privacy interest, Mr. Winn considered the fact that "the text messages were exchanged between two high-ranking FBI officials, and that the text messages exhibited very strong political opinions about an individual who was the subject of an ongoing FBI investigation, an investigation in which both of the authors of the text messages appeared to be personally involved."  Winn Decl. ¶ 13.  Mr. Winn also considered that the communications took place not on personal devices, but on Department-issued mobile devices, which are subject to monitoring. *Id.* ¶ 14.

32.     In addition, because the public had already become aware of the names of Plaintiff and Mr. Strzok, there appeared to be no way to mitigate the invasion of privacy that would accompany the release of the texts by redacting the individuals' names.  Winn Decl. ¶ 16.  Mr.

Winn also considered the fact that non-work related personal information was redacted from the text messages and that Deputy Attorney General Rosenstein was scheduled to testify publicly at a Congressional hearing the next day "where he was expected to be asked questions about [the] text messages. *Id.*

33.     As to the public interest side of the balancing, Mr. Winn found that "the texts displayed what a reasonable person could constitute bias," which risked "undermining public confidence in the objectivity and impartiality of the work of the FBI and the Department."  Winn Decl. ¶ 17.  Mr. Winn also considered that "the appearance of bias in this matter also involved the potential exercise of government power against a citizen." *Id.*  Accordingly, Mr. Winn determined that "such an appearance of bias in connection with criminal investigations, was sufficient to shift the presumption away from protecting personal privacy to one favoring public transparency." *Id.*

34.     Mr. Winn concluded that the Department's disclosure of the text messages would not violate the Privacy Act and relayed this conclusion to the ADAG.  Winn Decl. ¶ 18; *see also* Rosenstein Decl. ¶ 16.

35.     The ADAG reported Mr. Winn's conclusion to Mr. Rosenstein, who "with the express understanding that it would not violate the Privacy Act and that the text messages would become public by the next day in any event," authorized OPA to disclose the same subset of text messages that were being provided to Congress to the news media on December 12, 2017. Rosenstein Decl. ¶ 17.

36.     Mr. Rosenstein's decision to disclose the text messages to the media was based on the understanding that the text messages would become public when the Department provided them to Congress, and that releasing them all at once would further the goal that the Department be forthcoming with the public—consistent with its duties to safeguard law enforcement

information, protect public safety and national security, preserve privileges and respect valid privacy interests of employees and citizens—even when information is damaging to the Department.  Rosenstein Decl. ¶ 18.

37.     In fact, Mr. Rosenstein openly acknowledged that he authorized the disclosure of Plaintiff's text messages to the media on behalf of the Department during his testimony before the House Judiciary Committee on December 13, 2017.  *See Oversight Hearing with Deputy Attorney General Rod Rosenstein Before the H. Comm. on the Judiciary*, 115 Cong. 37, 63 (2017).  He also acknowledged that the Department had invited reporters to view the text messages at its offices. *See id.*

38.     Mr. Rosenstein would not have authorized the disclosure of Plaintiff's text messages to the media on behalf of the Department if he had believed that the disclosure was prohibited by the Privacy Act.  Rosenstein Decl. ¶ 19.

39.     The Department made subsequent productions to Congress of texts between Plaintiff and Mr. Strzok.  Boyd Decl. ¶ 11.

Dated: March 13, 2020

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Grace X. Zhou*
GRACE X. ZHOU
(NY Bar No. 83836)
BRADLEY P. HUMPHREYS
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Phone: (202) 616-8267

Fax: (202) 616-8460
Grace.X.Zhou@usdoj.gov

*Counsel for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| LISA PAGE, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:19-CV-3675-TSC |
| v. | ) | |
| | ) | |
| U.S. DEPARTMENT OF JUSTICE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF GRACE ZHOU

I, Grace Zhou, do hereby declare and state as follows:

1.      I am a Trial Attorney for the United States Department of Justice, Civil Division, Federal Programs Branch.  I am one of the counsel for the Defendants in the above-captioned case.  I submit this declaration in support of the Defendants' Motion for Summary Judgment.  I make the following statements based on my personal knowledge and upon information furnished to me in the course of my official duties.

