*Page v. U.S. Dep't of Justice*, No. 1:19-CV-3675-TSC

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PETER P. STRZOK,<br><br>   Plaintiff,<br><br>v.<br><br>ATTORNEY GENERAL WILLIAM F. BARR,<br>in his official capacity, et al.,<br><br>   Defendants. | Case No. 1:19-cv-2367-ABJ |

## DECLARATION OF ROD J. ROSENSTEIN

1. I served in the United States Department of Justice (Department) from December 1990 until May 2019, first as a career employee and then as a political appointee. President Bush nominated me to serve as U.S. Attorney for Maryland, and following Senate confirmation, I took office in July 2005. I continued to serve under that appointment as U.S. Attorney for twelve years, until President Trump appointed me to serve as Deputy Attorney General (DAG). Following Senate confirmation, I took office in April 2017 and served until May 2019.

2. My duties as DAG included, under the direction of the Attorney General, overseeing the Department's litigating divisions, law enforcement agencies and United States Attorney's Offices.

3. The statements contained herein are based on my personal knowledge and other information I obtained while performing my official duties.

4. On January 12, 2017, during the previous Administration, the Department's Inspector General (IG) announced that the Office of Inspector General (OIG) would conduct a review of allegations of impropriety by the FBI and Department in advance of the 2016 election,

including allegations of unauthorized leaks, improper considerations, and inappropriate public statements concerning the investigation of former Secretary Hillary Clinton's use of a private email server, which was closed in 2016.

5. In the summer of 2017, the IG told me and the Special Counsel (SC) conducting the Russian election interference investigation that in the course of the ongoing review, the OIG had discovered that two high-level FBI employees, Peter Strzok and Lisa Page, used FBI phones to send text messages that might violate Department and FBI policies and raised concerns about whether overt partisan bias influenced their performance of their official duties.

6. The issue was relevant to the SC because in addition to their involvement in the Clinton email investigation, Mr. Strzok and Ms. Page were working on the Russian election interference matter when I appointed the SC.

7. The SC removed Mr. Strzok from his role in the ongoing SC investigation after learning about the text messages. Ms. Page had already left the investigation and moved on to other duties.

8. On or about December 2, 2017, news reporters learned about the OIG review of the inappropriate text messages and reported about them. The Department then received requests for the text messages from several Senate and House committee chairs.

9. In order to respond to those congressional requests, the Associate Deputy Attorney General (ADAG) responsible for managing congressional oversight—a career Senior Executive Service employee appointed to his position during the previous Administration—requested copies of relevant text messages from OIG. OIG provided a subset of the total universe of discovered text messages between Mr. Strzok and Ms. Page, specifically those messages that OIG identified as inappropriate and particularly troubling.

10.   I was scheduled to testify before the House Judiciary Committee on December 13, 2017, regarding the Committee's oversight of the Department and the FBI, and I did not expect to discuss the text messages. On December 12, 2017, however, I learned that the text messages were ready for release to the Senate and House Committees that had requested them, there was no basis to withhold them, and they arguably were relevant to the Judiciary Committee's oversight hearing.

11.   I expressly asked my staff whether OIG objected to providing the messages to Congress. I was advised that OIG did not raise any objection and that the disclosure would not interfere with any ongoing investigation.

12.   It was therefore my understanding that law enforcement interests would not justify withholding the text messages from Congress.

13.   I also asked whether Mr. Strzok and Ms. Page had any privacy interest in the text messages that would warrant withholding them from disclosure. I understood that they did not, because the materials proposed for release represented a subset of text messages written by Mr. Strzok and Ms. Page that (1) were sent on government phones with the knowledge that they were subject to review by FBI; (2) were so inappropriate and intertwined with their FBI work that they raised concerns about political bias influencing official duties; and (3) the redacted portions proposed for disclosure were not sufficiently personal in nature.

14.   Based on the information known to me on December 12, 2017, there was a legitimate congressional oversight interest and no valid basis to decline the congressional oversight request. My staff presented me with the option of delaying disclosure for one day, until after I testified, so that I would not be in the witness chair to receive the inevitable harsh criticism of the FBI that would follow the disclosure. I concluded that it would be inappropriate to withhold the

messages for that reason. I therefore authorized the Department's Office of Legislative Affairs (OLA) to disclose the relevant text messages to the congressional oversight committees.

15. The Department's Office of Public Affairs (OPA) subsequently recommended providing the text messages to the media because otherwise, some congressional members and staff were expected release them intermittently before, during, and after the hearing, exacerbating the adverse publicity for Mr. Strzok, Ms. Page, and the Department. The disclosure obviously would adversely affect public confidence in the FBI, but providing the most egregious messages in one package would avoid the additional harm of prolonged selective disclosures and minimize the appearance of the Department concealing information that was embarrassing to the FBI.

16. Before disclosing the text messages to the news media, I wanted to confirm that it would not implicate the Privacy Act. The career ADAG contacted the Department's Acting Chief Privacy and Civil Liberties Officer—also a career Senior Executive Service employee appointed to his position during the previous Administration—and reported to me that the Department's expert had concluded that disclosing the texts to the media would not violate the Privacy Act.

17. On December 12, 2017, with the express understanding that it would not violate the Privacy Act and that the text messages would become public by the next day in any event, I authorized OPA to disclose to the news media the text messages that were being disclosed to congressional committees. I told my staff to notify Mr. Strzok's and Ms. Page's lawyers.

18. The decision to disclose the text messages to the media was based on the understanding that the text messages would become public when the Department provided them to Congress, and that releasing them all at one time would further the goal that the Department be forthcoming with the public—consistent with our duties to safeguard law enforcement information, protect public safety and national security, preserve privileges and respect valid

privacy interests of employees and other citizens—even when information is damaging to the Department.

19. If I had believed that the disclosure was prohibited by the Privacy Act, I would have ordered Department employees not to make the disclosure.

20. I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct, to the best of my knowledge and belief.

Dated: 1/17/20

ROD J. ROSENSTEIN