*Page v. U.S. Dep't of Justice*, No. 1:19-CV-3675-TSC

# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PETER P. STRZOK,   ) | |
| )  | |
| Plaintiff,   ) | |
| )   | Case No. 1:19-cv-2367-ABJ |
| v.   ) | |
| )  | |
| ATTORNEY GENERAL WILLIAM F. BARR,   ) | |
| in his official capacity, et al.,   ) | |
| )  | |
| Defendants.   ) | |
| )  | |
| )  | |

**DECLARATION OF PETER WINN**

I, Peter Winn, hereby declare:

1.      I am the Director of the Office of Privacy and Civil Liberties ("OPCL") at the United States Department of Justice ("Department" or "DOJ"), and a member of the Senior Executive Service.  Since January 20, 2017, have been the Acting Chief Privacy and Civil Liberties Officer ("CPCLO") of the Department, where I report to the Deputy Attorney General.  I have worked at DOJ since 1994, both as an Assistant United States Attorney and as an Attorney-Advisor at the Office of Legal Counsel.  I also served on a detail as the Acting General Counsel of the Privacy and Civil Liberties Oversight Board, during its review of the NSA programs that were the subject of the Edward Snowden disclosures.

2.      I have taught privacy law at the University of Washington, Southern Methodist University, and the University of Melbourne, have published a number of articles on privacy law and hold certifications as an information privacy professional in United States government privacy law and domestic privacy law from the International

Association of Privacy Professionals.  I have worked on issues involving privacy law and policy at the Department of Justice, with other federal agencies, and with the Rules Committee of the Judicial Conference of the United States.  I obtained my J.D. from Harvard Law School in 1986, clerked for Judge James B. McMillan, in the Western District of North Carolina, and worked at private law firms in New York City and Dallas, Texas.

3.      Among my responsibilities as the head of OPCL, is to provide authoritative legal advice and guidance to the Department's leadership and DOJ components on questions about the Privacy Act of 1974.  I also advise DOJ leadership and the heads of DOJ components on questions regarding the lawfulness of proposed disclosures under the Privacy Act.  The statements herein are based on my personal knowledge and other information I acquired while performing my official duties.

4.      On December 12, 2017, then-Acting Deputy Attorney General ("ADAG"), Scott Schools, contacted me, seeking advice on whether disclosure to the news media of certain text messages exchanged between Peter Strzok and an FBI attorney on a Department-issued mobile device would be permissible under the Privacy Act and other Department policies.  ADAG Schools provided the relevant messages to me with the proposed redactions so that I could review them.  My advice was limited to the question whether the proposed disclosure of the texts as redacted would violate the non-disclosure provisions of the Privacy Act, not whether the disclosure was advisable as a matter of policy.

5.      ADAG Schools informed me that one or more congressional committees had requested the text messages from the Department and that the Department intended to provide them to at least some of the requesting members of Congress on December 13,

2017.  He also informed me that the Department's Office of the Inspector General ("OIG") did not object to the disclosure to Congress.

6.     Given the politically charged nature of the text messages, it was my understanding that one or more members of the requesting committee(s) would very likely disclose them to the public shortly after receiving them from the Department.  Accordingly, according to ADAG Schools, the Department wanted to be as open and transparent with the public as possible, consistent with the law and established Department policy.

7.     Under the Privacy Act of 1974, 5 U.S.C. § 552a, agencies of the United States Government are authorized to disclose records contained within a system of records, among other reasons, for a routine use published in the Federal Register with an opportunity for interested persons to comment.  *See id.* § 552a(b)(3); *see also id.* § 552a(e)(11).

8.     Ordinarily, Department emails and text messages maintained in the Department's general archives have not constituted "records" in a "system records" that would be subject to the Privacy Act.  The Office of Management and Budget Guidelines explain that a system of records exists if: (1) there is an "indexing or retrieval capability using identifying particulars [that is] built into the system"; and (2) the agency "does, in fact, retrieve records about individuals by reference to some personal identifier."  OMB Guidelines, 40 Fed. Reg. 28,948, 28,952 (July 9, 1975).  The Guidelines state that the "is retrieved by" criterion "implies that the grouping of records under the control of an agency is accessed by the agency by use of a personal identifier; not merely that a capability or potential for retrieval exists."  *Id.*  This narrow interpretation of "system of records" has been adopted by courts that have had occasion to address the question.  *See Kreiger v. U.S.*

*Dep't of Justice*, 529 F. Supp. 2d 29, 42 (D.D.C 2008) (stating that email archives were not a system of records, in part, because the plaintiff "offers no facts suggesting that [the Department] would have been indexed by name, or that an electronic folder existed that grouped emails related to [the plaintiff] by name or other identifier"); *Minshew v. Donley*, 911 F. Supp. 2d 1043, 1071 (D. Nev. 2012) (finding emails about individual as the method of disclosure and not the source or record of the disclosure); *Counce v. Nicholson*, No. 3:06cv00171, 2007 WL 1191013, at *15 (M.D. Tenn. Apr. 18, 2007) (concluding that "email contain[ing] information regarding a potential presentation on bullying that [plaintiff's] supervisors directed her to submit for their review" was not a "record").

