**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| LISA PAGE, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-cv-3675 (ABJ) |
| | ) | |
| U.S. DEPARTMENT OF JUSTICE, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................................. 3

ARGUMENT .................................................................................................................... 8

    I.    Summary Judgment Is Premature and Plaintiff Is Entitled to Discovery .......................... 9

        A.    Under Federal Rule of Civil Procedure 56(d), Plaintiff Is Entitled to
        Discovery Prior to Consideration of Defendants' Summary Judgment Motion.................... 9

        B.    Defendants' Proffered Evidence Highlights, Rather Than Resolves,
        Disputed Factual Issues........................................................................................... 10

    II.    Defendants Have Failed to Show That They Are Entitled to Summary
    Judgment on Willfulness ....................................................................................... 14

        A.    The Circumstances of the Disclosure Strongly Suggest That Defendants
        Willfully and Intentionally Violated Ms. Page's Privacy Rights ......................................... 16

        B.    The Timing, Justification for, and Good Faith of Defendants' Purported
        Internal Privacy Act Analysis Are Hotly Disputed............................................................ 17

    III.    Defendants Have Not Established That a Valid Routine Use Permitted the
    Disclosure of Plaintiff's Messages ........................................................................... 21

        A.    Defendants Have Not Established the Necessary Factual Predicates to
        Rely on Routine Use (k) ......................................................................................... 22

        B.    Defendants Have Not Established the "Compatibility" Prong As a
        Matter of Law ...................................................................................................... 25

        C.    Defendants Have Not Established That the Disclosure Falls Within the
        Scope of Routine Use (k)........................................................................................ 28

    IV.    FBI Should Remain in the Case................................................................................ 35

CONCLUSION................................................................................................................. 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albright v. United States*,
    732 F.2d 181 (D.C. Cir. 1984) .................................................................................. 15, 21

*Allen v. Brown*,
    185 F. Supp. 3d 1 (D.D.C. 2016) ................................................................................. 14

*Ames v. U.S. Dep't of Homeland Sec.*,
    861 F.3d 238 (D.C. Cir. 2017) ........................................................................... 21, 28, 34

*Ames v. U.S. Dep't of Homeland Security*,
    153 F. Supp. 3d 342 (D.D.C. 2016) ............................................................................ 34

*Britt v. Naval Investigative Serv.*,
    886 F.2d 544 (3d Cir. 1989) ....................................................................................... 34

*Brunotte v. Johnson*,
    892 F. Supp. 2d 199 (D.D.C. 2012) ............................................................. 13, 21, 27, 30

*Budik v. United States*,
    949 F. Supp. 2d 14 (D.D.C. 2013) .............................................................................. 34

*Convertino v. U.S. Dep't of Justice*,
    684 F.3d 93 (D.C. Cir. 2012) .......................................................................... 2, 9–11, 14–15

*Dutton v. U.S. Dep't of Justice*,
    302 F. Supp. 3d 109 (D.D.C. 2018) ............................................................................ 33

**Fed. Energy Regulatory Comm'n v. City Power Mktg., LLC*,
    235 F. Supp. 3d 152 (D.C. Cir. 2019) ......................................................................... 9–10

*Grimes v. District of Columbia*,
    794 F.3d 83 (D.C. Cir. 2015) ...................................................................................... 9

*Maydak v. United States*,
    630 F.3d 166 (D.C. Cir. 2010) .................................................................................... 21

**McCready v. Nicholson*,
    465 F.3d 1 (D.C. Cir. 2006) ....................................................................................... 2, 14

*Military Audit Project v. Casey*,
    656 F.2d 724 (D.C. Cir. 1981) ................................................................................... 33–34

*Radack v. U.S. Dep't of Justice*,
    402 F. Supp. 2d 99 (D.D.C. 2005) .............................................................................. 34

*Reed v. Dep't of the Navy*,
  910 F. Supp. 2d 32 (D.D.C. 2012) ................................................................21

*Richardson v. Bd. of Governors of the Fed. Reserve Sys.*,
  248 F. Supp. 3d 91 (D.D.C. 2017) ..........................................................25, 28

*Sussman v. U.S. Marshals Serv.*,
  494 F.3d 1106 (D.C. Cir. 2007) ..................................................................20

*Sussman v. U.S. Marshals Serv.*,
  657 F. Supp. 2d 25 (D.D.C. 2009) ................................................................14

\*Tijerina v. Walters*,
  821 F.2d 789 (D.C. Cir. 1987) ........................................................15, 20, 28

*Toolasprashad v. Bureau of Prisons*,
  286 F.3d 576 (D.C. Cir. 2002) ....................................................................20

*Tran v. Dep't of Treasury*,
  351 F. Supp. 3d 130 (D.D.C. 2019), *aff'd*, No. 19-5053, 2020 WL 1487717
  (D.C. Cir. Mar. 6, 2020)........................................................................22–23, 30

## Statutes

5 U.S.C. § 552a(a)(7) .....................................................................................9, 25

5 U.S.C. § 552a(b) ..............................................................................................21

5 U.S.C. § 552a(e)(4)(D) ....................................................................................21

5 U.S.C. § 552a(g)(4).....................................................................................14, 15

## Rules and Regulations

28 C.F.R. § 50.2(c)(1) .........................................................................................29

72 Fed. Reg. 36,725 (July 5, 2007).....................................................................25

72 Fed. Reg. 36,726 (July 5, 2007) ...............................................................28, 30

Fed. R. Civ. P. 56(d) ..................................................................................2, 9, 10

## Other Authorities

*Inspector General Report on Origins of FBI's Russia Inquiry: Hearing Before the
  S. Comm. on the Judiciary*, 116th Cong. (2019) (statement of Michael
  Horowitz, Inspector Gen., U.S. Dep't of Justice), *available at*
  https://tinyurl.com/rca7olh........................................................................29

Natasha Bertrand, *In 'Highly Unusual' Move, DOJ Secretly Invited Reporters to View Texts Sent by Ousted FBI Agents*, Bus. Insider, Dec. 13, 2017, https://www.businessinsider.com/peter-strzok-page-texts-mueller-russia-trump-2017-12 ................................................................................16–17

Office of the Deputy Att'y Gen., Order No. 3915-2017, Appointment of Special Counsel (May 17, 2017) ......................................................................................4

# INTRODUCTION

The government does not dispute that, on December 12, 2017, senior Department of Justice ("DOJ" or the "Department") officials disclosed copies of 375 text messages containing highly personal information about Plaintiff Lisa Page, an attorney with the Federal Bureau of Investigation ("FBI"), and Peter Strzok, a longtime FBI Special Agent, to members of the press. The government admits that the Department released the messages to reporters without the knowledge or approval of DOJ's Office of the Inspector General ("OIG"), despite the fact that OIG was, at the time, reviewing the messages as evidence in a pending OIG investigation that would not conclude for another six months. The government further admits that Department officials invited reporters to DOJ after the close of business on December 12; permitted them to view, but not copy or remove, the messages; and instructed them not to source the material to DOJ. Notwithstanding these facts, Defendants DOJ and FBI now move for summary judgment, arguing based on untested, self-serving declarations by three current or former DOJ officials that (a) this anything-but-routine disclosure did not violate the Privacy Act (the "Act") because it somehow qualifies as a permitted "routine use" of agency records and, (b) even if it did, Ms. Page is not entitled to damages because the violation was not "intentional or willful" under the Act. Summary judgment is premature, and, in any case, Defendants are not entitled to judgment as a matter of law.

No discovery has occurred in this action. In fact, Defendants moved for summary judgment the same day they answered the complaint. The Court should deny or defer consideration of Defendants' motion until the parties complete discovery. As the D.C. Circuit emphasized in a prior Privacy Act case involving the politically motivated disclosure of information about a government employee to the media, "summary judgment is premature unless all parties have 'had

a full opportunity to conduct discovery.'" *Convertino v. U.S. Dep't of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)).  Where, as here, a party submits a sufficiently particular declaration in support of a request to take discovery under Federal Rule of Civil Procedure 56(d), that request should be granted "'almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence.'"  *Id.* (quoting *Berkeley v. Home Ins. Co.*, 68 F.3d 1409, 1414 (D.C. Cir. 1995)).  Because the parties have not had *any* opportunity to engage in discovery, let alone the "full opportunity" mandated by *Convertino*, this Court should reject Defendants' motion and allow discovery to proceed.

