**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LISA PAGE, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 1:19-cv-3675-TSC |
| v. | ) |
| | ) |
| U.S. DEPARTMENT OF JUSTICE, *et al.*, | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

**MEMORANDUM IN REPLY IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ....................................................................................................................... 3

I.     SUMMARY JUDGMENT IS APPROPRIATE ON THE CURRENT RECORD ............ 3

II.    THE FBI IS ENTITLED TO SUMMARY JUDGMENT ................................................. 6

III.   DEFENDANTS HAVE SHOWN CONCLUSIVELY THAT THERE WAS NO
WILLFUL OR INTENTIONAL VIOLATION OF THE PRIVACY ACT ...................... 8

IV.   THE PRIVACY ACT AUTHORIZED THE DEPARTMENT'S DISCOLSURE
OF THE TEXT MESSAGES ........................................................................................... 12

     A.    The Department Properly Relied on the OIG's SORN ......................................... 13

     B.    The Department's Disclosure to the Media Was Compatible with the
Purposes for Which the Text Messages Were Collected. .................................... 15

          1.    The Department Correctly Applied the Compatibility Test .................... 15

          2.    Plaintiff's Speculation about the Department's Motives Has No
Bearing on the Compatibility Analysis .................................................... 18

     C.    The Department Properly Relied on Routine Use (k) from the OIG's
SORN. .................................................................................................................... 19

          1.    Routine Use (k) Permits the Department's Disclosure to the Media ........ 19

          2.    The Department Made the Necessary Predicate Determination
under Routine Use (k) before Disclosing the Text Messages to the
Media. ...................................................................................................... 22

CONCLUSION .................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Albright v. United States*,
   732 F.2d 181 (D.C. Cir. 1984) .......................................................................... 9

*Ames v. U.S. Dep't of Homeland Security*,
   861 F.3d 238 (D.C. Cir. 2017) .................................................................... 16, 17

*Britt v. Naval Investigative Serv.*,
   886 F.2d 544 (3d Cir. 1989) ............................................................................ 16

*Chichakli v. Tillerson*,
   882 F.3d 229 (D.C. Cir. 2018) ......................................................................... 16

*Convertino v. U.S. Dep't of Justice*,
   684 F.3d 93 (D.C. Cir. 2012) ........................................................................ 5, 6

*Corel Corp. v. United States*,
   165 F. Supp. 2d 12 (D.D.C. 2001) .................................................................. 18

*Dinh Tran v. Dep't of Treasury*,
   351 F. Supp. 3d 130 (D.D.C. 2019) ................................................................ 21

*Fischer v. U.S. Dep't of Justice*,
   723 F. Supp. 2d 104 (D.D.C. 2010) .................................................................. 3

*Getman v. NLRB*,
   450 F.2d 670 (D.C. Cir. 1971) ........................................................................ 22

*Judicial Watch v. Dep't of Defense*,
   963 F. Supp. 2d 6 (D.D.C. 2013) .................................................................... 10

*Maydak v. United States*,
   630 F.3d 166 (D.C. Cir. 2010) .......................................................................... 7

*Muslim Advocates v. U.S. Dep't of Justice*,
   833 F. Supp. 2d 92 (D.D.C. 2011) .................................................................. 10

*Students Against Genocide v. Dep't of State*,
   257 F.3d 828 (D.C. Cir. 2001) ........................................................................ 10

*Sussman v. U.S. Marshals Serv.*,
   494 F.3d 1106 (D.C. Cir. 2007) .................................................................... 8, 9

*Tijerina v. Walters*,
821 F.2d 789 (D.C. Cir. 1987) ............................................................................................. 12

**Statutes**

5 U.S.C. § 552(b)(6) ............................................................................................................ 22

5 U.S.C. § 552a(b) ............................................................................................................... 14

5 U.S.C. § 552a(b)(2) ........................................................................................................... 22

5 U.S.C. § 552a(b)(3) ...................................................................................................... 14, 22

5 U.S.C. § 552a(g)(4) .................................................................................................. 7, 8, 14

**Legislative Materials**

*Oversight Hearing with the Deputy Attorney General Rod Rosenstein Before the H. Comm. On
the Judiciary*, 115 Cong. 37 (2017) ......................................................................... 10

*Crossfire Hurricane Report Hearing before the S. Comm.
On the Judiciary*, 116 Cong. (2019) ......................................................................... 10

**Regulations**

28 C.F.R. § 50.2(c)(1) ..................................................................................................... 19, 20

57 Fed. Reg. 8473 (Mar. 10, 1992) ...................................................................................... 15

72 Fed. Reg. 36,725 (July 5, 2007) .............................................................................. *passim*

## INTRODUCTION

There is no mystery to be solved in this case. The identities of the persons responsible for the disclosure of Plaintiff's text messages to the news media are known, as are their motivations and the timing of all of the relevant events.

Here are the dispositive facts, established through sworn testimony already in the record: On December 12, 2017, then–Deputy Attorney General Rod Rosenstein was considering whether to authorize the Department of Justice ("Department") to disclose to the media 357 text messages exchanged between Plaintiff and Peter Strzok that the Department received from the Office of the Inspector General ("OIG"). *See* Declaration of Rod J. Rosenstein ¶ 14, ECF No. 14-4 ("Rosenstein Decl."); Declaration of Stephen E. Boyd ¶ 6, ECF No. 14-5 ("Boyd Decl."). Congress had requested those text messages, and the Department had determined that there was no legal basis to deny Congress's request in advance of Mr. Rosenstein's upcoming testimony before a congressional committee on December 13, 2017. *See* Rosenstein Decl. ¶ 14; Boyd Decl. ¶ 7. Before deciding whether to release the text messages to the media, however, Mr. Rosenstein wanted to confirm that the disclosure would not violate the Privacy Act. *See* Rosenstein Decl. ¶ 16. Based on that concern, and at Mr. Rosenstein's direction, then–Associate Deputy Attorney General Scott Schools consulted with the head of the Department's Office of Privacy and Civil Liberties ("OPCL"), Peter Winn. *See* Rosenstein Decl. ¶ 16; Declaration of Peter Winn ¶¶ 3–4, ECF No. 14-6 ("Winn Decl."). Mr. Winn is the career expert in the Department responsible for providing authoritative legal advice and guidance to the Department's leadership on questions regarding the Privacy Act, including on the lawfulness of proposed disclosures of information. *See* Winn Decl. ¶ 3; *see also* Rosenstein Decl. ¶ 16. Mr. Winn reviewed the relevant text messages and concluded that disclosing them in redacted form would not violate the Privacy Act. *See* Winn Decl. ¶¶ 13,

18. Mr. Schools reported Mr. Winn's conclusion to Mr. Rosenstein on December 12, 2017, and Mr. Rosenstein then authorized their disclosure as redacted with the express understanding that doing so would not violate the Privacy Act. *See* Rosenstein Decl. ¶¶ 16–19; Winn Decl. ¶ 18. It was the Department's decision, not the FBI's, to disclose the text messages to the media. *See generally* Rosenstein Decl.; Boyd Decl. Winn Decl.