2.      Attached to Defendants' Motion for Summary Judgment as Exhibit 1 is a true and correct copy of the Declaration of Rod Rosenstein, dated January 17, 2020, which the government attached to its Reply in support of its Motion for Summary Judgment as to Count Three (Privacy Act) in *Strzok v. Barr*, No. 19-cv-2367 (D.D.C.), ECF 38.

3.      Attached to Defendants' Motion for Summary Judgment as Exhibit 2 is a true and correct copy of the Declaration of Stephen Boyd, dated November 15, 2019, which the government filed in support of its Motion for Summary Judgment as to Count Three (Privacy Act) in *Strzok v. Barr*, No. 19-cv-2367 (D.D.C.), ECF 30.

4.      Attached to Defendants' Motion for Summary Judgment as Exhibit 3 is a true and correct copy of the Declaration of Peter Winn, dated November 18, 2019, which the government filed in support of its Motion for Summary Judgment as to Count Three (Privacy Act) in *Strzok v. Barr*, No. 19-cv-2367 (D.D.C.), ECF 30.

5.      Defendants submit the aforementioned declarations in support of the instant Motion for Summary Judgment because the Privacy Act claim in this case arises from the same December 12, 2017 disclosure alleged in *Strzok*, 19-cv-2367.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct, and to the best of my knowledge and belief.

Executed on March 13, 2020.

Grace X. Zhou

Trial Attorney

*Page v. U.S. Dep't of Justice*, No. 1:19-CV-3675-TSC

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

PETER P. STRZOK,

      Plaintiff,

v.

ATTORNEY GENERAL WILLIAM F. BARR,
in his official capacity, et al.,

      Defendants.

</td>
<td>

)
)
)
)
)
)
)
)
)
)
)
)
)

</td>
<td>

Case No. 1:19-cv-2367-ABJ

</td></tr>
</table>

## DECLARATION OF ROD J. ROSENSTEIN

1.      I served in the United States Department of Justice (Department) from December 1990 until May 2019, first as a career employee and then as a political appointee. President Bush nominated me to serve as U.S. Attorney for Maryland, and following Senate confirmation, I took office in July 2005. I continued to serve under that appointment as U.S. Attorney for twelve years, until President Trump appointed me to serve as Deputy Attorney General (DAG). Following Senate confirmation, I took office in April 2017 and served until May 2019.

2.      My duties as DAG included, under the direction of the Attorney General, overseeing the Department's litigating divisions, law enforcement agencies and United States Attorney's Offices.

3.      The statements contained herein are based on my personal knowledge and other information I obtained while performing my official duties.

4.      On January 12, 2017, during the previous Administration, the Department's Inspector General (IG) announced that the Office of Inspector General (OIG) would conduct a review of allegations of impropriety by the FBI and Department in advance of the 2016 election,

including allegations of unauthorized leaks, improper considerations, and inappropriate public statements concerning the investigation of former Secretary Hillary Clinton's use of a private email server, which was closed in 2016.

5.        In the summer of 2017, the IG told me and the Special Counsel (SC) conducting the Russian election interference investigation that in the course of the ongoing review, the OIG had discovered that two high-level FBI employees, Peter Strzok and Lisa Page, used FBI phones to send text messages that might violate Department and FBI policies and raised concerns about whether overt partisan bias influenced their performance of their official duties.

6.        The issue was relevant to the SC because in addition to their involvement in the Clinton email investigation, Mr. Strzok and Ms. Page were working on the Russian election interference matter when I appointed the SC.

7.        The SC removed Mr. Strzok from his role in the ongoing SC investigation after learning about the text messages. Ms. Page had already left the investigation and moved on to other duties.

8.        On or about December 2, 2017, news reporters learned about the OIG review of the inappropriate text messages and reported about them. The Department then received requests for the text messages from several Senate and House committee chairs.

9.        In order to respond to those congressional requests, the Associate Deputy Attorney General (ADAG) responsible for managing congressional oversight—a career Senior Executive Service employee appointed to his position during the previous Administration—requested copies of relevant text messages from OIG. OIG provided a subset of the total universe of discovered text messages between Mr. Strzok and Ms. Page, specifically those messages that OIG identified as inappropriate and particularly troubling.