9.     That said, if the records of these text messages had been copied from the FBI's general archives into a "system of records," for instance into an OIG investigative file, it is conceivable that they would come under the protection of the Privacy Act, and could not be disclosed without the consent of the individual involved, absent a routine use allowing for such a disclosure.  I determined that, assuming the text messages at issue came from a system of records maintained by the OIG, the relevant routine uses would have been published in the Federal Register as System of Records Notice JUSTICE/OIG-001, "Office of the Inspector General Investigative Record."  82 Fed. Reg. 36,725 (July 5, 2007).

10.     One of the routine uses within JUSTICE/OIG-001 permits compatible disclosures "[t]o the news media and the public, including disclosures pursuant to 28 C.F.R. § 50.2, unless it is determined that release of the specific information in the context of a particular case would constitute an unwarranted invasion of personal privacy." 82 Fed. Reg. at 36,726.

11.     The Department practice has been to treat the "unwarranted invasion of personal privacy" limitation in its routine uses, as requiring the same analysis required under the FOIA's 552(b)(7)(C) and 552(b)(6) exemptions.  That is, the Department would not disclose records to the public or to news media under this routine use if such a disclosure "could reasonably be expected to constitute an unwarranted invasion of privacy."  *See* 5 U.S.C. § 552(b)(6), (b)(7)(C).  This in turn requires balancing the public interest in the information against the privacy interest of the individual to which the record pertains, effectively the same balancing test that is required under the privacy provisions of the FOIA.  *Id.*

12.     My analysis was based in part on the leading Supreme Court case in this area, in which the Court stated that, "[w]hether disclosure of a private document under Exemption 7(C) is warranted must turn on the nature of the requested document and its relationship to the basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny.' . . . rather than on the particular purpose for which the document is being requested."  *U.S. Dep't of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 772 (1989).  Information that sheds light on an agency's performance of its statutory duties falls squarely within that statutory purpose.  *Id.* at 773. The public interest is at its zenith when based on the information a reasonable person could conclude that the agency was acting inconsistent with the presumption of legitimacy it would ordinarily enjoy.

13.     Applying that test, and based upon my review of the materials, I considered it relevant that the text messages were exchanged between two high-ranking FBI officials, and that the text messages exhibited very strong political opinions about an individual who

was the subject of an ongoing FBI investigation, an investigation in which both of the authors of the text messages appeared to be personally involved.

14.     Further, the communications between the DOJ employees took place not on personal devices, but on Department-issued mobile devices, which contained clear banner warnings that inform users of the lack of any reasonable expectation of privacy.  While the Department permits limited personal use of its equipment, this policy does not exempt mobile devices from Department monitoring and oversight, and Department employees receive regular training and notices that any activity and content on Department devices is subject to monitoring.

15.     I felt that the two individuals knew or should have been aware that these texts would have been subject to review by others in the Department and possibly even the subject of a FOIA request or disclosed in connection with discovery in a possible criminal prosecution.

16.     In addition, because the public had already become aware of the names of both individuals, there appeared to be no way to mitigate the invasion of privacy that would accompany the release of the texts by redacting the individuals' names.  However, the fact that the Department proposed to redact non-work-related personal information from the text messages before releasing them to the media reduced the individual's privacy interests in the texts.  It is also significant that the text messages would be disclosed to Congress— as is permitted by the Privacy Act, *see* 5 U.S.C. § 552a(b)(9)—and that Deputy Attorney General Rosenstein was scheduled to testify publically before Congress the next day where he was expected to be asked questions about these text messages.  Congress, of course, could have released the text messages itself without creating any Privacy Act implications.

17.     As to the public interest side of the balancing, the texts displayed what a reasonable person could consider to constitute bias.  This in turn risked undermining public confidence in the objectivity and impartiality of the work of the FBI and the Department, given that the apparent bias concerned individuals who figured prominently in a criminal investigation for which the FBI senior officials were responsible.  It bears mention that the appearance of possible bias in this matter also involved the potential exercise of government power against a citizen.  I believed, and continue to believe, that such an appearance of bias in connection with criminal investigations, was sufficient to shift the presumption away from protecting personal privacy to one favoring public transparency.

18.     Under all the facts and circumstances presented to me at the time, it was my considered judgment that the public interest outweighed the privacy interest of the two individuals, and that the Department's disclosure of the text messages would not violate the Privacy Act.  I advised ADAG Schools accordingly.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct, to the best of my knowledge and belief.


Dated: <u>November 18, 2019</u>

Peter Winn