Far from justifying an unprecedented early summary judgment, Defendants' declarations omit key facts and are unsupported by any documentary evidence—despite the fact that the relevant evidence, including contemporaneous email communications, is overwhelmingly in Defendants' possession and control.  The D.C. Circuit has held that where a Privacy Act plaintiff has "brought at least one potential inaccuracy to [the court's] attention and . . . the record is wholly undeveloped on [the relevant] issue[s] generally," the plaintiff "should be afforded a reasonable opportunity to complete discovery before responding to [the Government's] summary judgment motion." *McCready v. Nicholson*, 465 F.3d 1, 19 (D.C. Cir. 2006) (quotation marks omitted) (last alteration in original).  At minimum, Ms. Page is entitled to depose the government's declarants and obtain other testimonial and documentary evidence necessary to develop the underlying facts.

Even on the existing record, however, summary judgment would be wholly inappropriate. In the absence of discovery, Ms. Page has relied on publicly available (albeit heavily redacted) documents, including documents produced in response to a FOIA request by Citizens for Responsibility and Ethics in Washington ("CREW"), to piece together what occurred and identify factual issues that cry out for further development.  *See* Plaintiff's Response to Defendants'

Statement of Undisputed Material Facts ("SOMF Response").  Even these limited public sources reveal multiple, critical issues of material fact in connection with each of the two legal issues before the Court: (1) whether Defendants acted willfully or intentionally in violating the Privacy Act and (2) whether Defendants' unprecedented, late night-disclosure of highly personal information about two career FBI employees—information that was, at the time, being reviewed as evidence in an active OIG investigation—somehow constitutes a "routine use" of agency records.  These disputed factual issues preclude summary judgment at this stage.

## FACTUAL AND PROCEDURAL BACKGROUND

After the close of business December 12, 2017, Defendants orchestrated the coordinated disclosure of agency records pertaining to Ms. Page—namely, a 90-page document reflecting 375 text messages, many of them highly personal and sensitive, between Ms. Page and Mr. Strzok—to a group of reporters (the "December 12 disclosure").  At the time, OIG was reviewing those messages as part of an inquiry into potential bias in the FBI's investigation of former Secretary of State Hillary Clinton's use of a private email server for government communications (known internally as the "Midyear" investigation). *See* Answer, ECF No. 15, ¶ 3; Statement of Undisputed Material Facts ("SOMF"), ECF No. 14-2, ¶¶ 7–8.  DOJ officials disclosed the records to reporters without OIG's knowledge or approval.  Answer ¶ 60.

### I.   Ms. Page's Service as a Government Attorney

Ms. Page was hired by the FBI in 2012, where she served in a variety of roles, including as Special Counsel to the Deputy Director.  Answer ¶ 13; SOMF ¶ 2.  In her capacity as Special Counsel, Ms. Page served as the Deputy Director's primary liaison to the Midyear investigation and also played a limited role in the FBI's investigation into the possibility of Russian interference in the 2016 presidential election (the "Crossfire Hurricane" investigation).  Compl., ECF No. 1,

¶¶ 14–15; *see* Answer ¶ 14; SOMF ¶¶ 3–4.  Between May and July 2017, Ms. Page completed a 45-day detail to the office of DOJ Special Counsel Robert S. Mueller III, before returning to her previous role at the FBI.  Compl. ¶ 17; *see* Answer ¶ 17; SOMF ¶ 5.

## II.   Events Leading Up to the December 12 Disclosure

On January 12, 2017, OIG undertook a review of the FBI's handling of the Midyear investigation.  Answer ¶ 16. OIG's review proceeded between January 2017 and June 2018 and included the review of text messages exchanged between Ms. Page and Mr. Strzok.  *Id.* ¶ 18; SOMF ¶¶ 6–7.  In June 2018, OIG released a 568-page public report summarizing its findings. *See* Compl. ¶ 23; *see also* **Jeffress Decl. Ex. G**, Excerpts from OIG Report.  Ultimately, OIG found no evidence of bias affecting any investigative decisions made during the Midyear inquiry. **Jeffress Decl. Ex. G** at iii, 149.

On May 17, 2017, Acting Attorney General Rod Rosenstein appointed Mr. Mueller to serve as Special Counsel and authorized him to conduct the investigation of any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump (the "Special Counsel's investigation").  Answer ¶ 17; *see also* Office of the Deputy Att'y Gen., Order No. 3915-2017, Appointment of Special Counsel (May 17, 2017). Both OIG's Midyear investigation and the Special Counsel's investigation were ongoing between May and December 2017.  Answer ¶ 25.

Throughout this period, President Trump repeatedly attacked the Special Counsel's appointment and investigation of members of his campaign, decrying that investigation as "the single greatest witch hunt of a politician in American history." Compl. ¶ 26.  He would repeat this complaint over 300 times on Twitter alone.  *Id.*  But privately, he worried, "This is the end of my presidency. I'm f***ed."  *Id.* ¶ 25.

4

The President focused much of his anger on his then-Attorney General ("AG"), Jefferson B. Sessions III, who had recused himself in March 2017 from all investigations related to the 2016 election. *Id.* ¶ 27; *see also* Answer ¶ 27. Although the Attorney General remained in his post until November 2018, the President continued to publicly attack and undermine him throughout his tenure, including during the period between the Special Counsel's appointment in May 2017 and Defendants' unlawful disclosure of the text messages in December 2017. Compl. ¶ 27. In the President's view, repeatedly aired via Twitter and other public platforms, Mr. Sessions' recusal had paved the way for Deputy AG Rosenstein to appoint the Special Counsel and thus had exposed the President and his associates to significant investigative peril. *Id.* ¶ 28.

Deputy AG Rosenstein learned of the existence of the text messages no later than July 27, 2017. Answer ¶ 19; SOMF ¶ 13. On information and belief, at some point between July and December 2017, DOJ officials notified White House personnel about the messages, and White House staff or associates subsequently contacted members of the media. Compl. ¶ 35.[1]

On Saturday, December 2, 2017, the New York Times reported that Mr. Strzok, a career FBI agent later assigned to the Special Counsel's Office, had been removed from the Special Counsel's investigation following "the discovery of text messages in which Mr. Strzok and a colleague reacted to news events, like presidential debates, in ways that could appear critical of Mr. Trump." Answer ¶ 36; SOMF ¶ 16. The article did not name Ms. Page. Answer ¶ 36. That same day, the Washington Post identified Ms. Page as the other participant in the "politically charged texts" under review. Compl. ¶ 37; SOMF Resp. ¶ 16. Neither the New York Times nor the Washington Post reported on the content of specific text messages. Compl. ¶ 37; SOMF Resp.

---

[1] Defendants could not deny this allegation in the complaint because they lacked sufficient knowledge or information. *See* Answer ¶ 35. Thus, it is a matter to be developed in discovery.

¶ 16.  The President immediately seized on the story, writing in a pre-dawn tweet on December 3, 2017, "'ANTI-TRUMP FBI AGENT LED CLINTON EMAIL PROBE' Now it all starts to make sense!"  Compl. ¶ 38.

## III.    The December 12 Disclosure

Prior to the December 12 disclosure, DOJ's Office of the Deputy AG obtained copies of 375 of the text messages from OIG.  *See* Answer ¶¶ 41, 43; SOMF ¶¶ 18–19.  On information and belief, records of these messages were simultaneously maintained in multiple DOJ and/or FBI systems of records.  Compl. ¶¶ 41, 62–65.  Defendants have not denied that the records were maintained in multiple systems of records, and the specific systems at issue are matters to be developed in discovery.  *See* Answer ¶¶ 41, 62–65.

Deputy AG Rosenstein was scheduled to testify before the House Judiciary Committee on the morning of December 13, 2017.  *Id.* ¶ 48; SOMF ¶ 21.  Defendants admit that "DOJ disclosed the text messages to members of the press on December 12, 2017" and that "then-Deputy Attorney General Rosenstein's upcoming testimony on December 13, 2017 was the reason for the timing of the disclosure."  Answer ¶ 49.  Other purposes of the disclosure remain to be determined.  Deputy AG Rosenstein personally authorized the disclosure to reporters on the evening of December 12.  Rosenstein Decl., ECF No. 14-4, ¶ 17.

On December 12, 2017, officials within the Department's Office of Public Affairs ("OPA"), including then-Director Sarah Isgur Flores, permitted members of the press to view the text messages in person at the Department.  Answer ¶¶ 4, 45.  Ms. Isgur invited reporters to arrive well after business hours, beginning around 8:30 p.m., and continued to receive them until at least 11 p.m.  *See* **Jeffress Decl. Exs. A–D** (messages between Sarah Isgur Flores and reporters).  Members of the press were permitted to view, but not remove or copy, the text messages.  Answer

¶¶ 4, 45, 53; *see also* **Jeffress Decl. Exs. A, C**.  DOJ also instructed members of the press who were present that night not to source the messages to DOJ.  Answer ¶¶ 4, 45, 54; **Jeffress Decl. Ex. C**.