These facts are uncontroverted, and they conclusively establish that Defendants did not willfully or intentionally violate the Privacy Act. To the contrary, the Department made an appropriate and reasonable factual and legal inquiry before proceeding to disclose a redacted set of the text messages, and the final decision-maker on behalf of the Department, Mr. Rosenstein, believed that the disclosure was lawful. *See* Rosenstein Decl. ¶¶ 16–19.

Plaintiff's refrain throughout her brief is that the Court should not decide her claims yet because she needs additional information. That argument is meritless, as discussed below and in Defendants' opposition to Plaintiff's Rule 56(d) motion. *See* Defs.' Opp'n to Pl.'s Rule 56(d) Mot. ("Defs.' 56(d) Opp'n"). The defects in Plaintiff's Privacy Act claim cannot be cured through discovery. While some areas of factual disagreement exist, none of them rises to the level of a material fact about which there is any genuine dispute. Plaintiff is therefore forced to rely on innuendo to try to convince the Court that Mr. Rosenstein or Mr. Winn may have acted in bad faith. But Plaintiff's rank speculation does not justify allowing her case to proceed.

Plaintiff's case suffers from other fatal flaws as well. As discussed further below, the Department's disclosure of the text messages was compatible with the purpose for which OIG collected them—among other things, to supervise conduct relating to programs and operations of the Department. In addition, the Department's disclosure of the text messages to the media was, in fact, authorized by the Privacy Act, as Mr. Winn concluded, because, assuming Plaintiff's text

messages were maintained in an OIG system of records, the disclosure falls within a routine use in OIG's system of records notice, or "SORN." Because the Department's disclosure was authorized by a compatible routine use, Plaintiff cannot establish a Privacy Act violation—even putting aside the fact that there was no willful or intentional violation of the statute.

At bottom, Plaintiff's case is based on her objection to the Department's policy decision to release Plaintiff's communications with Mr. Strzok to the media. While Plaintiff may disagree with the wisdom that decision, the evidence already before the Court demonstrates that the Department acted in good faith, with the clear understanding that the disclosure was legal, and therefore Plaintiff cannot prevail.

## ARGUMENT

### I. SUMMARY JUDGMENT IS APPROPRIATE ON THE CURRENT RECORD.

To start, the Court should reject Plaintiff's request to allow this case to proceed to discovery, because Plaintiff cannot prevail in light of the uncontroverted facts already in the record. As explained more fully in Defendants' opposition to Plaintiff's Rule 56(d) motion, discovery would be inappropriate in this case, which challenges a single disclosure under the Privacy Act, given that the government has already produced the declarations of three senior Department officials—including the ultimate decision-maker—attesting to the Department's basis and purpose for the disclosure of the text messages between Plaintiff and Mr. Strzok. Those declarations are entitled to a presumption of good faith, *see, e.g.*, *Fischer v. U.S. Dep't of Justice*, 723 F. Supp. 2d 104, 108 (D.D.C. 2010), and Plaintiff offers no valid reason to doubt their veracity. Plaintiff attacks the Department's account on the margins, relying on innuendo to characterize what Plaintiff calls the Department's "secretive process." Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 16, ECF No. 21 ("Opp'n"). Yet, Plaintiff does not challenge the key fact that Mr. Rosenstein believed—on the basis of information he sought from the person in the Department responsible for providing

3

authoritative advice regarding the legality of disclosures under the Privacy Act—that disclosing the text messages was permissible under that statute. The rest is just noise.

Plaintiff still makes the rather extraordinary claim that she is entitled to discovery in order to understand the "knowledge and motives" of "*all* officials whose conduct is relevant." Opp'n at 10, 13. For instance, Plaintiff faults the government for not providing a declaration from Mr. Schools, stating that the declarations in the record "do *not* address . . .when Mr. Schools had the relevant conversations; what, if anything, he told Mr. Winn about the relevant system or systems of records; and whether Mr. Schools provided any advice or analysis to Mr. Rosenstein beyond relaying Mr. Winn's conclusions." Opp'n at 12. Yet, none of those questions are material. Mr. Rosenstein, who was the Deputy Attorney General and the decision-maker regarding the disclosure, testified in his declaration that he sought advice from the appropriate Department official regarding whether disclosing the text messages to the media would be legal and relied on Mr. Winn's conclusion that the disclosure was permissible under the Privacy Act when authorizing their disclosure. Rosenstein Decl. ¶¶ 16–19. Plaintiff does not dispute those facts. And it is irrelevant, for example, what additional information, if any, Mr. Schools may have conveyed to Mr. Rosenstein at the time, because Mr. Rosenstein believed the disclosure to be legal following an appropriate inquiry.[1]

Plaintiff also misses the mark in claiming that she needs discovery to understand the role of Sarah Isgur, *see* Opp'n at 12–13, who was a senior official in the Department's Office of Public

---

[1] Similarly, Plaintiff argues that because Defendants lacked knowledge or information about Plaintiff's allegations about Department officials notifying the White House about the text messages and the White House subsequently notifying the media about them prior to the December 2 news articles, this "is a matter to be developed in discovery." Opp'n at 5 n.1, 33. But Plaintiff's Privacy Act claim is based solely on the December 12 disclosure to the media, not any previous disclosure. *See* Compl. ¶¶ 81–89, ECF No. 1.