10.     I was scheduled to testify before the House Judiciary Committee on December 13, 2017, regarding the Committee's oversight of the Department and the FBI, and I did not expect to discuss the text messages. On December 12, 2017, however, I learned that the text messages were ready for release to the Senate and House Committees that had requested them, there was no basis to withhold them, and they arguably were relevant to the Judiciary Committee's oversight hearing.

11.     I expressly asked my staff whether OIG objected to providing the messages to Congress. I was advised that OIG did not raise any objection and that the disclosure would not interfere with any ongoing investigation.

12.     It was therefore my understanding that law enforcement interests would not justify withholding the text messages from Congress.

13.     I also asked whether Mr. Strzok and Ms. Page had any privacy interest in the text messages that would warrant withholding them from disclosure. I understood that they did not, because the materials proposed for release represented a subset of text messages written by Mr. Strzok and Ms. Page that (1) were sent on government phones with the knowledge that they were subject to review by FBI; (2) were so inappropriate and intertwined with their FBI work that they raised concerns about political bias influencing official duties; and (3) the redacted portions proposed for disclosure were not sufficiently personal in nature.

14.     Based on the information known to me on December 12, 2017, there was a legitimate congressional oversight interest and no valid basis to decline the congressional oversight request. My staff presented me with the option of delaying disclosure for one day, until after I testified, so that I would not be in the witness chair to receive the inevitable harsh criticism of the FBI that would follow the disclosure. I concluded that it would be inappropriate to withhold the

messages for that reason. I therefore authorized the Department's Office of Legislative Affairs (OLA) to disclose the relevant text messages to the congressional oversight committees.

15.     The Department's Office of Public Affairs (OPA) subsequently recommended providing the text messages to the media because otherwise, some congressional members and staff were expected release them intermittently before, during, and after the hearing, exacerbating the adverse publicity for Mr. Strzok, Ms. Page, and the Department. The disclosure obviously would adversely affect public confidence in the FBI, but providing the most egregious messages in one package would avoid the additional harm of prolonged selective disclosures and minimize the appearance of the Department concealing information that was embarrassing to the FBI.

16.     Before disclosing the text messages to the news media, I wanted to confirm that it would not implicate the Privacy Act. The career ADAG contacted the Department's Acting Chief Privacy and Civil Liberties Officer—also a career Senior Executive Service employee appointed to his position during the previous Administration—and reported to me that the Department's expert had concluded that disclosing the texts to the media would not violate the Privacy Act.

17.     On December 12, 2017, with the express understanding that it would not violate the Privacy Act and that the text messages would become public by the next day in any event, I authorized OPA to disclose to the news media the text messages that were being disclosed to congressional committees. I told my staff to notify Mr. Strzok's and Ms. Page's lawyers.

18.     The decision to disclose the text messages to the media was based on the understanding that the text messages would become public when the Department provided them to Congress, and that releasing them all at one time would further the goal that the Department be forthcoming with the public—consistent with our duties to safeguard law enforcement information, protect public safety and national security, preserve privileges and respect valid

4

privacy interests of employees and other citizens—even when information is damaging to the Department.

19.      If I had believed that the disclosure was prohibited by the Privacy Act, I would have ordered Department employees not to make the disclosure.

20.      I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct, to the best of my knowledge and belief.

Dated: _1/17/20_

ROD J. ROSENSTEIN

*Page v. U.S. Dep't of Justice*, No. 1:19-CV-3675-TSC

# Exhibit 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| PETER P. STRZOK, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 1:19-cv-2367-ABJ |
| ATTORNEY GENERAL WILLIAM F. BARR, in his official capacity, et al., | ) |
| Defendants. | ) |

### DECLARATION OF STEPHEN E. BOYD

I, Stephen E. Boyd, hereby declare:

1.      I serve as the Assistant Attorney General for Legislative Affairs at the United States Department of Justice (Department).  I have held this position since August 9, 2017.