Despite the Department's efforts at secrecy, however, word of the Department's role leaked out by the following morning, and DOJ was forced to accept responsibility.  *See, e.g.*, **Jeffress Decl. Ex. I**, *Oversight Hearing with Deputy Attorney General Rod Rosenstein: Hearing Before the H. Comm. on the Judiciary*, 115 Cong. 37 (2018) (Deputy AG Rosenstein responding "I believe that is correct" to a member's question about whether "the Department of Justice . . . , last evening, invited a group of reporters to its offices to view the private text messages that were sent during the election by Peter Strzok and Lisa Page").  Reporters immediately began to question the propriety and lawfulness of the release.  In an exchange on December 14, 2017, for example, Mark Hosenball of Reuters pressed Ms. Isgur to provide examples of any similar releases in the past, ultimately responding: "I have consulted with former officials who say they have NEVER heard of a previous release of evidence in an active investigation.  So I am disturbed that you are unwilling or unable to produce any real evidence to support your case."  **Jeffress Decl. Ex. D**.

On the evening of December 12, 2017, Defendants also made arrangements to provide copies of the text messages to congressional committees, including the committee before which Mr. Rosenstein would be testifying the following morning.  Answer ¶ 48; SOMF ¶ 24; Rosenstein Decl. ¶ 10.  Like the disclosure to reporters, this production deviated from normal practice: the Department's Office of Legislative Affairs ("OLA") sent hard copies of the documents to congressional offices late in the evening, when some offices did not have staff available to receive them, rather than using the ordinary electronic delivery protocol.  *See* **Jeffress Decl. Ex. E** (emails between Senate staffer Jason Foster and Deputy Assistant Attorney General David Lasseter of

OLA); SOMF Resp. ¶ 24; *see also* Answer ¶ 48 (confirming that "certain members of congressional staff were not available to receive the text messages on that date"). On the morning of December 13, 2017, when Mr. Foster complained about the departure from protocol, Mr. Lasseter responded: "Problem is we have the DAG before HJC right now. I know we are working on getting this over to y'all asap." **Jeffress Decl. Ex. E**. Mr. Lasseter further stated: "The document production was atypical and thus necessitated hand delivery." *Id.*

## IV.   **This Lawsuit**

Ms. Page filed this lawsuit on December 10, 2019, asserting a Privacy Act claim based on the December 12 disclosure. ECF No. 1. On March 13, 2020, Defendants moved for summary judgment. ECF No. 14. Later that same day, Defendants filed their answer. ECF No. 15. Plaintiff's counsel reached out to Defendants' counsel to schedule the parties' Rule 26(f) meeting as necessary for commencement of discovery. *See* Jeffress Decl. ¶ 4. Defendants' counsel advised that Defendants' position is that "a Rule 26(f) conference would be premature at this point" and "the case should be resolved without discovery for the reasons stated in the motion for summary judgment." *See* Jeffress Decl. ¶ 4. No discovery has occurred in this action. *See* Jeffress Decl. ¶¶ 2-5.

## ARGUMENT

It is difficult to imagine a more drastic departure from an agency's Privacy Act obligations than the hosting of a secretive, after-hours gathering of reporters to leak highly personal information about a current employee from an active investigative file. Defendants' legal theory, however, is that the December 12 disclosure was business as usual. Forced to concede the key factual circumstances of the disclosure, Defendants seek to transform it from an egregious violation of Ms. Page's privacy rights into a "routine use" of agency records, relying on an

exception to the Privacy Act's disclosure bar that is meant to allow certain disclosures that are "compatible with the purpose for which [the records were] collected." 5 U.S.C. § 552a(a)(7). That exception does not apply, nor can Defendants show, at this early stage, that the evidence precludes Ms. Page from establishing that Defendants acted willfully and intentionally in disclosing her text messages to reporters and subsequently trying to conceal that fact. In any case, summary judgment is premature, and Defendants' three self-serving declarations fall far short of resolving the case. Ms. Page is entitled to discovery.

## I. Summary Judgment Is Premature and Plaintiff Is Entitled to Discovery

### A. Under Federal Rule of Civil Procedure 56(d), Plaintiff Is Entitled to Discovery Prior to Consideration of Defendants' Summary Judgment Motion

This Court should deny or defer consideration of Defendants' motion for summary judgment because no discovery has yet occurred and Plaintiff is entitled to relief under Federal Rule of Civil Procedure 56(d). Under Rule 56(d), if a litigant against whom summary judgment is sought "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition," the court may "(1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). This mechanism enables "nonmovants who lack the facts they need to seek an opportunity to gather more information before responding to a motion for summary judgment." *Grimes v. District of Columbia*, 794 F.3d 83, 92 (D.C. Cir. 2015).

A party seeking relief under Rule 56(d) must submit a declaration that satisfies the three factors set forth in the D.C. Circuit's *Convertino* decision. Specifically, a Rule 56(d) declaration "must: (1) 'outline the particular facts [the party] intends to discover and why those facts are necessary to the litigation'; (2) explain why the party has not been able to produce the facts; and (3) demonstrate that the information sought is, in fact, discoverable." *Fed. Energy Regulatory*

*Comm'n v. City Power Mktg., LLC*, 235 F. Supp. 3d 152, 155 (D.C. Cir. 2019) (quoting *Convertino v. U.S. Dep't of Justice*, 684 F.3d 93, 99–100 (D.C. Cir. 2012)) (alteration in original). *Convertino*, like this case, involved allegations that DOJ had violated the Privacy Act by leaking information about a former employee—specifically,  information relating to a professional misconduct investigation by DOJ's Office of Professional Responsibility—to the press.  684 F.3d at 96–97, 101.  Convertino sought additional discovery because he "d[id] not know the identity of the individual(s) who disclosed information regarding the OPR referral,"  and thus "c[ould not] show that the disclosure was 'intentional or willful.'"  *Id.* at 99.  Relying on the affidavit of Convertino's counsel, the court held that Convertino had satisfied all three factors and granted relief.  *Id.* at 100–101.

With this filing, Ms. Page is submitting a separate Rule 56(d) motion that attaches the declaration of her counsel, Amy Jeffress.  This declaration addresses all three *Convertino* factors.  Requests supported by a sufficient Rule 56(d) declaration "should be granted 'almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence.'"  *Id.* at 99 (quoting *Berkeley v. Home Ins. Co.*, 68 F.3d 1409, 1414 (D.C. Cir. 1995)).  For the reasons discussed above, as well as those stated in Ms. Page's Rule 56(d) motion and the supporting Jeffress declaration, this Court should deny or defer consideration of Defendants' motion for summary judgment pursuant to Rule 56(d) and allow the case to proceed to discovery.

## B. Defendants' Proffered Evidence Highlights, Rather Than Resolves, Disputed Factual Issues

Defendants' proffered evidence only underscores the need for discovery.  In support of their motion, Defendants have provided declarations from former Deputy AG Rod Rosenstein, who authorized disclosure of the messages to the media, *see* Rosenstein Decl. ¶ 17; Assistant Attorney General for Legislative Affairs Stephen Boyd, who participated in the production of the

text messages to Congress (but not in the disclosure to the media), *see* Boyd Decl. ¶¶ 11–12; and Director of the Office of Privacy and Civil Liberties ("OPCL") Peter Winn, who advised on the Privacy Act implications of the disclosure, *see* Winn Decl., ECF No. 14-6, ¶ 17.   None of the declarations attaches any documentary evidence, such as communications relating to Defendants' purported internal Privacy Act analysis and the final Privacy Act opinion upon which they rely (and for which they have waived privilege in these proceedings).   Nonetheless, they insist that this Court should resolve the case on the basis of their declarations alone, without allowing Plaintiff to test their claims through depositions of their declarants or other testimonial or documentary evidence.

They are wrong.   As an initial matter, Defendants' declarations are incomplete because they fail to address the role of other DOJ and/or FBI officials who are known to have been involved in the December 12 disclosure.   Because the element of willfulness or intent focuses on the state of mind of the individuals involved, a full accounting of all participating officials is essential for a determination of whether, as a matter of law, the agency acted intentionally or willfully in disclosing the protected records.   *See Convertino*, 684 F.3d at 99.   Here, Defendants have provided only partial accounts from just three officials—Rosenstein, Winn, and Boyd—while omitting any evidence from, or even reference to, other key participants.   Discovery is needed to identify the full range of relevant officials whose conduct is material to the claims.