Affairs ("OPA") at the time. Plaintiff directs much of her attention toward Ms. Isgur's communications with reporters and argues that discovery is necessary to determine whether the so-called "clandestine approach" to disclosing the text messages to reporters "was driven by Ms. Isgur or reflects instructions from her superiors." Opp'n at 13. But why is that relevant? As discussed below, there was nothing improper about how the Department released the text messages to the media. Putting that aside, and regardless of whether anyone instructed Ms. Isgur on the particulars of how she should give reporters access to the text messages, that information would not save Plaintiff's Privacy Act claim. Nothing in that statute, or the routine use for that matter, speaks to what time of day the government may release information, nor does it mandate that the government provide electronic copies when making disclosures or allow reporters to "source" the disclosed information to agency officials, as Plaintiff appears to suggest. *See* Opp'n at 16. Again, the undisputed and dispositive facts are that Mr. Rosenstein sought and received guidance from the relevant expert among the Department's career staff, and Mr. Rosenstein believed when authorizing the disclosure that doing so was lawful under the Privacy Act based on the authoritative guidance he received. Whatever additional facts Plaintiff might gather from discovery would be mere palace intrigue. They may be of interest to avid consumers of political journalism, but they are unmoored from the elements of a Privacy Act claim.

The case on which Plaintiff principally relies to argue that discovery is necessary, *Convertino v. U.S. Dep't of Justice*, 684 F.3d 93 (D.C. Cir. 2012), is a useful study in contrasts with the facts already before the Court here. In *Convertino*, the plaintiff brought a Privacy Act claim based on the allegedly willful or intentional disclosure of confidential information to a reporter by an unidentified Department employee, and the Department did not contend that the disclosure was authorized. *See id.* at 97. The plaintiff tried for several years through various means

5

to learn the identity of the person who allegedly disclosed the information, including by issuing a subpoena to the reporter, but the plaintiff was unsuccessful. The district court denied the plaintiff's motion to stay summary judgment proceedings in order to allow for additional discovery, and then entered summary judgment on behalf of the government. The D.C. Circuit then reversed the denial of the plaintiff's request for a stay, based on the plaintiff's "'monumental' efforts . . . to discover the needed information," and because the plaintiff "submitted ample evidence to suggest that additional discovery could reveal the source's identity." *Id.* at 101–02.

This case could not be more different. The court in *Convertino* allowed the case to go forward because the plaintiff could have plausibly obtained through additional discovery information that was *material* to his Privacy Act claim—*i.e.*, the identity of the person who allegedly leaked the information, which was necessary to determine whether there was a willful or intentional violation of the statute. *Id*. at 100. Here, the identity of the person who authorized the disclosure to the media is already known and is not in dispute. *See* Opp'n at 10 (acknowledging that Mr. Rosenstein "authorized disclosure of the messages to the media"). It is also clear from the existing record that Mr. Rosenstein authorized the disclosure with the belief that doing so would not violate the Privacy Act. *See* Rosenstein Decl. ¶¶ 14–19. The material facts are already known. Discovery would therefore only confirm—after a significant and unnecessary expenditure of resources and effort—that Defendants are entitled to judgment in their favor.

## II.     THE FBI IS ENTITLED TO SUMMARY JUDGMENT.

Plaintiff's opposition barely even attempts to show why the FBI should remain in this case. *See* Opp'n at 35. Defendants have submitted three separate sworn declarations, all of which indicate that the Department, and not the FBI, released the text messages to the media on December 12, 2017. *See* Rosenstein Decl. ¶¶ 15–18; Winn Decl. ¶¶ 4, 18; Boyd Decl. ¶ 12. Indeed, Plaintiff

does not even appear to dispute that fact. *See, e.g.*, Opp'n at 10 (acknowledging that Mr. Rosenstein authorized the disclosure).

Plaintiff's effort to keep the FBI in this case—such as it is—relies on sleight of hand. She states that the text messages may have been "contained in multiple systems of records," including the FBI's. *See* Opp'n at 35. Plaintiff's argument is that, even though it was the Department that authorized the disclosure to the media, *see* Rosenstein Decl. ¶¶ 15–18; Winn Decl. ¶¶ 4, 18; Boyd Decl. ¶ 12, and even though the Department received those text messages from OIG, *see* Rosenstein Decl. ¶ 9; Boyd Decl. ¶ 8, the FBI could still be liable for damages if the text messages were at some point in time also located on an FBI system of records, because those "systems [of records] may have been used to *facilitate* the disclosure," Opp'n at 35 (emphasis added).

Plaintiff's argument has no basis in law. Even assuming the text messages were, in fact, "contain[ed]" in an FBI system of records, in addition to a system of records maintained by OIG, their mere presence there would not violate the Privacy Act. The Privacy Act is implicated only when an agency *discloses* covered records from a "system of records," as that term is defined in the statute. *See Maydak v. United States*, 630 F.3d 166, 178 (D.C. Cir. 2010). Here, based on the Rosenstein, Winn, and Boyd declarations, there can be no serious question whether the FBI disclosed the text messages at issue: it did not. Furthermore, accepting Plaintiff's claim that the FBI could be liable under the Privacy Act—even though it did not authorize the disclosure— simply because the relevant records may have also been contained in an FBI system of records, and even though the Department received the records from OIG—would read out of the statute the clear requirement that a disclosure must be intentional and willful in order to make the agency liable for damages. *See* 5 U.S.C. § 552a(g)(4).

All of the material facts are clear. It was the Department, not the FBI, that disclosed the text messages to the media, and no amount of discovery could change that basic and dispositive fact. Defendants respectfully submit that the Court should grant summary judgment in Defendants' favor as to Plaintiff's claim against the FBI.

## III.   DEFENDANTS HAVE SHOWN CONCLUSIVELY THAT THERE WAS NO WILLFUL OR INTENTIONAL VIOLATION OF THE PRIVACY ACT.

For the reasons discussed below and in Defendants' opening brief, Plaintiff cannot establish a violation of the Privacy Act based on the Department's disclosure of the text messages to the media. But even if the Court were to disagree, Plaintiff cannot prevail, because the Department did not intentionally or willfully violate the statute, as established by the sworn declarations of one former and two current high-ranking Department officials. *See* 5 U.S.C. § 552a(g)(4) (requiring litigants to establish agency acted "in a manner which was intentional or willful" in order to obtain monetary damages); *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) (holding that plaintiff must show the government disclosed information "without grounds for believing it to be lawful, or by flagrantly disregarding others' rights").

The relevant facts are clear and are described above, but they are worth repeating: Before authorizing the disclosure of the text messages to the media, Mr. Rosenstein sought the advice of the senior career expert within the Department responsible for advising Department leadership regarding the lawfulness of proposed disclosures under the Privacy Act. *See* Rosenstein Decl. ¶ 16; *see also* Winn Decl. ¶ 4. That expert, Mr. Winn, reviewed the text messages and concluded that disclosing them to the media would not violate the Privacy Act, even assuming they were contained in a system of records. Winn Decl. ¶¶ 9–18. Then, based on Mr. Winn's analysis, Mr. Rosenstein authorized the disclosure with the understanding that doing so would not violate the Privacy Act. *See* Rosenstein Decl. ¶¶ 16–19. Plaintiff obviously disagrees with Mr. Winn's legal analysis and

Mr. Rosenstein's decision to release the text messages publicly, but there is no escaping the conclusion that Mr. Rosenstein acted based on this understanding and did not willfully or intentionally violate the Privacy Act. That should be the end of the matter. *See, e.g.*, *Sussman*, 494 F.3d at 1122 (requiring litigants to show that the "violation [was] so patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful").