2.      I head the Department's Office of Legislative Affairs (OLA), which is generally responsible for managing the Department's relationship with Congress.  OLA represents the Department's interests on Capitol Hill, develops and implements strategies to advance the Department's legislative initiatives, and articulates the Department's position on legislation proposed by Congress.  Additionally, OLA facilitates the appearance of Department witnesses at congressional hearings, manages the interagency clearance process led by the Office of Management and Budget, coordinates the Department's response to congressional committee oversight requests, and participates in the Senate confirmation process for the Department's executive nominees.

3.     The statements herein are based on my personal knowledge and other information I acquired while performing my official duties.

4.     As Assistant Attorney General, my direct supervisors at the Department are the Deputy Attorney General and the Attorney General, who at the time of the events described in this declaration were Rod J. Rosenstein and Jefferson B. Sessions, respectively.  In fulfilling its core responsibilities, OLA often consults with and, on certain matters, receives guidance from attorneys in the Office of the Deputy Attorney General. Attorney General Sessions recused himself from the matters described in this declaration.

5.     On or around December 2, 2017, based on reporting in the New York Times, I became aware of the existence of text messages exchanged between Peter Strzok and a Federal Bureau of Investigation (FBI) attorney on their FBI-issued mobile devices.

6.     My understanding is that the Department's Office of the Inspector General (OIG) previously discovered the messages as part of its then ongoing review of various actions taken by the Department and the FBI in connection with the FBI's 2016 investigation into former Secretary of State Hillary Clinton's use of a private email server, and that the OIG briefed officials within the Office of the Deputy Attorney General regarding the messages.

7.     Soon after the December 2, 2017 news report, the chairmen of congressional committees in both the U.S. House of Representatives and the U.S. Senate (Congressional Committees) made verbal and written oversight inquires to the Department regarding the existence and substance of the text messages. These inquires included written requests for the Department to produce the text messages to Congress for oversight purposes.

8.     My understanding is that, at or around the time of the publication of the New York Times article, the Office of the Deputy Attorney General requested from the OIG, and the OIG provided, an initial subset of the total universe of discovered text messages between Mr. Strzok and the FBI attorney that the OIG considered particularly troubling.

9.     Before producing the initial set of text messages to the Congressional Committees, the Department endeavored to redact certain information, which may have included purely personal information and law enforcement sensitive information.

10.     The Office of the Deputy Attorney General provided OLA with the redacted text messages for the purposes of coordinating the production of the text messages to the Congressional Committees.

11.     The Department made its initial hard copy production of redacted text messages to the Congressional Committees on the evening of December 12, 2017. Subsequent productions followed.

12.     Though I was not directly involved in matters involving the media, my recollection is that the Office of the Deputy Attorney General and the Department's Office of Public Affairs determined that it was appropriate to make the same subset of redacted text messages available to certain members of the media.

13.     My understanding is that, on December 12, 2017, the Department made the same set of redacted text messages available to certain members of the news media.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct, to the best of my knowledge and belief.

Dated: 15 NOV 19

_____
Stephen E. Boyd

4

*Page v. U.S. Dep't of Justice*, No. 1:19-CV-3675-TSC

# Exhibit 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| PETER P. STRZOK,<br><br>Plaintiff,<br><br>v.<br><br>ATTORNEY GENERAL WILLIAM F. BARR,<br>in his official capacity, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)   Case No. 1:19-cv-2367-ABJ<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF PETER WINN

I, Peter Winn, hereby declare:

1.      I am the Director of the Office of Privacy and Civil Liberties ("OPCL") at the United States Department of Justice ("Department" or "DOJ"), and a member of the Senior Executive Service.  Since January 20, 2017, have been the Acting Chief Privacy and Civil Liberties Officer ("CPCLO") of the Department, where I report to the Deputy Attorney General.  I have worked at DOJ since 1994, both as an Assistant United States Attorney and as an Attorney-Advisor at the Office of Legal Counsel.  I also served on a detail as the Acting General Counsel of the Privacy and Civil Liberties Oversight Board, during its review of the NSA programs that were the subject of the Edward Snowden disclosures.