Plaintiff has no way of knowing the full extent of the information Defendants may have excluded from their declarations, but two readily apparent deficiencies—the limited information provided about the critical role of then-Associate Deputy Attorney General ("ADAG") Scott

11

Schools, and the exclusion of *any* mention of then-Director of Public Affairs Sarah Isgur Flores—are, by themselves, sufficient to warrant the denial of Defendants' motion for summary judgment.[2]

Both the Winn and Rosenstein declarations suggest that ADAG Schools was deeply involved in the activities leading up to the December 12 disclosure, yet those secondhand accounts provide only a high-level outline of his role.  Among other things, the declarations assert that Mr. Schools requested copies of relevant text messages from OIG, Rosenstein Decl. ¶ 9; solicited the purported Privacy Act analysis from Mr. Winn on December 12, Winn Decl. ¶ 4; provided a set of text messages with proposed redactions to Mr. Winn for review, *id.*; and generally served as a conduit of information between Deputy AG Rosenstein and Mr. Winn, *see, e.g.*, Rosenstein Decl. ¶ 16 ("[Mr. Schools] contacted the Department's Acting Chief Privacy and Civil Liberties Officer . . . and reported to me that the Department's expert had concluded that disclosing the texts to the media would not violate the Privacy Act."); Winn Decl. ¶ 18 ("I advised ADAG Schools accordingly.").  The declarations do *not* address, among other key facts: when Mr. Schools had the relevant conversations; what, if anything, he told Mr. Winn about the relevant system or systems of records; and whether Mr. Schools provided any advice or analysis to Mr. Rosenstein beyond relaying Mr. Winn's conclusions.

Defendants' wholesale exclusion of the role of Sarah Isgur Flores is even more glaring. Defendants admit that "on December 12, 2017, DOJ officials within OPA, including Ms. Isgur, allowed members of the press to review the text messages at DOJ."  Answer ¶ 45.  Indeed, publicly available documents show that Ms. Isgur played a lead role in orchestrating the December 12 disclosure, including inviting reporters to DOJ on the evening of December 12; coordinating their

---

[2] The Rosenstein declaration refers to Mr. Schools as Associate Deputy Attorney General, Rosenstein Decl. ¶ 9, whereas the Winn declaration uses "Acting Deputy Attorney General," Winn Decl. ¶ 4.

entry into the building after hours; informing them that they were not permitted to remove the copies from the building, take pictures, or source the disclosure to DOJ; and responding to the disintegration of this plan in the days following the disclosure.  *See* Answer ¶¶ 4, 45, 52–54; *see also* **Jeffress Decl. Exs. A–D**.  Whether this clandestine approach was driven by Ms. Isgur or reflects instructions from her superiors, discovery is needed to determine the full extent of her role, as well as her communications with other officials.  *See Brunotte v. Johnson*, 892 F. Supp. 2d 199, 207 (D.D.C. 2012) (denying summary judgment on the basis that "issues of fact remain[ed]" as to the disclosing official's motives for disclosing the information).  More broadly, discovery is needed to identify not only those officials Defendants chose to put forward, but *all* officials whose conduct is relevant, as well as to develop the facts in connection with officials who are already known.

To the extent Defendants have provided firsthand accounts from *some* of the relevant officials, those accounts rely on carefully selected facts, contain significant gaps, and in some cases appear evasive as to the participating officials and their conduct.  To identify but a few examples:

- The declarations do not specify the timeline upon which Mr. Winn was consulted and provided his advice, which is critical to determining whether Defendants conducted a good-faith Privacy Act analysis prior to the disclosure.

- The Winn declaration does not address whether ADAG Schools (or anyone else) provided Mr. Winn with the background information necessary to conduct a proper Privacy Act analysis, including information about of the system or systems of records from which the messages would be disclosed.  *See* Winn Decl. ¶¶ 8–9 (assuming, rather than stating, that "the text messages at issue came from a system of records maintained by the OIG").

- The Rosenstein declaration does not provide any information about interactions between Mr. Rosenstein or his staff with then-Director of Public Affairs Sarah Isgur Flores, including any instructions he or ADAG Schools provided regarding the restrictions that Ms. Isgur ultimately communicated to reporters.

13

These deficiencies underscore the need for Ms. Page to test the government's evidence through discovery.  In particular, Ms. Page is entitled to depose the government's declarants and seek other testimonial and documentary evidence to develop the underlying facts.  Where a plaintiff in a Privacy Act case has "brought at least one potential inaccuracy to [the court's] attention and . . . the record is wholly undeveloped on [the relevant] issue[s] generally," the plaintiff "should be afforded a reasonable opportunity to complete discovery before responding to [the Government's] summary judgment motion."  *McCready v. Nicholson*, 465 F.3d 1, 19 (D.C. Cir. 2006) (quotation marks omitted) (last alteration in original).  Courts routinely deny motions for summary judgment and permit discovery where a plaintiff has not had the opportunity to test a declarant's statements by deposition.  *See, e.g.*, *Convertino*, 684 F.3d at 99–100; *Sussman v. U.S. Marshals Serv.*, 657 F. Supp. 2d 25, 27–28 (D.D.C. 2009) (denying summary judgment on Privacy Act claim because Marshals Service declarations "d[id] not establish a record that sufficiently explains" the relevant facts); *Allen v. Brown*, 185 F. Supp. 3d 1, 7 (D.D.C. 2016) (denying summary judgment because "Plaintiffs should not have to accept the statements in [the key official's] declaration at face value without having the opportunity to conduct document discovery and to depose him and others with potentially relevant information").  Here, no discovery has been taken, and Defendants' gap-filled declarations cannot remotely be considered dispositive of the serious issues in this case.

## II.   Defendants Have Failed to Show That They Are Entitled to Summary Judgment on Willfulness

In order to obtain summary judgment on the basis of the Privacy Act's requirement of "intentional or willful" agency action, 5 U.S.C. § 552a(g)(4), Defendants must establish that Plaintiff cannot prove—and, following a reasonable discovery period, would not be able to prove—that agency officials willfully or intentionally violated the Act.  *See Convertino*, 684 F.3d

at 101–2.  Critically, Defendants do not dispute the objective facts surrounding the release of Plaintiff's text messages.  They do not dispute that DOJ officials invited reporters to the Department on the evening of December 12, showed them copies of the messages that they were not allowed to take with them, and forbid them from sourcing the material to DOJ.  Nor do they dispute that the messages were part of a pending OIG investigation that would not conclude for another six months.  Against this backdrop, Defendants' proffered evidence falls far short of their burden: to provide a credible narrative to explain not just why Defendants publicized the messages in this highly unconventional manner, but also why to the fact-intensive element of intent should be resolved without any discovery.  Defendants do not cite a single case in which the court resolved willfulness against a Privacy Act plaintiff without any opportunity for discovery.

A plaintiff whose Privacy Act rights have been violated by an improper disclosure may be awarded damages if the disclosing agency "acted in a manner which was intentional or willful."  5 U.S.C. § 552a(g)(4); *see also Albright v. United States*, 732 F.2d 181, 189 (D.C. Cir. 1984) (characterizing "willful or intentional" as "committing the act without grounds for believing it to be lawful, or by flagrantly disregarding others' rights under the Act").  Courts have articulated the required showing in various ways, but the common thread is that the agency's conduct must be "greater than gross negligence."  *Tijerina v. Walters*, 821 F.2d 789, 799 (D.C. Cir. 1987) (internal quotation marks omitted).  The limited existing record raises serious questions regarding whether the relevant officials had a reasonable basis to believe their conduct was consistent with the law, with respect to both the circumstances of the disclosure and Defendants' purported internal Privacy Act analysis.

### A.  The Circumstances of the Disclosure Strongly Suggest That Defendants Willfully and Intentionally Violated Ms. Page's Privacy Rights

If Defendants believed that the release of the messages to reporters was justified by law, the most transparent and expeditious way to release them would have been to provide them electronically—either directly to reporters or to the public in general (for example, via a public posting to the DOJ website).  Instead, Defendants summoned reporters to DOJ late at night; allowed them to view, but not remove or copy, the messages; and forbade them from sourcing the material to DOJ.  *See* Answer ¶¶ 4, 45, 52–54 (admitting the substance of these points); *see also* **Jeffress Decl. Exs. A–D**.  This secretive process suggests that Department officials were conscious that their behavior was improper—quite the *opposite* of a firm conviction in the propriety of the release.