Undaunted, Plaintiff works hard to try to muddy the waters and cast doubt on whether Mr. Rosenstein acted in good faith, *see* Opp'n at 14–21, but she ultimately fails to raise a question of material fact. Plaintiff relies heavily on the timing and circumstances surrounding the December 12, 2017 disclosure. She points out that the disclosure occurred in the evening and that the Department did not transmit the text messages to reporters electronically, which Plaintiff believes would have been "the most transparent and expeditious way to release them." Opp'n at 16. She also highlights that OPA initially instructed reporters not to "source" the text messages to the Department for a short time after their release, which Plaintiff suggests is evidence of some malfeasance. *Id.*

Plaintiff's reliance on the specific timing and method OPA used to allow reporters to review the text messages is a sideshow. Plaintiff attempts to craft a narrative that the Department employed a "secretive process" with respect to the release. But even if one were to accept Plaintiff's account, the dispositive fact remains that Mr. Rosenstein believed that the proposed disclosure was lawful after making the appropriate inquiry. *See* Rosenstein Decl. ¶¶ 18–19. Far from "flagrantly disregarding" Plaintiff's rights, Opp'n at 15 (quoting *Albright v. United States*, 732 F.2d 181, 189 (D.C. Cir. 1984)), Mr. Rosenstein was specifically concerned about whether the contemplated disclosure might implicate the Privacy Act, and he sought and obtained advice

from the appropriate career official to ensure the Department would be acting within the bounds of the law. *See* Rosenstein Decl. ¶ 16.

Moreover, even assuming the details of the method by which the Department released the text messages were somehow relevant, Plaintiff's account comes nowhere close to suggesting that the Department acted improperly. There is nothing unusual or "secretive" about OPA providing information to reporters (or to Congress) in the evening, particularly given that reporters often operate on tight publishing deadlines. The work of the Department does not automatically grind to a halt at 5:00 p.m. And, as reflected in materials already before the Court, Ms. Isgur did not limit her interactions with reporters to ordinary business hours. *See Strzok v. Barr*, No. 19-cv-2367-ABJ, Ex. A, ECF No. 36-3 (containing an email from Ms. Isgur to a reporter sent close to midnight).

Nor is there anything unusual about OPA establishing restrictions on how reporters review information (*e.g.*, without providing an electronic copy). The government in many instances declines to provide copies of materials to reporters or other third parties and sets limits on what the reporter may reveal—such as by providing information "on background." *See, e.g.*, *Muslim Advocates v. U.S. Dep't of Justice*, 833 F. Supp. 2d 92, 96 (D.D.C. 2011) (in a meeting, FBI officials showed draft guide to civil rights groups and required them to return it before leaving); *Judicial Watch v. Dep't of Defense*, 963 F. Supp. 2d 6, 9 (D.D.C. 2013) (Defense Department official provided name of Navy Seal to filmmaker and asked that filmmaker not reveal it); *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 837 (D.C. Cir. 2001) (Ambassador Albright displayed, but did not distribute, surveillance photographs to U.N. Security Council members). These practices do not suggest bad faith, particularly not here given that Mr. Rosenstein acknowledged in his testimony the following day the Department's disclosure and the fact that the

Department invited reporters to view the texts in its offices. *See Oversight Hearing with Deputy Attorney General Rod Rosenstein Before the H. Comm. On the Judiciary*, 115 Cong. 37, 63 (2017).[2]

Another theme of Plaintiff's effort to cast doubt on the clear evidence before the Court is to suggest that Mr. Winn may not have had sufficient time to review the proposed disclosure and conduct an adequate Privacy Act analysis, or that Mr. Rosenstein may not have actually received Mr. Winn's analysis before authorizing the disclosure. *See* Opp'n at 17–19. Plaintiff's argument cannot be taken seriously. Mr. Winn's declaration makes clear that he had an opportunity to review the redacted text messages before concluding that their disclosure would be lawful. *See* Winn Decl. ¶¶ 4, 16. Mr. Rosenstein's declaration states that he sought and received Mr. Winn's conclusions "[b]efore disclosing the text messages to the news media," Rosenstein Decl. ¶ 16, and that he authorized OPA to disclose the redacted texts to the media "with the express understanding that it would not violate the Privacy Act," *id.* ¶ 17. Plaintiff must therefore engage in linguistic acrobatics to suggest that perhaps Mr. Rosenstein had not received Mr. Winn's conclusion before he authorized the disclosure. *See* Opp'n at 17–18. But no honest reading of the Rosenstein and Winn declarations supports Plaintiff's argument, *see, e.g.*, Rosenstein Decl. ¶¶ 16–18; Winn Decl. ¶¶ 4–5, 18. It is also of no moment that Mr. Winn later authored a memorandum to the file committing

---

[2] Plaintiff claims that the Department should get "no credit" for acknowledging its disclosure of the text messages after it was known publicly the following day that the Department provided the text messages to the media. *See* Opp'n at 16–17. Plaintiff's point only highlights the absurdity of her suggestion that the Department attempted to employ a "secretive process" for some nefarious purpose. *Id.* at 16. As is borne out by the facts, it would have been naïve in the extreme for anyone involved in the December 12, 2017 disclosure of the text messages to various news outlets to believe that the details surrounding the disclosure would not come to light. Indeed, Congress asked Mr. Rosenstein about the specifics the following day during his testimony. But even if Congress had not asked, the details were bound to be disclosed (and ultimately were disclosed, as evidenced in Plaintiff's exhibits) both by the reporters involved and/or in response to Freedom of Information Act ("FOIA") requests.

his analysis to writing, which is common after providing advice orally and does not change the fact that he concluded on December 12, 2017 that there would be no Privacy Act violation resulting from a public disclosure of the text messages. *See* Opp'n at 17.