2.      I have taught privacy law at the University of Washington, Southern Methodist University, and the University of Melbourne, have published a number of articles on privacy law and hold certifications as an information privacy professional in United States government privacy law and domestic privacy law from the International

Association of Privacy Professionals.  I have worked on issues involving privacy law and policy at the Department of Justice, with other federal agencies, and with the Rules Committee of the Judicial Conference of the United States.  I obtained my J.D. from Harvard Law School in 1986, clerked for Judge James B. McMillan, in the Western District of North Carolina, and worked at private law firms in New York City and Dallas, Texas.

3.      Among my responsibilities as the head of OPCL, is to provide authoritative legal advice and guidance to the Department's leadership and DOJ components on questions about the Privacy Act of 1974.  I also advise DOJ leadership and the heads of DOJ components on questions regarding the lawfulness of proposed disclosures under the Privacy Act.  The statements herein are based on my personal knowledge and other information I acquired while performing my official duties.

4.      On December 12, 2017, then-Acting Deputy Attorney General ("ADAG"), Scott Schools, contacted me, seeking advice on whether disclosure to the news media of certain text messages exchanged between Peter Strzok and an FBI attorney on a Department-issued mobile device would be permissible under the Privacy Act and other Department policies.  ADAG Schools provided the relevant messages to me with the proposed redactions so that I could review them.  My advice was limited to the question whether the proposed disclosure of the texts as redacted would violate the non-disclosure provisions of the Privacy Act, not whether the disclosure was advisable as a matter of policy.

5.      ADAG Schools informed me that one or more congressional committees had requested the text messages from the Department and that the Department intended to provide them to at least some of the requesting members of Congress on December 13,

2017.  He also informed me that the Department's Office of the Inspector General ("OIG") did not object to the disclosure to Congress.

6.      Given the politically charged nature of the text messages, it was my understanding that one or more members of the requesting committee(s) would very likely disclose them to the public shortly after receiving them from the Department.  Accordingly, according to ADAG Schools, the Department wanted to be as open and transparent with the public as possible, consistent with the law and established Department policy.

7.      Under the Privacy Act of 1974, 5 U.S.C.§ 552a, agencies of the United States Government are authorized to disclose records contained within a system of records, among other reasons, for a routine use published in the Federal Register with an opportunity for interested persons to comment.  *See id.* § 552a(b)(3); *see also id.* § 552a(e)(11).

8.      Ordinarily, Department emails and text messages maintained in the Department's general archives have not constituted "records" in a "system records" that would be subject to the Privacy Act.  The Office of Management and Budget Guidelines explain that a system of records exists if: (1) there is an "indexing or retrieval capability using identifying particulars [that is] built into the system"; and (2) the agency "does, in fact, retrieve records about individuals by reference to some personal identifier."  OMB Guidelines, 40 Fed. Reg. 28,948, 28,952 (July 9, 1975).  The Guidelines state that the "is retrieved by" criterion "implies that the grouping of records under the control of an agency is accessed by the agency by use of a personal identifier; not merely that a capability or potential for retrieval exists."  *Id*.  This narrow interpretation of "system of records" has been adopted by courts that have had occasion to address the question.  *See Kreiger v. U.S.*

*Dep't of Justice*, 529 F. Supp. 2d 29, 42 (D.D.C 2008) (stating that email archives were not a system of records, in part, because the plaintiff "offers no facts suggesting that [the Department] would have been indexed by name, or that an electronic folder existed that grouped emails related to [the plaintiff] by name or other identifier"); *Minshew v. Donley*, 911 F. Supp. 2d 1043, 1071 (D. Nev. 2012) (finding emails about individual as the method of disclosure and not the source or record of the disclosure); *Counce v. Nicholson*, No. 3:06cv00171, 2007 WL 1191013, at *15 (M.D. Tenn. Apr. 18, 2007) (concluding that "email contain[ing] information regarding a potential presentation on bullying that [plaintiff's] supervisors directed her to submit for their review" was not a "record").

9.   That said, if the records of these text messages had been copied from the FBI's general archives into a "system of records," for instance into an OIG investigative file, it is conceivable that they would come under the protection of the Privacy Act, and could not be disclosed without the consent of the individual involved, absent a routine use allowing for such a disclosure.  I determined that, assuming the text messages at issue came from a system of records maintained by the OIG, the relevant routine uses would have been published in the Federal Register as System of Records Notice JUSTICE/OIG-001, "Office of the Inspector General Investigative Record."  82 Fed. Reg. 36,725 (July 5, 2007).