The Department's instruction that reporters should not source the messages to DOJ is enough, by itself, for this Court to reject Defendants' willfulness arguments.  Where, as here, the agency justifies the disclosure as an act of public transparency, *see* Mem. at 15–16, facts suggesting an effort to conceal the underlying source are highly material.  Moreover, although Defendants seek to minimize the Department's attempts at secrecy by implying it only occurred "for a brief period *on December 12, 2017*," *see* Answer ¶¶ 4, 45, 54 (emphasis added), the reality is that well into the following morning, Ms. Isgur was still instructing the media that  "[y]ou can't take them with you, take pictures, or source them (to doj or otherwise)."  **Jeffress Decl. Ex. C** (December 13, 2017, 9:56 a.m. instruction from Ms. Isgur to Buzzfeed reporter).  Defendants are entitled to no credit for acknowledging DOJ's role in the disclosure only after public reports made it untenable to blame any "leaks" on the congressional committees that had received productions of the documents on the evening of December 12.  *See, e.g.*, Natasha Bertrand, *In 'Highly Unusual' Move, DOJ Secretly Invited Reporters to View Texts Sent by Ousted FBI Agents*, Bus. Insider, Dec.

13, 2017, https://www.businessinsider.com/peter-strzok-page-texts-mueller-russia-trump-2017-12.

Likewise, Defendants overstate the facts by claiming that Deputy AG Rosenstein "openly acknowledged" the disclosure in his congressional committee testimony the next day.  *See* Mem. at 25.  Mr. Rosenstein did not volunteer this information; rather, he answered "I believe that is correct" in response to a member's question.  **Jeffress Decl. Ex. I** at 37.  The fact that Mr. Rosenstein gave a truthful answer when directly confronted (while testifying under oath) does not explain why Defendants initially attempted to conceal a disclosure they now claim was in the interest of public transparency.  *See* Rosenstein Decl. ¶ 18 (referencing "the goal that the Department be forthcoming with the public").

### B. The Timing, Justification for, and Good Faith of Defendants' Purported Internal Privacy Act Analysis Are Hotly Disputed

Rather than accounting for the highly unusual circumstances of the December 12 disclosure, Defendants attempt to sweep them aside by arguing that this Court should defer to the "thoughtful" Privacy Act analysis conducted by Mr. Winn.  *See* Mem. at 25.  But publicly available documents suggest that Mr. Winn did not finalize his written advice until January 4, nearly a month after the December 12 disclosure, and Defendants' own declarations raise serious questions as to whether Defendants conducted a proper Privacy Act analysis prior to releasing (or, even more importantly, *deciding* to release) Ms. Page's text messages to the media.  Discovery is needed to establish the relevant facts, including the chronology of consultations between DOJ senior leadership, Privacy Act advisors, and others involved in the December 12 disclosure.

Neither the Winn declaration nor the Rosenstein declaration identifies the times at which Mr. Winn's advice was sought and provided.  The Winn declaration states that ADAG Schools "contacted him" to seek the relevant Privacy Act advice on December 12, but it says nothing about

when Mr. Winn actually provided that advice.  Winn Decl. ¶ 4; *see also id.* ¶ 18 ("I advised ADAG Schools accordingly.").  Thus, the Winn declaration alone does not establish that Defendants properly analyzed their Privacy Act obligations in advance of the disclosure, as opposed to after the fact.

Likewise, the Rosenstein declaration entirely omits this critical issue.  The declaration specifies the timing of only two events: (1) that Mr. Rosenstein "wanted to confirm that [the disclosure] would not implicate the Privacy Act" "[b]efore disclosing the text messages to the news media," Rosenstein Decl. ¶ 16, and (2) that Mr. Rosenstein authorized the disclosure "[o]n December 12, 2017, with the express understanding that it would not violate the Privacy Act and that the text messages would become public by the next day in any event," *id.* ¶ 17.  The declaration provides no information (either absolute or relative) about the timeline upon which "[Mr. Schools] contacted the Department's Acting Chief Privacy and Civil Liberties Officer" and "reported to [Mr. Rosenstein] that the Department's expert had concluded that disclosing the texts to the media would not violate the Privacy Act."  *Id.* ¶ 16.  The declaration does not even confirm that Mr. Rosenstein had received Mr. Winn's analysis by the time he reached his "understanding."  Whether intentional or inadvertent, these omissions make it impossible for the Court to rely on the Winn and Rosenstein declarations to conclude that the Department conducted a good-faith Privacy Act analysis ahead of time.  These points could be easily clarified in depositions, since they are within the personal knowledge of Mr. Winn and Mr. Rosenstein.  *Id.* ¶ 16.

The available documentary evidence also belies Defendants' claims of a "thoughtful" analysis.  *See* Mem. at 25.  Publicly released emails suggest that ADAG Schools provided Mr. Winn the redacted text messages to review on December 12 at 4:47 p.m., just hours before reporters were invited to the Department to view them.  *See* **Jeffress Decl. Ex. F**.  This fact raises

serious questions as to whether Mr. Winn had the time to complete a thorough Privacy Act analysis, including reviewing the 375 messages, collecting any relevant contextual information, conducting a fact-specific analysis, and advising Mr. Schools (who then had to advise Mr. Rosenstein) on the same.  The emails, though heavily redacted, suggest Mr. Schools requested the advice on December 12; that OPCL drafted written advice between December 15 and December 20; that Mr. Winn sent to a draft memo to Mr. Schools on December 20; and that the memo for the file was finalized on January 4, 2018, and backdated to December 12, 2017.  *See id.*

In addition, the Winn declaration does not describe, and the record does not otherwise reflect, the information upon which Mr. Winn relied as the basis for his Privacy Act analysis. Discovery is needed, for example, to determine what the requesting officials told Mr. Winn about the circumstances and planned timing of the disclosures to Congress and reporters.  The Winn declaration states that "ADAG Schools informed me that . . . the Department intended to provide [the text messages] to at least some of the requesting members of Congress on *December 13*, 2017."  Winn Decl. ¶ 5 (emphasis added).  This statement raises a genuine question as to whether Mr. Winn was aware that the messages might be rushed out to both congressional offices and the news media on the night of December 12 or whether others in the Department intentionally misled him and/or Mr. Schools about the sequence of events because they knew the timing and circumstances of the disclosure were improper.

Likewise, discovery is needed to determine whether Mr. Winn was told to assume that the records would be disclosed from a particular system or whether he had independent knowledge, either firsthand or secondhand, of the relevant system or systems.  *See id.* ¶¶ 8, 9 (referencing the assumptions, rather than facts, upon which Mr. Winn relied).  Discovery is further needed to establish whether any system Mr. Winn was told to assume was, in fact, the system from which

the records were disclosed.  These facts are material to determining whether DOJ analyzed its Privacy Act obligations in good faith prior to releasing Ms. Page's text messages.  To enable the parties and Court to perform this assessment, Defendants will need to produce the final, written advice Mr. Winn provided, as well as all of the communications with other Department officials regarding that advice.

If the evidence developed through discovery shows that the Department's analysis was the product of misinformation from certain DOJ and/or FBI employees, such evidence could establish willfulness regardless of whether other officials, viewed in isolation, may have acted reasonably in relying upon it.  *See*, *e.g.*, *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 580–81, 583–84 (D.C. Cir. 2002) ("Reasonable reliance by some employees cannot immunize an agency from the Privacy Act consequences of employing other individuals who (allegedly) deliberately falsify records.").  Defendants' failure to account for the conduct of all relevant officials thus dooms their motion.

Far from supporting their bid for early summary judgment with no discovery, the willfulness cases relied upon by Defendants emphatically support Ms. Page's position.  In two of Defendants' cited cases, the D.C. Circuit *reversed* summary judgments that had been based on lack of willfulness.  *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) (holding that passing allegation in pleading that merely "touched on willfulness," namely that disclosing officials "were yelling and screaming," required vacating summary judgment); *Tijerina*, 821 F.2d at 799 (rejecting government's argument that  agency official's "affidavit stating he did not believe he was violating the Act in sending the July 1982 letter disposes of appellant's damages claim").  In another, the D.C. Circuit held that a Bureau of Prisons policy of retaining, for security purposes, duplicate prints of photos taken by inmates using BOP equipment did not willfully

violate the Privacy Act—but that was after a decade of litigation in which plaintiffs utterly "fail[ed] to propound any discovery requests related to the Privacy Act's intent question." *Maydak v. United States*, 630 F.3d 166, 168, 183 (D.C. Cir. 2010).   In each of the other cases Defendants cite for their willfulness argument, the Privacy Act claim went to three-day bench trials, where the court heard from multiple agency witnesses subject to cross-examination. *Albright*, 732 F.2d at 189-90; *Reed v. Dep't of the Navy*, 910 F. Supp. 2d 32, 34–35 (D.D.C. 2012).   Defendants cannot seriously maintain that these cases support summary judgment right out of the gate here, without Ms. Page having been afforded any opportunity for discovery.