Further, Plaintiff cites no authority to support her suggestion that there is some minimum amount of time—for example, a certain number of hours or even days—that Mr. Winn needed to spend reviewing the text messages and considering the question before it would be appropriate for Mr. Rosenstein to rely on his analysis. *See* Opp'n at 18–19 (pointing out that "ADAG Schools provided Mr. Winn the redacted text messages to review . . . just hours before reporters were invited to the Department to review them"); *id.* at 31 (apparently criticizing the Department for making the decision "in hours"). As head of OPCL, Mr. Winn is the Department's primary expert on disclosures under the Privacy Act. He is the person responsible for advising Department leadership on whether a proposed disclosure is permissible under the statute, and he has extensive knowledge and experience in the field. *See* Winn Decl. ¶¶ 1–3. His considered judgment, based on his expertise and his review of the text messages, was that the disclosure would not violate the Privacy Act, Winn Decl. ¶ 18. Moreover, and crucially, Mr. Rosenstein reasonably relied on Mr. Winn's analysis when authorizing the disclosure, Rosenstein Decl. ¶¶ 16–19. Based on the uncontroverted facts before the Court, there was certainly nothing close to the sort of conduct "greater than gross negligence" or "flagrant disregard[]" of Plaintiff's rights that would be required for her to prevail. *Tijerina v. Walters*, 821 F.2d 789, 799 (D.C. Cir. 1987).

## IV.   THE PRIVACY ACT AUTHORIZED THE DEPARTMENT'S DISCLOSURE OF THE TEXT MESSAGES.

Even if Plaintiff could somehow get past the dispositive fact that the Department did not willfully or intentionally violate the Privacy Act, the Department is entitled to summary judgment because the disclosure of the text messages is compatible with the purposes for which the

documents were collected and because it was authorized by a routine use—specifically routine use (k)—contained within OIG's SORN, assuming they were held within a system of records at all. *See* Mem. in Supp. of Defs.' Mot. for Summ. J. at 13-22, ECF No. 14-1 ("Defs.' Mem."). Plaintiff attempts to refute those legal conclusions by pointing to questions of fact that remain—though none of them are legally relevant and therefore cannot defeat Defendants' motion for summary judgment.

### A.      The Department Properly Relied on the OIG's SORN.

Plaintiff claims, incorrectly, that the Department has not established the "Factual Predicates" to rely on the relevant routine use in the OIG's SORN. Opp'n at 22. While Plaintiff acknowledges that the OIG's SORN contains the routine use through which the Department disclosed the text messages, Plaintiff argues that the disclosure may still violate the Privacy Act because Defendants "have not established that they retrieved and disclosed Ms. Page's text messages *solely* from the OIG-001 system." Opp'n at 22. Plaintiff's assertion is incorrect as a factual matter, as Mr. Rosenstein's sworn declaration clearly states that the Department received from OIG the text messages disclosed to the media. *See* Rosenstein Decl. ¶ 9; *see also* Boyd Decl. ¶ 8. Thus, to the degree the text messages were contained in any relevant system of records, and that any SORN is applicable, it is OIG's.

Plaintiff attempts to muddy the waters by pointing to language in Mr. Winn's declaration that he "assumed" for the purposes of his analysis that the records came from an OIG system of records. Opp'n at 22, 24 (citing Winn Decl. ¶¶ 8–9). But Plaintiff grounds her argument in a misunderstanding of Mr. Winn's analysis. When Mr. Winn analyzed the text messages prior to their disclosure to the media, he assumed for the purposes of argument, and in the light most favorable to Plaintiff and Mr. Strzok, that the text messages were, in fact, contained within OIG's system of records. As Mr. Winn explained in his declaration, "emails and text messages maintained

in the Department's general archives have not constituted 'records' in a 'system [of] records' that would be subject to the Privacy Act." Winn Decl. ¶ 8. Of course, if that assumption were incorrect, and the text messages the Department received from OIG were not, in fact, contained in a system of records, the Privacy Act would not apply *at all*. *See* 5 U.S.C. § 552a(b).

Plaintiff points out that the relevant text messages may have been contained in "*multiple*" systems of records. *See* Opp'n at 23. That is conceivable, but it is also irrelevant, because there can be no dispute that ODAG received the text messages that were disclosed from OIG, *see* Rosenstein Decl. ¶ 9, and that routine use (k) of the OIG's SORN allows certain disclosures to the media, 72 Fed. Reg. 36,725, 36,726 (July 5, 2007). The Privacy Act authorizes disclosure of agency records when authorized by "*a* routine use" published in the Federal Register. 5 U.S.C. § 552a(b)(3) (emphasis added). It does not, as Plaintiff would have the Court believe, require the government to ensure that the disclosure is permitted by the SORN of *all other* systems of records in which the same information may also be stored. As discussed above with respect to the FBI, the result of Plaintiff's argument would be to eliminate altogether the requirement for litigants to establish willfulness or intentionality in order to recover money damages, because any other government agency or component that may have stored the same records was not involved in the decision to disclose the text messages. *See* Part I, *supra*; *see also* 5 U.S.C. § 552a(g)(4).

Finally, even if one were to assume that the text messages were located within a system of records maintained by the Office of the Deputy Attorney General ("ODAG"), after that component received the text messages from OIG, the result would be the same, and Defendants would still be entitled to summary judgment. The ODAG SORN, "General Files System of the Deputy Attorney General," JUSTICE/DAG-013, includes a routine use that is substantively identical to routine use (k) of the OIG SORN, relied on by Mr. Winn in his December 12, 2017 analysis. *See* Privacy Act

of 1974; Systems of Record, 57 Fed. Reg. 8473, 8474 (Mar. 10, 1992) ("These records may be disclosed to the news media and the public pursuant to 28 C.F.R. 50.2 unless it is determined that release of the specific information in the context of a particular case would constitute an unwarranted invasion of privacy."). Mr. Winn's analysis would therefore apply equally, even if the ODAG SORN were to govern.

> **B.**  **The Department's Disclosure to the Media Was Compatible with the Purposes for Which Those Records Were Collected.**

The record conclusively establishes that the Department's purpose for releasing Plaintiff's text messages to the media is compatible with the purpose for which OIG collected the messages during its review. *Compare* Rosenstein Decl. ¶¶ 5, 13, 18 (noting that the purpose of the disclosure was to further the Department's goal of being transparent and forthcoming with the public about potential misconduct), *with A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election* at i ("OIG Report") (noting that the purpose of the review was to respond to public and congressional concerns regarding the Department's and the FBI's handling of the Midyear investigation), https://www.justice.gov/file/1071991/download. Plaintiff's arguments to the contrary are meritless.