10.   One of the routine uses within JUSTICE/OIG-001 permits compatible disclosures "[t]o the news media and the public, including disclosures pursuant to 28 C.F.R. § 50.2, unless it is determined that release of the specific information in the context of a particular case would constitute an unwarranted invasion of personal privacy." 82 Fed. Reg. at 36,726.

11.     The Department practice has been to treat the "unwarranted invasion of personal privacy" limitation in its routine uses, as requiring the same analysis required under the FOIA's 552(b)(7)(C) and 552(b)(6) exemptions.  That is, the Department would not disclose records to the public or to news media under this routine use if such a disclosure "could reasonably be expected to constitute an unwarranted invasion of privacy."  *See* 5 U.S.C. § 552(b)(6), (b)(7)(C).  This in turn requires balancing the public interest in the information against the privacy interest of the individual to which the record pertains, effectively the same balancing test that is required under the privacy provisions of the FOIA.  *Id*.

12.     My analysis was based in part on the leading Supreme Court case in this area, in which the Court stated that, "[w]hether disclosure of a private document under Exemption 7(C) is warranted must turn on the nature of the requested document and its relationship to the basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny.' . . . rather than on the particular purpose for which the document is being requested."  *U.S. Dep't of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 772 (1989).  Information that sheds light on an agency's performance of its statutory duties falls squarely within that statutory purpose.  *Id*. at 773. The public interest is at its zenith when based on the information a reasonable person could conclude that the agency was acting inconsistent with the presumption of legitimacy it would ordinarily enjoy.

13.     Applying that test, and based upon my review of the materials, I considered it relevant that the text messages were exchanged between two high-ranking FBI officials, and that the text messages exhibited very strong political opinions about an individual who

was the subject of an ongoing FBI investigation, an investigation in which both of the authors of the text messages appeared to be personally involved.

14.     Further, the communications between the DOJ employees took place not on personal devices, but on Department-issued mobile devices, which contained clear banner warnings that inform users of the lack of any reasonable expectation of privacy.  While the Department permits limited personal use of its equipment, this policy does not exempt mobile devices from Department monitoring and oversight, and Department employees receive regular training and notices that any activity and content on Department devices is subject to monitoring.

15.     I felt that the two individuals knew or should have been aware that these texts would have been subject to review by others in the Department and possibly even the subject of a FOIA request or disclosed in connection with discovery in a possible criminal prosecution.

16.     In addition, because the public had already become aware of the names of both individuals, there appeared to be no way to mitigate the invasion of privacy that would accompany the release of the texts by redacting the individuals' names.  However, the fact that the Department proposed to redact non-work-related personal information from the text messages before releasing them to the media reduced the individual's privacy interests in the texts.  It is also significant that the text messages would be disclosed to Congress— as is permitted by the Privacy Act, *see* 5 U.S.C. § 552a(b)(9)—and that Deputy Attorney General Rosenstein was scheduled to testify publically before Congress the next day where he was expected to be asked questions about these text messages.  Congress, of course, could have released the text messages itself without creating any Privacy Act implications.

17.     As to the public interest side of the balancing, the texts displayed what a reasonable person could consider to constitute bias.  This in turn risked undermining public confidence in the objectivity and impartiality of the work of the FBI and the Department, given that the apparent bias concerned individuals who figured prominently in a criminal investigation for which the FBI senior officials were responsible.  It bears mention that the appearance of possible bias in this matter also involved the potential exercise of government power against a citizen.  I believed, and continue to believe, that such an appearance of bias in connection with criminal investigations, was sufficient to shift the presumption away from protecting personal privacy to one favoring public transparency.

18.     Under all the facts and circumstances presented to me at the time, it was my considered judgment that the public interest outweighed the privacy interest of the two individuals, and that the Department's disclosure of the text messages would not violate the Privacy Act.  I advised ADAG Schools accordingly.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct, to the best of my knowledge and belief.


Dated: November 18, 2019

Peter Winn