## III.   Defendants Have Not Established That a Valid Routine Use Permitted the Disclosure of Plaintiff's Messages

The Privacy Act prohibits a federal agency from disclosing protected records to any person outside the agency, subject to a list of enumerated exceptions.   5 U.S.C. § 552a(b).   Here, Defendants seek summary judgment based solely on the Act's "routine use" exception.   "To fit within the confines of the routine use exception to the Privacy Act, an agency's disclosure of a record must be both (i) 'for a purpose which is compatible with the purpose for which it was collected' and (ii) within the scope of a routine use notice published by the agency." *Ames v. U.S. Dep't of Homeland Sec.*, 861 F.3d 238, 240 (D.C. Cir. 2017) (quoting 5 U.S.C. §§ 552a(a)(7), 552a(e)(4)(D)).   These requirements are known as the "compatibility" and "publication" requirements. *See, e.g.*, *Brunotte v. Johnson*, 892 F. Supp. 2d 199, 207 (D.D.C. 2012) ("The agency must demonstrate both compatibility and publication in order to invoke the routine use exception.").

Here, Defendants rely on an alleged "routine use" specific to a DOJ OIG system of records, the "Office of the Inspector General Investigative Records" system, or OIG-001.   Specifically, Defendants assert that the December 12 disclosure falls within a routine use category covering

disclosures "[t]o the news media and the public, including disclosures pursuant to 28 C.F.R. § 50.2, unless it is determined that release of the specific information in the context of a particular case would constitute an unwarranted invasion of personal privacy" ("routine use (k)").  Mem. at 18 (quoting 72 Fed. Reg. 36,726 (July 5, 2007)).

Thus, assuming *arguendo* that Defendants had adduced evidence showing beyond any genuine issue of material fact that the disclosed records came from the OIG-001 system, Defendants could prevail on their asserted routine use defense only by establishing that the disclosure was both (1) compatible with the purpose for which the records were collected and (2) within the scope of the cited routine use of OIG-001 records.  They cannot meet those requirements, but, more importantly, they have not laid the necessary foundation for the assumption that the records came from the OIG-001 system in the first place, as opposed to any of the multiple other systems of records at issue.

### A. Defendants Have Not Established the Necessary Factual Predicates to Rely on Routine Use (k)

Defendants have not established that they retrieved and disclosed Ms. Page's text messages *solely* from the OIG-001 system.  Rather, their analysis merely *assumes* that the records were disclosed from "an OIG system of records."  Mem. at 8, 14, 17, 22; *see* Winn Decl. ¶¶ 8–9 (prefacing routine use analysis with "[a]ssuming that the text messages at issue came from an OIG system of records . . .").  Summary judgment, however, requires evidence, not assumptions.  Defendants' assumptions do not provide a sufficient factual basis for this Court to find that the December 12 disclosure was permitted under routine use (k).

Routine uses are system-specific, rather than applicable to all agency disclosures or even all disclosures by a particular agency or its component.  For each system of records an agency maintains, the agency "must publish in the Federal Register 'each routine use of the records

22

contained in the system, including the categories of users and the purpose of such use.'" *Tran v. Dep't of Treasury*, 351 F. Supp. 3d 130, 135 (D.D.C. 2019), *aff'd*, No. 19-5053, 2020 WL 1487717 (D.C. Cir. Mar. 6, 2020).   These regulations are known as "Systems of Records Notices," or SORNs. *Id.*   The "publication" requirement allows individuals—including federal employees— to consider the uses to which their personal information may be put before deciding whether to provide Privacy Act-protected information.   *See id.* at 137 (describing § 552a(3)(4)(D) as setting forth a "requirement that agencies notify individuals of the purposes for which their information may be used").

Because Ms. Page has plausibly alleged that the records were contained in multiple systems of records, *see* Compl. ¶¶ 41, 62–65, Defendants cannot extinguish Ms. Page's claims by simply *assuming* that a particular system is the relevant one.   Rather, Defendants must *either* establish that the records were disclosed from a particular system, then prove that the disclosure was permissible under a routine use specific to that system, *or* otherwise dispose of the claims with respect to all of the systems at issue (for example, by showing that a non-system-specific Privacy Act exception applies).   Yet Defendants rely solely on the system-specific routine use exception here, and they have proffered no evidence to establish that the text messages were disclosed from the OIG-001 system alone.

Indeed, the record indicates that Defendants maintained the messages in *multiple* DOJ, FBI, and OIG systems at the time Defendants disclosed them.   In their answer, Defendants acknowledge that the Department obtained copies of the relevant text messages from OIG prior to the December 12 disclosure.   *See* Answer ¶¶ 42, 43, 65.   Separately, OIG's own public statements make clear that, before the relevant messages ever entered any OIG system of records, they were present in DOJ and FBI systems.   *See* **Jeffress Decl. Ex. H**, Press Release, Office of the Inspector

Gen., U.S. Dep't of Justice (Dec. 15, 2017) (stating that OIG had "told the Department that [it] did not object to the Department releasing to Congress records that it had *previously produced* to [OIG] in the course of [OIG's] ongoing review, which included the text messages" (emphasis added)); *see also* Answer ¶ 60; SOMF Resp. ¶ 23. Indeed, Defendants admit, for example, that "the FBI maintains the Enterprise Security Operations Center system, which may collect text messages sent to or from FBI-issued mobile devices, and that such text messages may be retrieved in certain circumstances using the telephone numbers of those devices." Answer ¶ 62. Collectively, these facts suggest that OIG-001 is far from the only system of records of Defendants in which these records resided. Only discovery—and not Defendants' declarants' "assumptions"—can shed light on which of these systems were sources of the December 12 disclosure.

Defendants' strategy of admitting overall responsibility for the disclosure but refusing to provide the facts to establish that its conduct complied with the law heightens the need for discovery. This strategy is especially troubling because this practice of selectively sharing information appears to extend to senior DOJ officials' consultations with their own Privacy Act advisors. Indeed, based on the statements in the Winn declaration, it is far from clear that Mr. Winn ever knew or considered the system of records from which Ms. Page's text messages were disclosed. *See, e.g.*, Winn Decl. ¶ 9 ("assuming" for purposes of the analysis that "the text messages at issue came from a system of records maintained by the OIG"); *id.* ¶ 8 ("*Ordinarily*, [DOJ] emails and text messages maintained in the Department's general archives have not constituted 'records' in a 'system [of] records' that would be subject to the Privacy Act." (emphasis added)); *id.* ¶ 9 ("*[I]f* the records of these text messages had been copied from the FBI's general archives into a 'system of records,' for instance into an OIG investigative file, *it is conceivable that* they would come under the protection of the Privacy Act . . . .") (emphasis added)).

24

Based solely on the hypothetically phrased statements in the Winn declaration, there is no way for this Court to conclude that senior Department officials provided Mr. Winn with the factual basis required to conduct a proper Privacy Act analysis, nor is it possible to confirm whether the realities of the disclosure did, in fact, track the assumptions upon which Mr. Winn operated. Discovery is needed to determine, among other material facts: the details of the planned disclosure, the systems from which the records were retrieved, whether other systems in which the records were housed were used to facilitate the disclosure, and which of these facts senior Department officials shared with Mr. Winn. If the requesting officials kept Mr. Winn in the dark in order to elicit the answer they wanted to hear, the analysis may be entirely invalid.

## B. Defendants Have Not Established the "Compatibility" Prong As a Matter of Law

Assuming *arguendo* that Defendants retrieved the disclosed records solely from the OIG-001 system, Defendants' evidence fails to establish that the disclosure is "compatible with the purpose for which [the relevant record] was collected." 5 U.S.C. § 552a(a)(7). This "compatibility" analysis "require[s] a fairly close relationship between the purpose for which a document was created and the purpose of its disclosure." *Richardson v. Bd. of Governors of the Fed. Reserve Sys.*, 248 F. Supp. 3d 91, 102 (D.D.C. 2017) (collecting cases).

Defendants fall far short of that standard. The SORN for the OIG-001 system explains: "The OIG maintains this system of records in order to carry out its responsibilities pursuant to the Inspector General Act of 1978, as amended . . . . Accordingly, the records in this system are used in the course of investigating individuals and entities suspected of having committed illegal or unethical acts and in conducting related criminal prosecutions, civil proceedings, and administrative actions." 72 Fed. Reg. 36,725 (July 5, 2007). Even based on the limited existing record, the circumstances of the December 12 disclosure do not remotely align with these purposes for which OIG investigative records are collected. Notably, *OIG did not authorize and*

*emphatically disclaimed any role in the December 12 disclosure of its investigative records to reporters*, stating in a press release on December 15, 2017: "At no time prior to the release of the text messages did the Department consult with the OIG about providing records to the media." **Jeffress Decl. Ex. H** (emphasis added); *see also* Answer ¶¶ 60, 65 (admitting that "DOJ officials disclosed the records to reporters without OIG's knowledge or approval"). That OIG felt the need to distance itself from Defendants' conduct is powerful evidence that the purposes of Defendants' disclosure were not compatible with the purpose for which the records were collected—*i.e.*, to facilitate OIG's review of the FBI's Midyear investigation.