> 1.   The Department Correctly Applied the Compatibility Test.

Plaintiff contends that the Department's December 12, 2017 disclosure fails the compatibility requirement because it was not for the purpose of "facilitat[ing] OIG's review of the FBI's Midyear investigation," as required by OIG's SORN. Opp'n at 25–26 (citing 72 Fed. Reg. 36,725). Plaintiff is incorrect. The compatibility requirement does not limit disclosures under the OIG's SORN to those made "in the course of investigating individuals and entities suspected of having committed illegal or unethical acts[.]" *Id.* at 25 (quoting 72 Fed. Reg. at 36,725). Rather, as the text of the SORN expressly provides, "[t]he primary purpose of the system is to enable

[OIG] to carry out its responsibilities under the Inspector General Act of 1978, as amended, 5 U.S.C. App. 3, including its responsibility to conduct and supervise investigations relating to programs and operations of the Department." 72 Fed. Reg. at 36,725. That makes sense. Otherwise, under Plaintiff's reading, multiple other routine uses in OIG's SORN would also be invalid. For instance, disclosures "in connection with the hiring or continued employment of an employee or contractor" by "state, local territorial, or tribal law enforcement or detention agencies" (routine use (e)); disclosures to "the National Archives and Records Administration for purposes of records management inspections" (routine use (j)); and disclosures to "the news media and the public" (routine use (k)), clearly serve an information purpose, and are not made in the course of *investigating* potential misconduct. *See* Fed. Reg. at 36,726.

In any event, the relevant inquiry here is whether "the purpose for the collection of the record *in [this] specific case* and the purpose of the disclosure" are compatible. *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 548–49 (3d Cir. 1989) (emphasis added); *see also Chichakli v. Tillerson*, 882 F.3d 229, 233 (D.C. Cir. 2018). As the OIG Report itself states, the purpose of OIG's review was to respond to Congress's and the public's concern about potential misconduct during the Midyear investigation, particularly "allegations that certain investigative decisions were based on improper considerations." *See* OIG Report at i. There can be no dispute, then, that the Department's reason for the disclosure—to be transparent with the public about potential misconduct, *see* Rosenstein Decl. ¶ 18—satisfies the compatibility threshold. *See Ames v. U.S. Dep't of Homeland Security*, 861 F.3d 238, 240 n.1 (D.C. Cir. 2017) (requiring, at most, a "nexus approaching an identity of purpose").

Plaintiff's only real rejoinder is to fault the Department for defining its purpose at "a level of generality" that "would render [the compatibility requirement] largely meaningless," Opp'n at

26, but that argument fares no better. Accepting that public transparency is a legitimate purpose for which records subject to OIG's SORN may be disclosed does not mean that the government can "justify virtually *any* disclosure of individual records from a pending OIG investigation involving a matter of public interest," *id.* To the contrary, as detailed in Mr. Winn's declaration, routine use (k) requires that the Department assesses—on a case-by-case basis—whether a disclosure would constitute an "unwarranted invasion of personal privacy" by balancing the public's interest in disclosure against the individual's privacy interests in the records. *See* Winn Decl. ¶¶ 11–18. Nor would the Department's interpretation of OIG's SORN create a *de facto* exception for all "information [that] could enter the public domain in the future through other means," Opp'n at 27. To be sure, Mr. Winn considered the fact that Plaintiff's text messages would likely be released by Congress the very next day. *See* Winn Decl. ¶ 16. But, as his declaration makes clear, that fact was but one of many considerations in his thorough Privacy Act analysis. *See id.* at ¶¶ 11–18 (noting that Plaintiff's privacy interest was also diminished by the fact that the communications took place on her FBI issued cell-phone; that the texts were exchanged with another high-ranking FBI official; and that the existence of the messages had already been reported on by multiple media outlets).

Plaintiff also points out at several points in her brief that the OIG's review of various actions by the FBI and the Department in connection with its investigation into the use of a private email server by former Secretary of State Clinton was still ongoing on December 12, 2017. *See, e.g.*, Opp'n at 4, 15, 26, 29. There is no dispute in that regard. Yet, Plaintiff fails to provide any doctrinal basis to believe that the ongoing nature of the OIG's review is in any way relevant. Plaintiff may be attempting to suggest that the Department's disclosure of the text messages does not meet the compatibility test because the disclosure could have interfered with the OIG's

investigation. If so, Plaintiff's claim is meritless. It is a matter of public record that the Department did not consult OIG regarding the release of the text messages to the media. *See* Def.'s Mem. at 7 n.3 However, OIG did not object to the Department's release of the text messages to Congress, provided that the Department determined there were no legal restrictions to doing so, *id.*, and Mr. Rosenstein was specifically advised "that the disclosure would not interfere with any ongoing investigation." Rosenstein Decl. ¶ 11. It is implausible to believe that OIG would have signed off on the disclosure to Congress, even conditionally, if there was a risk that making the information public would have compromised the investigation, as members of Congress are generally not subject to restrictions, such as those under the Privacy Act, that would prevent them from disseminating information to the public.

2.    <u>Plaintiff's Speculation about the Department's Motives Has No Bearing on the Compatibility Analysis</u>.

Perhaps recognizing that the government's stated (and accurate) purpose satisfies the compatibility requirement, Plaintiff dedicates the bulk of her compatibility argument to attacking its credibility instead. *See* Opp'n at 25–26 (stating that OIG "emphatically disclaimed any role in the December 12 disclosure" (italics omitted)); *id*. at 27 (arguing that the "factual circumstances associated with the December 12 disclosure make clear that it was highly unusual"). But that is a red herring. As discussed above, the sworn statement of Mr. Rosenstein—the decision-maker— that the disclosure was motivated by the Department's goal of public transparency, *see* Rosenstein Decl. ¶ 18, is entitled to a presumption of good faith. *See, e.g.*, *Corel*, 165 F. Supp. 2d at 35 ("To justify departing from the presumption that government officials act in good faith in the discharge of their duties, the plaintiff 'must allege and prove, by clear and strong evidence, specific acts of bad faith on the part of the government'"). Neither the logistics of the disclosure nor OIG's statement has anything to do with Mr. Rosenstein's well-founded belief that the disclosure would

18

comport with the Privacy Act and his intention of furthering public transparency. *See* Defs.' Mem. at 22, 25; Part III, *supra*. Plaintiff's mere speculation to the contrary cannot defeat Defendants' motion for summary judgment.