In an attempt to reconcile these divergent purposes, Defendants ask the Court to decide the compatibility issue at a level of generality that would render it largely meaningless, urging, for example, that the December 12 disclosure and OIG's Midyear investigation shared a common purpose of "shed[ding] light on potential government misconduct," Mem. at 15, or being "forthcoming with the public," *id.*; Rosenstein Decl. ¶ 18. These stated purposes are so open-ended that they could be employed to justify virtually *any* disclosure of individual records from a pending OIG investigation involving a matter of public interest. Yet that would fly in the face of the Department's longstanding practice for decades *not* to disclose such records. The Court should hesitate to accept a novel interpretation that would empower politically appointed DOJ officials to selectively leak sensitive OIG records to the media in the middle of an investigation, regardless of whether the facts had been developed or an investigative conclusion had been reached.

Defendants also suggest that their disclosure to reporters is somehow proper because they had an "understanding" that unidentified members of Congress might publicize the messages anyway after the Department rushed them over to committee offices on the same evening. Winn Decl. ¶¶ 6, 16; *see also* Rosenstein Decl. ¶ 18. That argument, if accepted, would eviscerate the

Privacy Act.  The Privacy Act contains a number of carefully delineated exceptions, but nowhere to be found is any exception allowing an agency to release protected information merely because it has an understanding that the information could enter the public domain in the future through other means.  Defendants were not free to violate the Privacy Act simply because they may have thought members of Congress would release the text messages anyway.

In any case, the relevant facts are either disputed or militate strongly against a finding that senior Department officials were acting with a purpose of transparency, rather than improper purposes such as rehabilitating the Department's standing with President Trump and providing fodder for the President and his allies to discredit the Special Counsel's investigation and the Russia investigation more broadly.  Undisputed factual circumstances associated with the December 12 disclosure make clear that it was highly unusual, to put it mildly.  *See* Answer ¶¶ 4, 45, 52–54; *see also* **Jeffress Decl. Exs. A–D**.  The record also suggests that Defendants rushed the messages out the door ahead of Deputy AG Rosenstein's testimony on the morning of December 13.  *See, e.g.*, Answer ¶ 49 (admitting that "then-Deputy Attorney General Rod Rosenstein's upcoming testimony on December 13, 2017 was the reason for the timing of the disclosure").  The parties dispute a range of issues related to the purposes of the disclosure, including whether the text messages were, in fact, "ready to release" to Congress on December 12.  *See* SOMF Resp. ¶ 22.

Summary judgment based on the routine use exception is inappropriate where, as here, the record is insufficient to establish that the disclosing officials' motives are compatible with the records' purpose.  *See Brunotte*, 892 F. Supp. 2d at 207 (denying summary judgment on the basis that "[i]ssues of fact remain[ed] regarding [the disclosing official's] motives in submitting Plaintiff's criminal investigation information to GPO and whether these submissions can be said

to have been compatible with GSA's purpose for collecting it in the first instance"); *Richardson*, 248 F. Supp. 3d at 102 (rejecting reliance on routine use exception where defendants "ha[d] not provided sufficient detail to establish that the disclosure . . . satisfie[d] the test for 'routine use'"). In light of the facts described above, the conclusory statements in Defendants' declarations do not resolve the dispute, and summary judgment is inappropriate at this time.

## C. Defendants Have Not Established That the Disclosure Falls Within the Scope of Routine Use (k)

Assuming *arguendo* that Defendants obtained the records they disclosed solely from the OIG-001 system, Defendants' routine use argument also fails to satisfy the "publication" requirement—*i.e.*, the requirement that a disclosure fall within the scope of a published routine use, *see Ames*, 861 F.3d at 240—because they have not shown that the December 12 disclosure satisfies the requirements of routine use (k). In particular, the applicability of routine use (k) turns on hotly contested disputes, such as whether the disclosure constituted an unwarranted invasion of Ms. Page's personal privacy. *See Tijerina*, 821 F.2d at 798 (reversing summary judgment where the relied-upon routine uses did not apply as a matter of law).

### i. Routine Use (k) Does Not Extend to the Circumstances of the December 12 Disclosure

Routine use (k) permits the disclosure of records within the OIG-001 system "[t]o the news media and the public, including disclosures pursuant to 28 C.F.R. § 50.2, unless it is determined that release of the specific information in the context of a particular case would constitute an unwarranted invasion of personal privacy." 72 Fed. Reg. 36,726 (July 5, 2007). This exception makes possible, for example, the release of final OIG reports summarizing the Inspector General's findings and conclusions. But Defendants cite nothing indicating they have ever before construed routine use (k) as covering the extraordinary circumstances present here: an ad hoc disclosure of

28

cherry-picked *evidence* relating to specific individuals midstream during a pending OIG investigation.

Indeed, the very DOJ regulation referenced in routine use (k), 28 C.F.R. § 50.2(c)(1), is to the contrary:

> Personnel of the Department of Justice associated with a civil action shall not during its investigation or litigation make or participate in making an extrajudicial statement, other than a quotation from or reference to public records, which a reasonable person would expect to be disseminated by means of public communication if there is a reasonable likelihood that such dissemination will interfere with a fair trial and which relates to . . . [e]vidence regarding the occurrence or transaction involved.

In line with these principles, the DOJ Inspector General has testified in connection with the Crossfire Hurricane investigation, which also encompassed a review of text messages exchanged between Ms. Page and Mr. Strzok for evidence of potential bias, that it would be inappropriate for him or anyone in his office to give interviews about a pending investigation, in part because preliminary assessments may not be borne out by the evidence. *See Inspector General Report on Origins of FBI's Russia Inquiry: Hearing Before the S. Comm. on the Judiciary*, 116th Cong. (2019) (statement of Michael Horowitz, Inspector Gen., U.S. Dep't of Justice), *available at* https://tinyurl.com/rca7olh, 1:46:20–1:46:50 ("Ongoing investigations . . . need to be protected from outside influence. You don't know as an investigator, or you shouldn't conclude as an investigator until you are done with the investigation—you shouldn't be reaching your conclusions until that point. And so giving preliminary ideas, advice, guidance, statements, that can be misleading, and you should not be reaching final conclusions until you get to the end of the investigation.").

Notably, no one who was involved in the December 12 disclosure other than Defendants thought there was anything "routine" about it. Reuters reporter Mark Hosenball observed that his

former-official contacts "with historical knowledge of such issues and they said they had never seen or heard of a previous case of DoJ late at night calling reporters in to look at private message-type evidence - EVIDENCE, not internal memoranda - which had been collected by DoJ or IG in what is still an active, open investigation." **Jeffress Decl. Ex. D**.

These facts defeat Defendants' reliance on routine use (k). The December 12 disclosure simply does not fall within its scope. If routine use (k) *could* be stretched to cover the situation here, however, it would be invalid because it would not provide sufficient notice to someone in Ms. Page's position regarding the purposes for which personal records generated in the course of her employment could be used. *See Tran*, 351 F. Supp. 3d at 137. Courts have recognized that agencies' promulgation of routine uses cannot be used to subvert the very purposes of the Privacy Act. In particular, routine uses cannot be so broad that they undermine the functions of the publication and compatibility requirements. *See id.* ("[B]road term[s] . . . do[ ] not provide adequate notice of the purposes for which the [agency] may release an employee's information."); *Brunotte*, 892 F. Supp. 2d at 207 ("An 'agency cannot, by the mere publication of broad routine use purposes, evade the statutory requirement that disclosure must be compatible with the purpose for which the material was collected.'" (quoting *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 550 (3d Cir. 1989))). Routine uses that are overly broad are invalid and cannot be used to shield the agency from liability for harmful disclosures of information about individuals.

### ii. The Parties Dispute Facts Material to Whether the December 12 Disclosure Constituted an Unwarranted Invasion of Ms. Page's Personal Privacy

Defendants also have failed to dispel any genuine issue of material fact about whether the December 12 disclosure constituted an "unwarranted invasion of [Ms. Page's] personal privacy." 72 Fed. Reg. 36,726 (July 5, 2007) (OIG-001 SORN).