**C.      The Department Properly Relied on Routine Use (k) from the OIG SORN.**

1.      <u>Routine Use (k) Permits the Department's Disclosure to the Media</u>.

Plaintiff makes several attempts to show why the disclosure does not fall within routine use (k) of the OIG SORN, none of which is convincing. Plaintiff suggests that the Court should interpret routine use (k) to apply only to, "for example, the release of final OIG reports summarizing the Inspector General's findings and conclusions." Opp'n at 28. But Plaintiff misreads the actual text of the routine use, which states that "*[r]ecords in this system* may be disclosed . . . [t]o the news media and the public, including disclosures pursuant to 28 C.F.R. 50.2, unless it is determined that release of the specific information in context of a particular case would constitute an unwarranted invasion of personal privacy." 72 Fed. Reg. at 36,725–26 (emphasis added). Nothing in the text of the OIG SORN limits the Department to providing information to the media only when it is part of an official OIG report. *See* 72 Fed. Reg. at 36,725 (describing "Categories of Records in the System," of which "reports" are only one). Plaintiff's interpretation of the SORN, moreover, would lead to absurd results, preventing the Department from commenting to the public on the details of the OIG's work, even on matters of great national importance, and even when there is no investigatory or law enforcement justification for withholding the information.

Plaintiff also quotes from a Department regulation governing the release of information to suggest that the disclosure of the text messages was improper. *See* Opp'n at 29 (quoting 28 C.F.R. § 50.2(c)(1)). Plaintiff's argument suffers from at least two fatal flaws. First, routine use (k) states the Department may release information "[t]o the news media and the public, *including disclosures*

*pursuant to 28 CFR 50.2*, unless it is determined that release of the information in the context of a particular case would constitute an unwarranted invasion of personal privacy." 72 Fed. Reg. at 36,726 (emphasis added). Given that the SORN expressly allows for disclosures of the type described in that regulation when the Department has made the predicate determination regarding personal privacy, Plaintiff's argument that the Department somehow acted "contrary" to either the SORN or the regulation is nonsensical. Opp'n at 29. Furthermore, the portion of the regulation Plaintiff cites, 28 C.F.R. § 50.2(c)(1), applies only to the disclosure of information "associated with a civil action" where "there is a reasonable likelihood that such dissemination will interfere with a fair trial." Plaintiff does not even attempt to argue that an ongoing OIG review is a "civil action" or that there was the possibility of a "trial."

Plaintiff also relies on testimony by the Inspector General ("IG") from December 2019, in which he said that it would be inappropriate for OIG investigators to give interviews regarding an ongoing investigation. *See* Opp'n at 29 (quoting *Crossfire Hurricane Report Hearing before the S. Comm. On the Judiciary*, 116th Cong. (Dec. 11, 2019)). The IG's testimony, however, does not include any analysis of the relevant routine use, or whether it would be permissible under the Privacy Act to release information to the public in any specific instance. The IG said that "giving preliminary ideas, advice, guidance statements, can be misleading and you should not be releasing final conclusions until you get to the end of the investigations." *See id*. But none of those things occurred here. The Department determined that a discrete set of information was appropriate for release because, among other reasons, doing so would be in the public interest, and because the information would likely be public soon after it was disclosed to Congress. *See* Rosenstein Decl. ¶ 18; *see also* Winn Decl. ¶¶ 10–18.

Left with no valid argument based in the text of the routine use, Plaintiff next tries to create an issue of material fact based on an email from a Reuters reporter, Mark Hosenball, in which he suggested that the Department's disclosure was somehow unique based on his discussions with "one or two people," neither of whom are identified. *See* Opp'n at 29 (citing Jeffress Decl., Ex. D). Fortunately, the Court need not rely on that sort of second- or third-hand information to evaluate Plaintiff's claim. Regardless of what Mr. Hosenball or his source(s) may think of the disclosure, routine use (k), on its face, covers the Department's disclosure to the media, because the Department determined in the context of a particular case that the disclosure would not constitute an unwarranted invasion of personal privacy. The details of that disclosure—such as the time of day it was made or the fact that OIG's review was ongoing—are simply immaterial.

Plaintiff further claims that, if the routine use were interpreted to allow the December 12, 2017 disclosure, it "would not provide sufficient notice to someone in Ms. Page's position" regarding the potential that the messages could be disclosed. Opp'n at 30 (citing *Dinh Tran v. Dep't of Treasury*, 351 F. Supp. 3d 130, 137 (D.D.C. 2019)). Yet, the Department unquestionably published routine use (k) in the Federal Register, *see* 72 Fed. Reg. at 36,726, and that routine use plainly describes when it authorizes the Department to use its discretion to release information to the media—*i.e.*, at any time "unless it is determined that release of the specific information in the context of a particular case would constitute an unwarranted invasion of personal privacy." *Id.* Plaintiff's notice argument therefore lacks merit. *Compare Tran*, 351 F. Supp. 3d at 136–37 (rejecting the government's interpretation of the word "benefit" to include a "work detail," which the court concluded was an overbroad interpretation of the relevant SORN).

Plaintiff's fallback argument is that routine use (k) is overly broad because, if interpreted to allow disclosures to the media when the public interest outweighed the relevant privacy interest,

it would undermine the purposes of the Privacy Act. *See* Opp'n at 30. Plaintiff's argument proves too much, because the Department, including OIG, is *required*, in the context of a FOIA request, to disclose information contained in certain of its records if it determines that the relevant privacy interests are outweighed by the public interest in disclosure, and a required disclosure under FOIA is an exception to the Privacy Act. *See* 5 U.S.C. § 552(b)(6), (b)(7)(C); *id.* § 552a(b)(2). That is the same balancing contemplated by the OIG routine use, *see* 72 Fed. Reg. at 36,726, and that the Department conducted before releasing Plaintiff's records, *see* Winn Decl. ¶¶ 10–18; *see also* Rosenstein Decl. ¶¶ 13, 16. Congress clearly contemplated that agencies would, and should, disclose certain material to the public where, as here, there is a substantial public interest in doing so, even when the proposed disclosure may implicate privacy interests. *See Getman v. NLRB*, 450 F.2d 670, 674–75 (D.C. Cir. 1971). And, for that reason alone, an agency does not act contrary to the Privacy Act when the public interest in disclosure outweighs the privacy interests of the individual. *See* 5 U.S.C. § 552a(b)(2); *id*. § 552 (b)(6), (b)(7)(C).

2. The Department Made the Necessary Predicate Determination under Routine Use (k) before Disclosing the Text Messages to the Media.