Rather than starting from the premise that the agency should shield sensitive personal information about employees collected during an internal investigation, Mr. Winn and Mr. Rosenstein treat the confidential handling of such records as a privilege to be bestowed or withheld by Department leadership, subject only to a nominal Privacy Act analysis that does not depend on the stage of OIG's investigation; does not require OIG's approval or knowledge; and does not require an independent analysis (indeed, it can be completed in hours). According to his declaration, Mr. Rosenstein concluded that Mr. Strzok and Ms. Page did not have "*any* privacy interest in the text messages that would warrant withholding them from disclosure . . . because the materials proposed for release . . . (1) were sent on government phones with the knowledge that they were subject to review by FBI; (2) were so inappropriate and intertwined with their FBI work that they raised concerns about political bias influencing official duties; and (3) the redacted portions proposed for disclosure were not sufficiently personal in nature." Rosenstein Decl. ¶ 13 (emphasis added). Mr. Winn addressed many of the same factors within the framework of the balancing test used for FOIA exemptions 6 and 7(C). Winn Decl. ¶¶ 12–14.

Critically, the very factors Mr. Winn and Mr. Rosenstein considered to make a snap decision on December 12 were, at the same time, undergoing careful and methodical review by OIG. It would take another six months for OIG to finalize its investigative conclusions and issue its report on the handling of the Midyear investigation. Ultimately, OIG found no evidence of bias or other improper considerations affecting the handling of the investigation, including in the messages exchanged between Ms. Page and Mr. Strzok. *See* **Jeffress Decl. Ex. G**, Excerpts from OIG Report, at iii, 149. Although Ms. Page does not agree with OIG's analysis in every respect, there is no question that the Inspector General was in a far better position to draw conclusions

31

following its 16-month investigation than Mr. Winn and Mr. Rosenstein were on the evening of December 12.

Indeed, the final OIG report confirms that Defendants' disclosure of the 375 text messages constituted an unwarranted invasion of Ms. Page's privacy. Over the course of its review of the Midyear investigation, OIG determined that many of the messages between Ms. Page and Mr. Strzok involved matters "of a personal nature, including discussions about their families, medical issues, and daily events." **Jeffress Decl. Ex. G** at 398. The final OIG Report deemed as relevant and published only about a tenth of the 375 messages that Defendants had disclosed to the press six months earlier, while OIG's review of the Midyear investigation was still underway, as well as messages outside those 375. Against this backdrop, it is disingenuous for Mr. Rosenstein to claim that the Department made its selective disclosure of 375 purportedly "political" messages, in part, to protect Ms. Page from the risk that members of Congress would make their own "selective disclosures" from within this set. *See* Rosenstein Decl. ¶ 15 (expressing concern about "adverse publicity" for Ms. Page). In addition, the published OIG Report preserved the anonymity of other FBI employees whose conduct OIG investigated—referring, for example, to "FBI Attorney 1" and "FBI Attorney 2," *id.* at 44; "Agent 1" and "Agent 5," *id.* at xi; and "Prosecutor 1," *id.* at 119— but it did not take any similar steps to protect the privacy interests of Ms. Page, which the Department had already concluded were not entitled to protection.

The parties vigorously dispute whether Defendants properly redacted the messages, *see* SOMF Response ¶¶ 20, 32, as well as the Department's suggestion that it was merely an onlooker in the *earlier* disclosure of Ms. Page's and Mr. Strzok's identities to the press prior to December 2, 2017, *see* SOMF ¶ 32; Winn Decl. ¶ 16 (purporting to excuse the failure to "mitigate the invasion of privacy" on the ground that "the public had already become aware" of Ms. Page's and

Mr. Strzok's identities through news reports).  Notably, Defendants "lack[ed the] knowledge or information" to deny the following allegation in their answer: "On information and belief, between July and December 2017, DOJ officials notified White House personnel about the existence of the messages, and White House staff or associates subsequently contacted members of the media." Answer ¶ 35; Compl. ¶ 35.  Defendants' role in publicizing the existence of the text messages prior to their December 12 release is yet a matter for discovery, and regardless, those prior media leaks do not justify the December 12 disclosure.

Defendants rely on several cases for the proposition that "courts routinely rely on the declarations of agency officials to determine whether the agency properly weighed the private interests at stake versus the public interest in disclosure."  *See* Mem. at 19–20 (citing cases).  The Government fails to acknowledge that these are FOIA cases, not Privacy Act cases.  It is one thing to hold that if an agency official describes the methodology and scope of a FOIA search in reasonable detail, the requester will not be permitted to depose the official in an effort to establish that a different search might have yielded more documents.  *See, e.g.*, *Dutton v. U.S. Dep't of Justice*, 302 F. Supp. 3d 109, 124 (D.D.C. 2018).  It is quite another to say that in a Privacy Act case where liability turns on the disclosing officials' states of mind, the Government's declarations must be taken as gospel truth and cannot be tested through cross-examination and document discovery.  Even under Defendants' analogy to FOIA, however, Ms. Page would easily be entitled to discovery here.  *See Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981) (explaining that summary judgment in FOIA cases is proper only if "the affidavits describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, *and are not*

*controverted by either contrary evidence in the record nor by evidence of agency bad faith*"
(emphasis added)).

   More broadly, the cases that Defendants rely upon for their routine use defense are nothing
like this case, and in fact underscore why summary judgment should be denied here.  The cases in
which the defense was sustained involved disclosures of agency employee personnel records to
subsequent employers or authorities that matched a published routine use with a high degree of
precision.  *See, e.g., Ames v. U.S. Dep't of Homeland Sec.*, 861 F.3d 238, 241 (D.C. Cir. 2017)
(finding no liability for furnishing of DHS IG report identifying security breaches by personnel
security officer to that individual's new employer (DOD), because DHS routine use specifically
authorized sharing such information with sister agencies in the intelligence, counter-intelligence,
or anti-terrorism field).[3]  Unlike here, moreover, the summary judgment motion in *Ames* was filed
*after discovery*, more than two years into the case.  *Ames v. U.S. Dep't of Homeland Security*, 153
F. Supp. 3d 342, 346, 352 n.6 (D.D.C. 2016).  Most striking is Defendants' reliance on *Britt v.
Naval Investigative Service*, 886 F.2d 544 (3d Cir. 1989).  That case squarely supports Ms. Page:
it held that "the district court *erred* in granting summary judgment for the government" because
"the agency cannot, by the mere publication of broad routine use purposes, evade the statutory
requirement that disclosure must be compatible with the purpose for which the material was
collected."  *Id.* at 550 (emphasis added).  Defendants' routine use argument here suffers from the
very same flaw.

---

[3] *See also Budik v. United States*, 949 F. Supp. 2d 14, 28–30 (D.D.C. 2013) (disclosure of DOD
radiologist's mediocre performance to new employer; routine use covered sharing of medical
quality information "needed . . . to assess the professional qualifications of any health care
provider"); *Radack v. U.S. Dep't of Justice*, 402 F. Supp. 2d 99, 105–6 (D.D.C. 2005) (disclosure
of DOJ attorney's possible ethical violation to bar authorities; routine use authorized referral to
"state bar disciplinary authorities . . . in connection with the administration and maintenance of
standards of conduct and discipline").

**IV.    FBI Should Remain in the Case**

Defendants argue that Ms. Page's claim against the FBI fails because "the Bureau did not disclose Plaintiff's text messages to the press on December 12, 2017." Mem. at 11. That is wrong. Defendants have proffered no evidence at all regarding the FBI, nor do they rely on a routine use specific to an FBI system of records. Unless and until Defendants establish that the records were not disclosed from an FBI system, as Ms. Page has plausibly alleged, the FBI should remain in the case.

By choosing to rely on assumptions rather than facts about the systems of records from which Ms. Page's messages were disclosed, Defendants have deprived themselves of a basis for the argument that the case should not proceed against the FBI. Even without having yet had the opportunity for *any* discovery, Ms. Page has plausibly alleged—as well as proffered evidence to suggest—that the text messages were contained in multiple systems of records. *See* Compl. ¶¶ 41, 62–65; **Jeffress Decl. Ex. H**, Dec. 15, 2017 OIG Press Release (confirming that the Department had previously produced the text messages to OIG). In addition, Defendants admit that "the FBI maintains the Enterprise Security Operations Center system, which may collect text messages sent to or from FBI-issued mobile devices, and that such text messages may be retrieved in certain circumstances using the telephone numbers of those devices." Answer ¶ 62. Thus, Defendants must show that there is no genuine issue of material fact as to whether relevant FBI systems may have been used to facilitate the disclosure. Because they have not carried that burden, both Defendants should remain in the case and be subject to party discovery.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion for summary judgment.

Dated: April 3, 2020

Respectfully submitted,

/s/ Amy Jeffress
_____
Amy Jeffress (D.C. Bar No. 449258)
Robert J. Katerberg (D.C. Bar No. 466325)
Kaitlin Konkel (D.C. Bar No. 1021109)
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, DC 20001-3743
Telephone: (202) 942-5000
Fax: (202) 942-5999

*Counsel for Plaintiff Lisa Page*