Finally, Plaintiff spends several pages of her brief trying to convince the Court that there is a question of material fact regarding whether the Department's disclosure constituted an unwarranted invasion of her personal privacy. *See* Opp'n at 30–34. Plaintiff's argument is untethered to the Privacy Act, which allows disclosures of information contained in an agency system of records if authorized by a routine use published in the Federal Register. *See* 5 U.S.C. § 552a(b)(3). As relevant here, routine use (k) from the OIG's SORN permits the disclosure of information "[t]o the news media and the public . . . *unless it is determined* that the release of the specific information in the context of a particular case would constitute an unwarranted invasion of personal privacy." 72 Fed. Reg. at 36,726 (emphasis added). But the Department did not

conclude that there would be an unwarranted invasion of personal privacy caused by the disclosure. To the contrary, the senior career official responsible for advising Department leadership regarding the lawfulness of proposed disclosures under the Privacy Act, Mr. Winn, determined the exact opposite. Mr. Winn attested that, after a careful balancing of the individuals' privacy interests and the public interest, he concluded that the disclosure would *not* constitute an unwarranted invasion of personal privacy. *See* Winn Decl. ¶¶ 11–18. And Plaintiff does not dispute that, when authorizing the disclosure of text messages, Mr. Rosenstein relied on Mr. Winn's conclusion. *See* Rosenstein Decl. ¶¶ 16–18. The Department therefore made the appropriate predicate finding, and the disclosure falls squarely within routine use (k). No additional factual development is required.

Even assuming the Court were required to engage in an actual weighing of Plaintiff's privacy interests for the purposes of summary judgment—which it is not, both under the terms of routine use (k) and because Mr. Rosenstein believed the disclosure was lawful—Plaintiff fails to offer any reason to question Mr. Winn's conclusion that the disclosure would not constitute an *unwarranted* invasion of her privacy interest. Plaintiff faults the Department for not "starting from the premise that the agency should shield sensitive personal information about employees collected during an internal investigation." Opp'n at 31. Yet the text messages were redacted to remove purely personal information prior to their release. *See* Rosenstein Decl. ¶ 13; Winn Decl. ¶ 4; Boyd Decl. ¶ 9. Plaintiff "vigorously disputes" whether the redactions were properly applied, Opp'n at 32, but it is inaccurate to say that the Department did not take steps to protect personal privacy.

Plaintiff also all but ignores Mr. Winn's thoughtful explanation of his analysis, in which he considered both Plaintiff's and Mr. Strzok's privacy interests but concluded that they were diminished based on the particular circumstances and ultimately outweighed by the public interest. *See* Winn Decl. ¶¶ 11–18. Nowhere in Plaintiff's brief does she credit, for example, that she and

Mr. Strzok exchanged the text messages using FBI-issued devices that were subject to monitoring. *Id.* ¶ 14. Plaintiff also essentially ignores that the messages exhibited strong political opinions that called into question her impartiality regarding matters related to her duties; the great public interest in the subject matter; that the communications were exchanged with another high-ranking FBI official; that the existence of the communications was already public; and that Congress (which is not subject to the Privacy Act) also received the same messages. *See id.* ¶¶13–15; *see also* Opp'n at 30 (acknowledging that the messages were generated "in the course of her employment"). All of those factors were important pieces in Mr. Winn's analysis and undermine any claim that the Department failed to weigh Plaintiff's privacy interests properly.

Plaintiff also quotes selectively from the OIG Report to suggest that the text messages were exclusively "of a personal nature, including discussions about their families, medical issues, and daily events." Opp'n at 32 (quoting OIG Report at 398). That is not the case. The OIG Report does acknowledge that many of the over 40,000 text messages exchanged between Plaintiff and Mr. Strzok were personal in nature, but the specific 375 messages disclosed to the media consisted only of the subset that OIG identified as inappropriate and particularly troubling, and they were redacted to remove certain personal information before they were disclosed. *See* Rosenstein Decl. ¶¶ 9, 13; Winn Decl. ¶ 9; Boyd Decl. ¶ 12; *see also* OIG Report at 398 (describing various categories of text messages between Plaintiff and Mr. Strzok "that raised concern about political bias in FBI investigations," "specifically highlight[ing some] text messages because Strzok and Page played important roles in investigations involving both Trump and Clinton, and the exchange of these text messages on an FBI-issued device potentially created the appearance of bias").

Along the same lines, also absent from Plaintiff's brief is any acknowledgement that her communications with Mr. Strzok gave rise to a troubling appearance of bias on behalf of the

Department and the FBI on a matter of the highest public concern. Plaintiff again attempts to shield herself from Mr. Winn's analysis by misstating what the OIG found in its report. Plaintiff cites to the OIG's conclusion that the bias reflected in her and Mr. Strzok's text messages did not "directly affect[ ] specific investigations decisions." OIG Report at iii; *see also* Opp'n at 31. And Plaintiff goes further to claim that "there is no question that the Inspector General was in a far better position to draw conclusions following its 16-month investigation than Mr. Winn and Mr. Rosenstein were on the evening of December 12." Opp'n at 31–32. But Plaintiff confuses bias that directly affects an investigation with bias that is a matter of great public concern. Indeed, Plaintiff omits from her brief that the OIG was concerned "[i]n particular" about "text messages exchanged by FBI Deputy Assistant Director Peter Strzok and Lisa Page, Special Counsel to the Deputy Director, that potentially indicated or created the appearance that investigative decisions were impacted by bias or improper considerations." OIG Report at iii. Mr. Winn properly relied on those same concerns in concluding that there was a strong public interest in disclosing the text messages, which "was sufficient to shift the presumption from protecting personal privacy to one favoring public transparency." Winn Decl. ¶ 17. Contrary to Plaintiff's suggestion, the OIG's conclusions support Mr. Winn's analysis and further weigh in favor of summary judgment.

## CONCLUSION

For the reasons stated above, in Defendants' opening brief, and in Defendants' opposition to Plaintiff's Rule 56(d) motion, the Court should enter judgment in favor of Defendants.

Dated: May 11, 2020                    Respectfully submitted,

                                       JOSEPH H. HUNT
                                       Assistant Attorney General

                                       MARCIA BERMAN
                                       Assistant Branch Director

*/s/ Bradley P. Humphreys*
BRADLEY P. HUMPHREYS
GRACE X. ZHOU
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20001
Phone: (202) 305-0878
Fax: (202) 616-8460
Bradley.Humphreys@usdoj.gov

*Counsel for Defendants*